APPEAL,CLOSED,OPEN_MJ

Email All Attys

Email All Attys and Secondary Emails

# US District Court Electronic Case Filing System
## District of Utah (Central)
## CIVIL DOCKET FOR CASE #: <u>2:17–cv–01328–DAK</u>

K. et al v. United Behavioral Health et al
Assigned to: Judge Dale A. Kimball
Cause: 29:1001 E.R.I.S.A.: Employee Retirement

Date Filed: 12/29/2017
Date Terminated: 06/22/2021
Jury Demand: None
Nature of Suit: 791 Labor: E.R.I.S.A.
Jurisdiction: Federal Question

**<u>Plaintiff</u>**

**David K.**                    represented by   **Brian S. King**
BRIAN S KING PC
420 E SOUTH TEMPLE STE 420
SALT LAKE CITY, UT 84111
(801)532–1739
Email: brian@briansking.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nediha Hadzikadunic**
GROSS & ROONEY
136 E SOUTH TEMPLE STE 1500
SALT LAKE CITY, UT 84111
801–935–4611
Email: nedihahk@grossrooney.com
*TERMINATED: 10/16/2020*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Kathleen K.**                 represented by   **Brian S. King**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nediha Hadzikadunic**
(See above for address)
*TERMINATED: 10/16/2020*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Amy K.**                      represented by   **Brian S. King**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nediha Hadzikadunic**
(See above for address)
*TERMINATED: 10/16/2020*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United Behavioral Health**            represented by **Clint R. Hansen**
FABIAN VANCOTT
215 S STATE ST STE 1200
SALT LAKE CITY, UT 84111–2323
(801)531–8900
Email: chansen@fabianvancott.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael H. Bernstein**
ROBINSON & COLE LLC
CHRYSLER E BLDG
666 THIRD AVE 20TH FL
NEW YORK, NY 10017
212–451–2940
Fax: 212–451–2999
Email: mbernstein@rc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott M. Petersen**
FABIAN VANCOTT
215 S STATE ST STE 1200
SALT LAKE CITY, UT 84111–2323
(801)531–8900
Email: spetersen@fabianvancott.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Alcatel–Lucent Medical Expense Plan**      represented by **Clint R. Hansen**
**for Active Management Employees**      (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael H. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott M. Petersen**

2

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 12/29/2017 | 1 | | Case has been indexed and assigned to Magistrate Judge Dustin B. Pead. Plaintiffs Amy K., David K., Kathleen K. is directed to E–File the Complaint and cover sheet (found under Complaints and Other Initiating Documents) and pay the filing fee of $ 400.00 by the end of the business day. <br> NOTE: The court will not have jurisdiction until the opening document is electronically filed and the filing fee paid in the CM/ECF system. <br> Civil Summons may be issued electronically. Prepare the summons using the courts PDF version and email it to utdecf_clerk@utd.uscourts.gov for issuance. (nl) (Entered: 12/29/2017) |
| 12/29/2017 | 2 | | COMPLAINT against Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health (Filing fee $ 400, receipt number 1088–2909361) filed by Kathleen K., David K., Amy K.. (Attachments: # 1 Civil Cover Sheet civil cover sheet) Assigned to Magistrate Judge Dustin B. Pead (King, Brian) (Entered: 12/29/2017) |
| 04/03/2018 | 3 | | Stipulated MOTION for Extension of Time to File Answer re 2 Complaint, and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Attachments: # 1 Text of Proposed Order) Attorney Scott M. Petersen added to party Alcatel–Lucent Medical Expense Plan for Active Management Employees(pty:dft), Attorney Scott M. Petersen added to party United Behavioral Health(pty:dft)(Petersen, Scott) (Entered: 04/03/2018) |
| 04/04/2018 | 4 | | NOTICE OF ADR, e–mailed or mailed to Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health, Plaintiffs Amy K., David K., Kathleen K.. (las) (Entered: 04/04/2018) |
| 04/04/2018 | 5 | | NOTICE – This case is assigned to a magistrate judge. To consent or request reassignment, use the form on this link or use the included form for non–efilers and send it to consents@utd.uscourts.gov <br> within 15 days or mail to the court with *Attention: Consent Clerk* on the envelope. Notice e–mailed or mailed to Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health, Plaintiffs Amy K., David K., Kathleen K.. Form due by 4/19/2018. (las) (Entered: 04/04/2018) |
| 04/04/2018 | 6 | | ORDER granting 3 Motion for Extension of Time to Answer re 2 Complaint. Answer deadline updated for Alcatel–Lucent Medical Expense Plan for Active Management Employees answer due 5/3/2018; United Behavioral Health answer due 5/3/2018. Signed by Magistrate Judge Dustin B. Pead on 3/4/2018. (las) (Entered: 04/04/2018) |
| 04/04/2018 | 7 | | RECEIVED Consent/Reassignment Form from Plaintiffs Amy K., David K., Kathleen K.. (las) (Entered: 04/04/2018) |
| 04/23/2018 | 8 | | NOTICE REMINDER – All parties are requested to respond within the time frame set forth in the 5 Notice of Presiding Magistrate Assignment,, pursuant to General Order 07–001. If you have already consented/objected, please disregard this notice. No judge will be informed of a party's response unless all parties have consented to the assignment of the matter to a U.S. Magistrate Judge. Unless consents from all parties are received within fifteen(15) days, the case will be randomly re–assigned to a U.S. District Judge without further notice. <br> Link to Magistrate Consent Objection form (las) (Entered: 04/23/2018) |

| 04/24/2018 | 9 | | RECEIVED Consent/Reassignment Form from Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (las) (Entered: 04/24/2018) |
| 04/24/2018 | 10 | | All Consent/Reassignment Forms have now been received. After review of all forms, Case Reassigned to District Judge per request of one or more party(s). Case randomly assigned to Judge Clark Waddoups. Magistrate Judge Dustin B. Pead no longer assigned to the case. (las) (Entered: 04/24/2018) |
| 04/25/2018 | 11 | | AMENDED COMPLAINT against Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. filed by Kathleen K., David K., Amy K.. (King, Brian) (Entered: 04/25/2018) |
| 04/30/2018 | 12 | | ORDER OF RECUSAL – Judge Clark Waddoups recused. Case reassigned to Judge Dale A. Kimball for all further proceedings. Signed by Judge Clark Waddoups on 4/30/18. (jmr) (Entered: 04/30/2018) |
| 05/09/2018 | 13 | | Stipulated MOTION for Extension of Time to File Answer re 2 Complaint, and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Attachments: # 1 Text of Proposed Order Extending Answer Deadline)(Petersen, Scott) (Entered: 05/09/2018) |
| 05/09/2018 | 14 | | ORDER granting 13 Stipulated Motion for Extension of Time to Answer or Otherwise Respond to Plaintiffs' 11 Amended Complaint. Answer deadline updated for Alcatel–Lucent Medical Expense Plan for Active Management Employees, and for United Behavioral Health: Answer due 6/8/2018. Signed by Judge Dale A. Kimball on 5/9/2018. (eat) (Entered: 05/09/2018) |
| 06/07/2018 | 15 | | MOTION to Amend/Correct 11 Amended Complaint and Memorandum in Support filed by Plaintiffs Amy K., David K., Kathleen K.. (Attachments: # 1 Exhibit proposed second amended complaint)(King, Brian) (Entered: 06/07/2018) |
| 06/12/2018 | 16 | | Stipulated MOTION for Extension of Time to Respond to Amended Complaint and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Attachments: # 1 Text of Proposed Order Granting Extension of Time to Respond to Amended Complaint)(Petersen, Scott) (Entered: 06/12/2018) |
| 06/12/2018 | 17 | | ORDER granting 16 Stipulated Motion for Extension of Time. Defendants shall have to and including 14 days following the Court's ruling on Plaintiff's motion for leave to file a second amended complaint to move, answer, or otherwise respond to Plaintiffs' most current complaint on file with the Court. Signed by Judge Dale A. Kimball on 6/12/2018. (eat) (Entered: 06/12/2018) |
| 07/02/2018 | 18 | | ORDER granting 15 Motion to Amend/Correct 11 Amended Complaint. The motion was filed on June 7, 2018, and no opposition has been filed although the time for doing so has passed. For good cause appearing, the court GRANTS the Motion for Leave to File Amended Complaint. Signed by Judge Dale A. Kimball on 7/2/18. (jlw) (Entered: 07/02/2018) |
| 07/03/2018 | 19 | | AMENDED COMPLAINT against Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. filed by Kathleen K., David K., Amy K.. (King, Brian) (Entered: 07/03/2018) |
| 07/16/2018 | 20 | | MOTION to Dismiss and Memorandum in Support *to Transfer Venue* filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Attachments: # 1 Exhibit Declaration of Scott Petersen in Support of Motion to Dismiss or Transfer Venue, # 2 Exhibit A, # 3 Exhibit Declaration of Ingrid Orav in Support of Motion to Dismiss or Transfer Venue, # 4 Exhibit A1, # 5 Exhibit A2)(Petersen, Scott). Added MOTION to |

| | | | |
|---|---|---|---|
| | | | Change Venue on 7/17/2018 (eat). (Entered: 07/16/2018) |
| 08/13/2018 | 21 | | Stipulated MOTION for Extension of Time Opposition to Motion to Transfer filed by Plaintiffs Amy K., David K., Kathleen K.. (Attachments: # 1 Text of Proposed Order Proposed Order)(King, Brian) Modified by changing event type to motion for extension of time to file response/reply on 8/13/2018 (eat). (Entered: 08/13/2018) |
| 08/13/2018 | 22 | | ORDER granting 21 Stipulated Motion for Extension of Time to File Response/Reply re 20 MOTION to Dismiss or Transfer Venue. Plaintiffs' Opposition is due by 8/15/2018. Signed by Judge Dale A. Kimball on 8/13/2018. (eat) (Entered: 08/13/2018) |
| 08/15/2018 | 23 | | MEMORANDUM in Opposition re 20 MOTION to Dismiss and Memorandum in Support *to Transfer Venue* MOTION to Change Venue filed by Plaintiffs Amy K., David K., Kathleen K.. (Attachments: # 1 Affidavit Declaration in support of opposition, # 2 Exhibit Exhibit to Declaration, # 3 Exhibit Exhibit to Declaration, # 4 Exhibit Exhibit to Declaration, # 5 Exhibit Exhibit to Declaration, # 6 Exhibit Exhibit A to Opp Memo)(King, Brian) (Entered: 08/15/2018) |
| 08/20/2018 | 24 | | **NOTICE OF HEARING ON MOTION** re 20 MOTION to Dismiss or Transfer Venue (Notice generated by DAK Chambers): Motion Hearing is set for 9/25/2018, at 10:00 AM in Rm 3.400 before Judge Dale A. Kimball. (eat) (Entered: 08/20/2018) |
| 08/23/2018 | 25 | | **AMENDED NOTICE OF HEARING ON MOTION** re 20 MOTION to Dismiss or Transfer Venue (Notice generated by DAK Chambers): Motion Hearing is RESET for 10/15/2018, at 02:30 PM in Rm 3.400 before Judge Dale A. Kimball. (eat) (Entered: 08/23/2018) |
| 08/29/2018 | 26 | | MOTION for Extension of Time for Defendants to file their reply memorandum in support of their motion to dismiss or transfer venue to and including September 14, 2018 filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Attachments: # 1 Text of Proposed Order)(Petersen, Scott) Modified by changing event type to motion for extension of time to file response/reply on 8/29/2018 (eat). (Entered: 08/29/2018) |
| 08/29/2018 | 27 | | ORDER granting 26 Stipulated Motion for Extension of Time to File Reply re 20 MOTION to Dismiss or Transfer Venue. Defendants' Reply Memorandum is due by 9/14/2018. Signed by Judge Dale A. Kimball on 8/29/2018. (eat) (Entered: 08/29/2018) |
| 09/14/2018 | 28 | | NOTICE of Appearance by Clint R. Hansen on behalf of Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health (Hansen, Clint) (Entered: 09/14/2018) |
| 09/14/2018 | 29 | | REPLY to Response to Motion re 20 MOTION to Dismiss and Memorandum in Support *to Transfer Venue* MOTION to Change Venue filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Hansen, Clint) (Entered: 09/14/2018) |
| 09/14/2018 | 30 | | AFFIDAVIT/DECLARATION of Denise C. Strait in Support re 20 MOTION to Dismiss and Memorandum in Support *to Transfer Venue* MOTION to Change Venue filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Hansen, Clint) (Entered: 09/14/2018) |
| 10/15/2018 | 31 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Motion Hearing held on 10/15/2018, re Defendants' 20 MOTION to Dismiss or Change Venue. After hearing statements and arguments from counsel, the court takes the Motion under advisement and will issue a ruling in due course. Attorney for Plaintiff: Brian S. King. Attorney for Defendant: Scott M. Petersen. Court Reporter: Phoebe Moorhead. (eat) (Entered: 10/15/2018) |

| 10/24/2018 | 32 | | MEMORANDUM DECISION AND ORDER denying Defendants' 20 Motion to Dismiss or Alternatively to Transfer Venue in its entirety. Signed by Judge Dale A. Kimball on 10/24/2018. (eat) (Entered: 10/24/2018) |
|---|---|---|---|
| 11/07/2018 | 33 | | ANSWER to 19 Amended Complaint filed by Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health.(Hansen, Clint) (Entered: 11/07/2018) |
| 12/20/2018 | 34 | | REPORT OF ATTORNEY PLANNING MEETING. (Attachments: # 1 Text of Proposed Order Proposed Order)(King, Brian) (Entered: 12/20/2018) |
| 12/20/2018 | 35 | | SCHEDULING ORDER: Amended Pleadings due by 2/20/2019. Joinder of Parties due by 2/20/2019. Discovery due by 6/19/2019. Dispositive Motions due by 7/16/2019. 2 Day Bench Trial is set for 3/9/2020, at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. Signed by Judge Dale A. Kimball on 12/20/2018. (eat) (Entered: 12/20/2018) |
| 02/20/2019 | 36 | | MOTION for Leave to File Third Amended Complaint and Memorandum in Support filed by Plaintiffs Amy K., David K., Kathleen K.. (Attachments: # 1 Exhibit Exhibit A, # 2 Text of Proposed Order Proposed Order)(King, Brian) (Entered: 02/20/2019) |
| 02/27/2019 | 37 | | NOTICE of Non–Opposition to Plaintiffs' Motion for Leave to File Third Amended Complaint by Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health re 36 MOTION for Leave to File Third Amended Complaint and Memorandum in Support (Hansen, Clint) (Entered: 02/27/2019) |
| 03/05/2019 | 38 | | ORDER granting 36 Motion for Leave to File Third Amended Complaint. Signed by Judge Dale A. Kimball on 3/5/2019. (eat) (Entered: 03/05/2019) |
| 03/12/2019 | 39 | | AMENDED COMPLAINT *Third Amended Complaint* against Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. filed by Kathleen K., David K., Amy K.. (King, Brian) (Entered: 03/12/2019) |
| 03/26/2019 | 40 | | Joint MOTION for Extension of Time to File Answer re 39 Amended Complaint and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Attachments: # 1 Text of Proposed Order Granting Extension of Time to Respond to Third Amended Complaint)(Hansen, Clint) (Entered: 03/26/2019) |
| 03/26/2019 | 41 | | ORDER granting 40 Stipulated Motion for Extension of Time to Respond to the 39 Third Amended Complaint. Answer deadline updated for Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees and United Behavioral Health. Answers or other responses are due by 4/16/2019. Signed by Judge Dale A. Kimball on 3/26/2019. (eat) (Entered: 03/26/2019) |
| 04/16/2019 | 42 | | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Hansen, Clint) (Entered: 04/16/2019) |
| 05/13/2019 | 43 | | MEMORANDUM in Opposition re 42 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Plaintiffs Amy K., David K., Kathleen K.. (King, Brian) (Entered: 05/13/2019) |
| 05/28/2019 | 44 | | REPLY to Response to Motion re 42 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Hansen, Clint) (Entered: 05/28/2019) |

| 05/29/2019 | 45 | | **NOTICE OF HEARING ON MOTION** re Defendants' 42 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Notice generated by DAK Chambers): Motion Hearing is set for 8/20/2019, at 03:00 PM in Rm 3.400 before Judge Dale A. Kimball. (eat) (Entered: 05/29/2019) |
|---|---|---|---|
| 05/30/2019 | 46 | | **AMENDED NOTICE OF HEARING ON MOTION** re Defendant's 42 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Notice generated by DAK Chambers): Motion Hearing is RESET for 10/2/2019, at 02:00 PM in Rm 3.400 before Judge Dale A. Kimball. (eat) (Entered: 05/30/2019) |
| 06/25/2019 | 47 | | NOTICE of SUPPLEMENTAL AUTHORITY by Amy K., David K., Kathleen K. re 43 Memorandum in Opposition to Motion *to Dismiss* (Attachments: # 1 Exhibit Timothy D. v. Aetna) (King, Brian) (Entered: 06/25/2019) |
| 07/12/2019 | 48 | | Stipulated MOTION to Strike 35 Scheduling Order, filed by Plaintiffs Amy K., David K., Kathleen K.. (Attachments: # 1 Text of Proposed Order Proposed Order)(King, Brian) (Entered: 07/12/2019) |
| 07/15/2019 | 49 | | ORDER granting 48 Stipulated Motion to Strike 35 Scheduling Order. The scheduling order entered by the court on December 20, 2018 is stricken. The parties are directed to file a joint scheduling order within 14 days of a ruling on Defendants' Motion to Dismiss Third Amended Complaint. Signed by Judge Dale A. Kimball on 7/15/2019. (eat) (Entered: 07/15/2019) |
| 09/12/2019 | 50 | | **AMENDED NOTICE OF HEARING ON MOTION** re: 42 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Notice generated by DAK Chambers): Motion Hearing is RESET for 10/2/2019, at 02:00 PM in **Rm 7.300** before Judge Dale A. Kimball. PLEASE NOTE THE CHANGE IN COURTROOM ONLY. (eat) (Entered: 09/12/2019) |
| 09/16/2019 | 51 | | **AMENDED NOTICE OF HEARING ON MOTION** re 42 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Notice generated by DAK Chambers): Motion Hearing is RESET for 10/2/2019 at **01:30 PM in Rm 7.300** before Judge Dale A. Kimball. PLEASE NOTE THE CHANGE IN TIME ONLY. (eat) (Entered: 09/16/2019) |
| 09/20/2019 | 52 | | **AMENDED NOTICE OF HEARING ON MOTION** re 42 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Notice generated by DAK Chambers): Motion Hearing is RESET at the request of the parties for 12/18/2019, at 02:30 PM in Rm 3.400 before Judge Dale A. Kimball. (eat) (Entered: 09/20/2019) |
| 09/24/2019 | 53 | | MOTION for Admission Pro Hac Vice of Michael H. Bernstein , Registration fee $ 250, receipt number 1088–3379800, filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Attachments: # 1 Text of Proposed Order for Pro Hac Vice Admission (Michael H. Bernstein), # 2 Exhibit A – Application for Pro Hac Vice Admission)(Hansen, Clint) (Entered: 09/24/2019) |
| 09/24/2019 | 54 | | ORDER granting 53 Motion for Admission Pro Hac Vice of Michael H. Bernstein for Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, and United Behavioral Health. *Attorneys admitted Pro Hac Vice may download a copy of the District of Utah's local rules from the court's web site at http://www.utd.uscourts.gov* Signed by Judge Dale A. Kimball on 9/24/2019. (eat) (Entered: 09/24/2019) |
| 11/13/2019 | 55 | | NOTICE of Change of Address by Brian S. King (King, Brian) (Entered: 11/13/2019) |
| 12/17/2019 | 56 | | NOTICE of SUPPLEMENTAL AUTHORITY by Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health re 44 Reply Memorandum/Reply to Response to Motion, 42 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and |

| | | | |
|---|---|---|---|
| | | | Memorandum in Support (Attachments: # <u>1</u> Exhibit A – John R v United Behavioral Health, # <u>2</u> Exhibit B – Jeff N v United HealthCare Insurance Company, # <u>3</u> Exhibit C – E M v Humana, # <u>4</u> Exhibit D – JL v Anthem Blue Cross, # <u>5</u> Exhibit E – Mary D v Anthem Blue Cross Blue Shield) (Hansen, Clint) (Entered: 12/17/2019) |
| 12/17/2019 | <u>57</u> | | NOTICE of SUPPLEMENTAL AUTHORITY by Amy K., David K., Kathleen K. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D, # <u>5</u> Exhibit E) (King, Brian) (Entered: 12/17/2019) |
| 12/18/2019 | 58 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Motion Hearing held on 12/18/2019 re Defendants' <u>42</u> MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. After hearing statements and arguments from counsel, the court takes the motion under advisement and will issue a ruling in due course. Attorney for Plaintiffs: Brian S. King. Attorneys for Defendants: Michael H. Bernstein and Clint R. Hansen. Court Reporter: Laura Robinson. (eat) (Entered: 12/18/2019) |
| 01/17/2020 | <u>59</u> | | MEMORANDUM DECISION AND ORDER granting in part and denying in part <u>42</u> Motion to Dismiss for Failure to State a Claim. Signed by Judge Dale A. Kimball on 1/17/2020. (eat) (Entered: 01/17/2020) |
| 01/17/2020 | 60 | | **NOTICE VACATING BENCH TRIAL** set for 3/9/2020 at 8:30 AM before Judge Dale A. Kimball (Notice generated by DAK Chambers). In light of the court's January 17, 2020, Memorandum Decision, the parties shall meet and confer and submit a Joint Proposed Amended Scheduling Order by 2/14/2020. (eat) (Entered: 01/17/2020) |
| 01/21/2020 | <u>61</u> | | ORDER REFERRING CASE to Magistrate Judge Paul M. Warner under 28:636 (b)(1)(A), Magistrate to hear and determine all nondispositive pretrial matters. No attached document. Signed by Judge Dale A. Kimball on 1/21/2020. (eat) (Entered: 01/21/2020) |
| 02/03/2020 | <u>62</u> | | ANSWER to <u>39</u> Amended Complaint filed by Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health.(Petersen, Scott) (Entered: 02/03/2020) |
| 02/18/2020 | <u>63</u> | | AMENDED SCHEDULING ORDER: Amended Pleadings due by 2/20/2020. Joinder of Parties due by 2/20/2020. Dispositive Motions due by 7/16/2020. 2 Day Bench Trial is set for 2/8/2021 at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. Signed by Magistrate Judge Paul M. Warner on 2/18/2020. (eat) (Entered: 02/18/2020) |
| 03/21/2020 | <u>64</u> | | MOTION for Discovery and Memorandum in Support filed by Plaintiffs Amy K., David K., Kathleen K.. (Attachments: # <u>1</u> Exhibit proposed RFA, ROG, and RPD) Motions referred to Paul M. Warner.(King, Brian) (Entered: 03/21/2020) |
| 04/06/2020 | <u>65</u> | | MEMORANDUM in Opposition re <u>64</u> MOTION for Discovery and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Hansen, Clint) (Entered: 04/06/2020) |
| 04/20/2020 | <u>66</u> | | REPLY to Response to Motion re <u>64</u> MOTION for Discovery and Memorandum in Support filed by Plaintiffs Amy K., David K., Kathleen K.. (King, Brian) (Entered: 04/20/2020) |
| 06/04/2020 | 67 | | REASSIGNMENT to Newly Appointed Magistrate Judge. Case Reassigned to Magistrate Judge Jared C. Bennett. Magistrate Judge Paul M. Warner no longer assigned to the case. Case number will now read **2:17cv01328–DAK–JCB.** Please make changes to document captions accordingly. Motions referred to Jared C. Bennett. (eat) (Entered: 06/04/2020) |
| 06/30/2020 | <u>68</u> | | Stipulated MOTION to Stay re <u>63</u> Scheduling Order, filed by Plaintiffs Amy K., David K., Kathleen K.. (Attachments: # <u>1</u> Text of Proposed Order Proposed Order) Motions referred to |

| | | | Jared C. Bennett.(King, Brian) (Entered: 06/30/2020) |
|---|---|---|---|
| 07/22/2020 | 69 | | MEMORANDUM DECISION AND ORDER granting in part and denying in part Plaintiff's 64 Motion for Leave to Conduct Discovery; and granting in part and denying in part the parties' 68 Stipulated Motion to Stay Amended Scheduling Order. The parties shall submit a proposed scheduling order to the court within 14 days of the date of this order. Signed by Magistrate Judge Jared C. Bennett on 7/22/2020. (eat) (Entered: 07/22/2020) |
| 08/05/2020 | 70 | | Joint MOTION for Amended Scheduling Order and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Attachments: # 1 Text of Proposed Order Second Amended Scheduling Order) Motions referred to Jared C. Bennett.(Hansen, Clint) (Entered: 08/05/2020) |
| 08/10/2020 | 71 | | SECOND AMENDED SCHEDULING ORDER granting 70 Joint Motion for Amended Scheduling Order. Fact Discovery due by 10/30/2020. Dispositive Motions due by 12/3/2020. Signed by Magistrate Judge Jared C. Bennett on 8/10/2020. (eat) (Entered: 08/10/2020) |
| 10/15/2020 | 72 | | NOTICE OF WITHDRAWAL OF COUNSEL of Nediha Hadzikadunic filed by Brian S. King on behalf of Amy K., David K., Kathleen K. (King, Brian) (Entered: 10/15/2020) |
| 10/30/2020 | 73 | | Stipulated MOTION for Amended Scheduling Order filed by Plaintiffs Amy K., David K., Kathleen K.. (Attachments: # 1 Text of Proposed Order Proposed Order) Motions referred to Jared C. Bennett.(King, Brian) (Entered: 10/30/2020) |
| 11/05/2020 | 74 | | THIRD AMENDED SCHEDULING ORDER granting 73 Stipulated MOTION for Amended Scheduling Order filed by Plaintiffs. Fact Discovery due by 1/18/2021. Dispositive Motions due by 2/18/2021. See Order for additional deadlines. Although the court has granted the parties' stipulated motion in this instance, they are hereby notified the dates in this amended scheduling order will not be extended without a showing of compelling and exceptional circumstances. Signed by Magistrate Judge Jared C. Bennett on 11/5/2020. (eat) (Entered: 11/05/2020) |
| 02/18/2021 | 75 | | MOTION for Summary Judgment and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Hansen, Clint) (Entered: 02/18/2021) |
| 02/18/2021 | 76 | | Ex Parte (Not Sealed) MOTION for Leave to File Sealed Document filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Attachments: # 1 Text of Proposed Order) Motions referred to Jared C. Bennett.(Hansen, Clint) (Entered: 02/18/2021) |
| 02/18/2021 | 77 | | MOTION for Summary Judgment and Memorandum in Support filed by Plaintiffs Amy K., David K., Kathleen K.. (King, Brian) (Entered: 02/18/2021) |
| 02/18/2021 | 78 | | MOTION for Leave to File Excess Pages and Memorandum in Support filed by Plaintiffs Amy K., David K., Kathleen K.. Motions referred to Jared C. Bennett.(King, Brian) (Entered: 02/18/2021) |
| 02/19/2021 | 79 | | DOCKET TEXT ORDER granting 76 Ex Parte Motion for Leave to File Sealed Document. Signed by Judge Dale A. Kimball on 2/19/2021. No attached document. (eat) (Entered: 02/19/2021) |
| 02/19/2021 | 80 | | DOCKET TEXT ORDER granting Plaintiffs' 78 Motion for Leave to File Excess Pages. Signed by Judge Dale A. Kimball on 2/19/2021. No attached document. (eat) (Entered: 02/19/2021) |
| 02/19/2021 | 81 | | **SEALED DOCUMENT** re 75 MOTION for Summary Judgment filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral |

| | | | |
|---|---|---|---|
| | | | Health |
| | | | **NOTE: Filer is instructed to serve the <u>sealed document</u> on all other parties.**. (Attachments: # <u>1</u> UBH 229–457, # <u>2</u> UBH 458–1033, # <u>3</u> UBH 1034–1609, # <u>4</u> UBH 1610–1753, # <u>5</u> UBH 1754–1897, # <u>6</u> UBH 1898–2041, # <u>7</u> UBH 2042–2185, # <u>8</u> UBH 2186–2377, # <u>9</u> UBH 2378–2569, # <u>10</u> UBH 2570–2665, # <u>11</u> UBH 2666–2762, # <u>12</u> UBH 2763–2858)(Hansen, Clint) Modified by creating link to motion for summary judgment on 2/19/2021 (eat). (Entered: 02/19/2021) |
| 03/17/2021 | <u>82</u> | | Stipulated MOTION for Extension of Time to File Response/Reply as to <u>77</u> MOTION for Summary Judgment and Memorandum in Support , <u>75</u> MOTION for Summary Judgment and Memorandum in Support filed by Plaintiffs Amy K., David K.. (Attachments: # <u>1</u> Text of Proposed Order Proposed Order) Motions referred to Jared C. Bennett.(King, Brian) (Entered: 03/17/2021) |
| 03/18/2021 | <u>83</u> | | ORDER granting 82 Stipulated Motion for Extension of Time to File Responsive Pleadings re Cross–Motions for Summary Judgment (Docket Entries <u>75</u> and <u>77</u> ). Responses are due by 3/22/2021. Signed by Judge Dale A. Kimball on 3/18/2021. (eat) (Entered: 03/18/2021) |
| 03/22/2021 | <u>84</u> | | MEMORANDUM in Opposition re <u>75</u> MOTION for Summary Judgment and Memorandum in Support filed by Plaintiffs Amy K., David K., Kathleen K.. (King, Brian) (Entered: 03/22/2021) |
| 03/22/2021 | <u>85</u> | | Ex Parte (Not Sealed) MOTION for Leave to File Defendants' Ex Parte Motion for Leave to File Overlength Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Attachments: # <u>1</u> Text of Proposed Order Granting Leave to File Ex Parte Overlength Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment) Motions referred to Jared C. Bennett.(Hansen, Clint) (Entered: 03/22/2021) |
| 03/22/2021 | <u>86</u> | | MEMORANDUM in Opposition re <u>77</u> MOTION for Summary Judgment and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Hansen, Clint) (Entered: 03/22/2021) |
| 03/23/2021 | <u>87</u> | | ORDER granting 85 *Ex Parte* Motion for Leave to File Overlength Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment. Signed by Judge Dale A. Kimball on 3/23/2021. (eat) (Entered: 03/23/2021) |
| 04/02/2021 | <u>88</u> | | Stipulated MOTION for Extension of Time for Deadline to Submit Reply Memoranda in Support of Cross–Motions for Summary Judgment and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Attachments: # <u>1</u> Text of Proposed Order Granting Stipulated Motion to Extend Deadline to Submit Reply Memoranda in Support of Cross–Motions for Summary Judgment) Motions referred to Jared C. Bennett.(Hansen, Clint) Modified by changing event type to motion for extension of time to file response/reply on 4/2/2021 (eat). (Entered: 04/02/2021) |
| 04/05/2021 | <u>89</u> | | ORDER granting 88 Stipulated Motion for Extension of Time to File Replies re Cross–Motions for Summary Judgment (Docket Numbers <u>75</u> and <u>77</u> ). The parties' Replies are due by 4/9/2021. Signed by Judge Dale A. Kimball on 4/5/2021. (eat) (Entered: 04/05/2021) |
| 04/06/2021 | 90 | | **NOTICE OF ZOOM HEARING ON MOTIONS** re Cross–Motions for Summary Judgment (Docket Numbers <u>75</u> and <u>77</u> ) (Notice generated by DAK Chambers): Motion Hearing is set for 5/25/2021 at 02:00 PM before Judge Dale A. Kimball. The hearing will be conducted via Zoom. The parties should not appear in person at the courthouse. The Zoom participation information is as follows: |

| | | | |
|---|---|---|---|
| | | | Join ZoomGov Meeting:<br><br>https://www.zoomgov.com/j/16133447407?pwd=RWtlVFM2c2tmWXZKYUp5NVhTbkZ5UT09<br><br>Meeting ID: 161 3344 7407<br>Password: 584299<br>One tap mobile<br>+16692545252,,16133447407#,,,,0#,,584299# US (San Jose)<br>+16468287666,,16133447407#,,,,0#,,584299# US (New York)<br><br>Dial by your location<br>+1 669 254 5252 US (San Jose)<br>+1 646 828 7666 US (New York)<br>Meeting ID: 161 3344 7407<br>Password: 584299<br><br>Find your local number: https://www.zoomgov.com/u/abPYf89LJa (eat) (Entered: 04/06/2021) |
| 04/09/2021 | 91 | | REPLY to Response to Motion re 77 MOTION for Summary Judgment and Memorandum in Support filed by Plaintiffs Amy K., David K., Kathleen K.. (King, Brian) (Entered: 04/09/2021) |
| 04/09/2021 | 92 | | REPLY to Response to Motion re 75 MOTION for Summary Judgment and Memorandum in Support filed by Defendants Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. (Hansen, Clint) (Entered: 04/09/2021) |
| 05/21/2021 | 93 | | **NOTICE VACATING MOTION HEARING** set for 5/25/2021 at 2:00 PM before Judge Dale A. Kimball (Notice generated by DAK Chambers). The hearing is vacated at the request of Plaintiffs' counsel. The hearing will be rescheduled at a later date. (eat) (Entered: 05/21/2021) |
| 05/21/2021 | 94 | | **AMENDED NOTICE OF ZOOM HEARING ON MOTIONS** re Cross–Motions for Summary Judgment (Docket Numbers 75 and 77 ) (Notice generated by DAK Chambers): Motion Hearing is RESET for 6/17/2021 at 02:00 PM before Judge Dale A. Kimball. The hearing will be conducted via Zoom. The parties should not appear in person at the courthouse. The Zoom participation information is as follows:<br><br>Join ZoomGov Meeting:<br><br>https://www.zoomgov.com/j/16133447407?pwd=RWtlVFM2c2tmWXZKYUp5NVhTbkZ5UT09<br><br>Meeting ID: 161 3344 7407<br>Password: 584299<br>One tap mobile<br>+16692545252,,16133447407#,,,,0#,,584299# US (San Jose)<br>+16468287666,,16133447407#,,,,0#,,584299# US (New York)<br><br>Dial by your location<br>+1 669 254 5252 US (San Jose)<br>+1 646 828 7666 US (New York)<br>Meeting ID: 161 3344 7407<br>Password: 584299<br><br>Find your local number: https://www.zoomgov.com/u/abPYf89LJa (eat) (Entered: 05/21/2021) |

| 06/17/2021 | 95 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Motion Hearing held on 6/17/2021 re the parties' Cross–Motions for Summary Judgment (Docket Entries 75 and 77 . All parties appear by Zoom. After hearing statements and arguments from counsel, the court takes the Motions under advisement and will issue a ruling in due course. Attorney for Plaintiffs: Brian S. King. Attorney for Defendants: Michael H. Bernstein. Court Reporter: Kelly Hicken. (eat) (Entered: 06/17/2021) |
| 06/22/2021 | 96 | | MEMORANDUM DECISION AND ORDER granting in part and denying in part Defendants' 75 Motion for Summary Judgment; and granting in part and denying in part Plaintiffs' 77 Motion for Summary Judgment. Plaintiffs' Motion is GRANTED as to their First Cause of Action for ERISA violations. The court DENIES Plaintiffs' Motion on their Second Cause of Action for Parity Act violations. This means that the court similarly GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment. Defendants' Motion is DENIED as to Plaintiffs' First Cause of Action for ERISA violations and GRANTED as to Plaintiffs' Second Cause of Action for violations of the Parity Act. Since Defendants' denials were arbitrary and capricious, the court will not remand the claims to Defendants and instead orders Defendants to pay for A.K.'s treatment at Discovery. Signed by Judge Dale A. Kimball on 6/22/2021. (eat) (Entered: 06/22/2021) |
| 06/22/2021 | 97 | | JUDGMENT – In the court's Memorandum Decision and Order, dated June 23, 2021, the court awarded Plaintiffs summary judgment on their ERISA claim and denied their claim under the Mental Health Parity and Addiction Equity Act (29 U.S.C. §1132(a)(3)). Accordingly, Defendants are ordered to pay for A.K.'s treatment at Discovery and Plaintiffs' Mental Health Parity and Addiction Equity Act claim is denied and dismissed with prejudice. This action is closed. Magistrate Judge Jared C. Bennett no longer assigned to case. Signed by Judge Dale A. Kimball on 6/22/2021. (eat) (Entered: 06/22/2021) |
| 07/06/2021 | 98 | | Stipulated MOTION for Extension of Time to file Plaintiffs' Motion for Award of Prejudment Interest, Attorney Fees, and Costs filed by Plaintiffs Amy K., David K., Kathleen K.. (Attachments: # 1 Text of Proposed Order Proposed Order)(King, Brian) (Entered: 07/06/2021) |
| 07/07/2021 | 99 | | ORDER granting 98 Stipulated Motion for Extension of Deadline to File Plaintiff's Motion for Award of Prejudgment Interest, Attorney Fees, and Costs. The deadline is extended from July 6, 2021 to July 9, 2021. Signed by Judge Dale A. Kimball on 7/7/2021. (eat) (Entered: 07/07/2021) |
| 07/09/2021 | 100 | | Plaintiff's MOTION for Attorney Fees filed by Plaintiffs Amy K., David K.. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F, # 7 Exhibit Exhibit G, # 8 Exhibit Exhibit H, # 9 Exhibit Exhibit I)(King, Brian) (Entered: 07/09/2021) |
| 07/21/2021 | 101 | | NOTICE OF APPEAL as to 96 Memorandum Decision,,,, Order on Motion for Summary Judgment,,,,,,, 97 Judgment,, filed by Alcatel–Lucent Medical Expense Plan for Active Management Employees, United Behavioral Health. Appeals to the USCA for the 10th Circuit. Filing fee $ 505, receipt number AUTDC–4063520. (Attachments: # 1 Judgment and Memorandum Decision and Order)(Bernstein, Michael) (Entered: 07/21/2021) |

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| D.K. and A.K.,<br><br>        **Plaintiffs,**<br><br>vs.<br><br>**UNITED BEHAVIORAL HEALTH and ALCATEL–LUCENT MEDICAL EXPENSE PLAN FOR ACTIVE MANAGEMENT EMPLOYEES,**<br><br>        **Defendants**. | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 2:17-CV-01328-DAK**<br><br>**Judge Dale A. Kimball** |

## INTRODUCTION

This matter is before the court on the parties' Cross-Motions for Summary Judgment. (ECF No. 75, 77.) On June 21, 2021, the court held a hearing on these motions. At the hearing, Brian S. King represented D.K and A.K (collectively, "Plaintiffs") and Michael H. Bernstein represented United Behavioral Health ("UBH") and Alcatel-Lucent Medical ("ALM") (collectively, "Defendants"). The court took the matter under advisement. Now being fully informed, the court issues the following Memorandum Decision and Order.

## BACKGROUND

### The Plan & Its Terms

The plan (the "Plan") at issue is self-funded by Nokia of America Corporation (formerly known as Alcatel-Lucent USA Inc.). It is undisputed that the Plan is an employee welfare benefit plan governed by ERISA and that at all relevant times, Plaintiff D.K., A.K.'s father, was a member of the Plan. Defendant UnitedHealthcare ("United") and United's affiliate,

UnitedHealthcare Behavior Health ("UHB"), are some of the Plan's designated claim administrators.

There are three provisions in the Plan that are germane to this case: the provision detailing "Medical Necessity"; the conditions for qualifying for care in a "Residential Treatment Facility"; and the definition of "Custodial Care." Those provisions are quoted in turn.

**Medically Necessary**: (Rec. 27)

Medically Necessary treatment must meet the following criteria:

> (i) . . . accepted by the health care profession in the U.S. as the most appropriate level of care
> (ii) . . . the safest and most effective level of care for the condition being treated.
> (iii) . . . appropriate and required for the diagnosis or treatment of the accidental injury, Illness, or Pregnancy.
> (iv) There is not a less intensive or more appropriate place of service . . .
> (v) . . . provided in a clinically controlled research setting using a specific research protocol that meets standards equivalent to that as used by the National Institute of Health for a life-threatening or seriously debilitating condition. The treatment must be considered safe with promising efficacy as demonstrated by accepted clinical evidence reported by generally recognized medical professionals or publications.

**Residential Treatment Facility**: (Rec. 36–37)

To qualify for Residential Treatment the following conditions must be met:

> • The member is not in imminent or current risk of harm to self and others and/or property.
> <u>AND</u>
> • Co-occurring behavior health and physical condition can be safely managed.
> <u>AND</u>
> • The "why now" factors leading to admission cannot be safely efficiently, or effectively addressed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychological and environmental factors. Examples include:
>> ○ Acute impairment of behavioral or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.
>> ○ Psychological and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.

2

**Custodial Care**: (Rec. 19)

> Treatment or service prescribed by a medical professional, that could be rendered safely and reasonably by a person not medically skilled, or that is designed mainly to help the patient with daily living activities. These activities are the following:
>
> (a) Personal care such as help in: walking, getting in and out of bed, bathing, eating by spoon, tube or gastronomy, exercising and dress;
> (b) Homemaking, such as preparing meals or special diets;
> (c) Moving the patient;
> (d) Acting as a companion or sitter;
> (e) Supervising medication that can usually be self-administered; or
> (f) Treatment or services that any person may be able to perform with minimal instruction including, but not limited to, recording temperature, pulse, and respirations, or administration and monitoring of feeding systems.

### *A.K.'s Mental Health Disorders & Treatment Before Long-Term Residential Treatment*

Beginning in 2010, A.K. began having issues with her mental health. Initially, A.K. struggled with fairly typical bouts of anxiety, Attention Deficit Disorder ("ADD"), and depression. A.K.'s symptoms escalated quite quickly, and she began secretly cutting herself with razor blades. A.K.'s parents did not discover that she had been cutting herself until February 2012, when she cut herself so severely that she was frightened into showing her parents. That same month, A.K. began seeing a therapist. Despite the therapy, A.K. attempted suicide by cutting herself on March 4, 2012.

The same day that A.K. attempted suicide, she was admitted to Seay Behavior Center ("Seay"), an inpatient unit where she received treatment for her mental health disorders. On March 13, 2012, A.K. transitioned to Seay's day patient program and, on March 23, 2012, A.K. was discharged from Seay.

On March 31, 2012, A.K. ran away from home and, when the police found A.K., she was readmitted to Seay's in-patient unit. After two weeks at Seay's in-patient unit, A.K. was discharged to Cedar Crest Residential Center ("Cedar Crest"), a sub-acute inpatient mental health provider. While at Cedar Crest, providers diagnosed A.K. with "major depressive

3

disorder, severe and recurrent." On May 21, 2012, A.K. was discharged from Cedar Crest.
Following this discharge, A.K. began attending a day program at Children's Medical Center
("Children's Medical"), resumed seeing her therapist, and started seeing a psychiatrist to manage
her medications.

In September 2012, A.K. started cutting herself again. Some of these cutting events
required visits to the emergency department. Due to her escalating and recurring pattern of self-
harm, A.K. was re-enrolled in the day program at Children's Medical. Despite the treatment at
Children's Medical, A.K.'s self-harm continued to escalate. A.K. was again discharged from the
Children's Medical day program on October 6, 2012.

A month later, A.K. became upset with her parents and ran away from home. When she
returned home, her anger toward her parents escalated and A.K. threatened—and then
attempted—to commit suicide by strangulation. That same evening, A.K. was again admitted to
Children's Medical. This time, however, A.K. was admitted to Children's Medical's inpatient
program. A.K. only stayed a few days at the in-patient unit.

From October 18, 2012, to December 13, 2012, A.K. received treatment at Meridell
Achievement Center ("Meridell"), a residential treatment center. After discharge from Meridell,
A.K. transitioned to a day patient program at The Excel Center ("Excel"). Things were
seemingly improving for A.K. until she failed an exam in March 2013. After failing her exam,
A.K. began engaging in self-harming behaviors again.

On March 8, 2013, A.K. was admitted to the University Behavior Center ("University")
for major depressive disorder and suicidal ideation. A.K.'s stay at University lasted only one
month. The day after being discharged, A.K. was readmitted to the hospital due to suicidal
ideation. Following her discharge from the hospital, A.K. continued to cut herself until she was

readmitted to University on May 4, 2013. After a week-long stay at University, A.K. restarted the program at Meridell for residential treatment.

### *Treatment Professionals Recommend Long-Term Residential Treatment for A.K.*

In May 2013, while A.K. was at Meridell, the treating professionals began suggesting to A.K.'s parents that A.K. would need long-term residential treatment to treat her mental health disorders. A.K.'s parents then contacted Mr. William Johnson, A "Care Advocate Lead" at Optum Healthcare (a subsidiary of UnitedHealth Group). Mr. Johnson counseled A.K.'s parents to identify long-term treatment programs in order to request coverage. While A.K.'s parents searched for a long-term treatment program, Defendants decided they would stop coverage for A.K. at Meridell on July 30, 2013. Three days after leaving Meridell, A.K. cut herself again— nearly severing her femoral artery and requiring 12 stitches. This self-harm incident required that A.K. be readmitted to the inpatient program at Children's Medical.

On August 14, 2013, A.K. was transferred from Children's Medical to Meridell. Again, A.K.'s treatment team at Meridell recommended that A.K. be placed in a structured, long-term residential treatment program. Specifically, Ms. Kimberly Weaster, M.Ed., opined that A.K. would need "ongoing specialized residential treatment . . . upon discharge from Meridell." Dr. Andrew Diedrich also wrote that "[b]ased on [his] experience with [A.K.], it [was] [his] clinical recommendation that she needs a long-term residential placement." Dr. K.K. Riedel, M.D., also recommended that A.K. received "a long-term residential treatment center placement to accomplish the goals necessary for her to succeed and have a chance at sustaining a healthy life."

### *Defendants Approval & Denials for Coverage for Treatment at Discovery*

Following the treating team's advice that A.K. receive long-term residential care, A.K.'s parents hired a consultant to help find appropriate long-term residential treatment options. This

consultant eventually homed in on two facilities. A.K.'s parents informed Mr. Johnson (Optum Healthcare's Care Advocate) of these options and Mr. Johnson told A.K.'s parents to submit a request for coverage to Defendants. A.K.'s parents submitted their request for long-term treatment. Eventually, Defendants notified A.K.'s parents that it had approved A.K.'s treatment at Discovery Girls Ranch ("Discovery") for an initial 90 days and that a review should be conducted after the 90 days to see if continued treatment would be necessary. (Rec. 2027.) On November 4, 2013, A.K. enrolled at Discovery. (Rec 2035.)

All told, in the 20 months between her first suicide attempt on March 4, 2012 and her admission to Discovery, A.K. had: 11 psychiatric emergency room visits; five in-patient hospitalizations (totaling 58 days); four stints of residential treatment centers lasting 38 days, 57, days, 63 days, and 79 days (totaling 237 days); six enrollments into partial hospitalization programs (totaling 69 days); weekly individual therapy; family therapy; medication management from a psychiatrist; and some DBT therapy. None of this—or the sum of all these forms of treatment—had proven sufficient to keep A.K. from regressing to her self-harming ways. Discovery and long-term residential treatment were the professionals' recommended—and obvious— next steps.

Near the end of the 90-days, Defendants informed A.K.'s parents that they would be denying coverage for treatment at Discovery beginning on February 9, 2014. This Adverse Benefit Decision stated:

> I have reviewed your child's treatment plan that was submitted by Discovery Ranch for Girls, and I have determined that coverage is not available under your child's benefit plan for the requested services of long term residential treatment. Based upon current clinical member appears to require Mental health Residential Treatment Center long term Level of Care but due to excluded service a denial will be submitted.

(Rec. 442–43.) A.K.'s parents did not anticipate this denial—especially a denial based on the service being unavailable under the plan since they received prior approval for treatment at Discovery. So, A.K.'s parents requested more information about why the coverage was denied. Defendants responded by stating that the service was not covered due to the provision titled "Alternative treatment facilities accessed or Out-of-Network is excluded." Defendants had, however, retroactively eliminated this provision from the Plan.

On June 25, 2014, A.K.'s parents appealed the first denial of coverage, pointing out that the provision that Defendants relied on to deny coverage had been removed. On August 1, 2014, Defendants responded again, affirming their denial of coverage. This denial, performed by a different reviewer, stated:

> Based upon current medical records, the member appears to require Mental Health Residential long term level of care but due to excluded service, a denial will be submitted.. . . We are unable to authorize benefit coverage for Long Term Residential treatment as the member's benefit contract does not provide mental health coverage for this type of treatment or service.

(Rec. 1904–05.) Notably, this language is nearly identical to the first denial decision letter.

On September 25, 2014, A.K.'s parents appealed the second denial, reminding Defendants that the exclusion for "Alternative Treatment Facilities Accessed or Provided Out-of-Network" had been deleted from the Plan. Defendants acknowledged that these denials were erroneous. (Rec. 468.) Upon recognizing—and admitting—that these first two denials were an error, Defendants conducted another review of the submitted claims.

On December 10, 2014, Defendants submitted a third denial letter after conducting a new medical necessity review. In this denial letter, Defendants stated that they reviewed several documents (e.g., medical records, letters from K.K., the Plan's Guidelines, etc.) and concluded

that the coverage would be denied because the treatment was not medically necessary.

Specifically, the relevant portion of the letter states:

> As of the last covered day, . . . medical necessity was not met. UBH Leve of Care Guidelines for Residential Treatment requires evidence of active treatment. It requires that the physician is seeing the patient two times per week. The attending psychiatrist during your daughter's stay at Discovery Ranch assessed her only on a monthly basis. The guideline also requires the treatment plan is targeted and addresses the "why now" reason for the admission. The purpose of the admission was to consolidate her gains, as she had a history of regressing when not in a structured environment. However, on admission the attending psychiatrist found little evidence of active psychiatric illness. She was described as having had Dysthymia, in partial remission, Major Depressive Disorder, in remission but having an Anxiety Disorder and what is termed a rule out for Group B Traits (meaning personality issues). The treatment record indicates no evidence of ongoing self-injurious behavior in the three months prior to the adverse determination (or for that matter during her most recent treatment at Meridell, thus providing objective evidence of significantly improved ability to control self-injurious behavior. The "why now" reason for the admission had been addressed. When the "why now" reason for admission has been addressed, the care is considered custodial.

(Rec. 2004.) The letter also made a brief mention that A.K.'s treatment at Discovery was mainly "focus[ed] on her personality issues" and that "personality issues are a long-term issue and are not expected to respond within a reasonable amount of time. As such the focus of the treatment, the personality issues, also would be considered custodial." (Rec. 2004.)

On February 5, 2015, A.K.'s parents file another appeal. On March 6, 2015, Defendants provided Plaintiffs with a fourth and final, internal denial letter. The letter states that the claims administrator reviewed the medical record, case management notes, appeal letter, and the Level of Care Guidelines before addressing why UBH was denying coverage. The denial portion of the letter states:

> As of the last covered day, 01/31/2014, medical necessity was not met. Optum Level of Care Guidelines for Residential Treatment requires evidence of active treatment, including that the psychiatrist see the patient twice a week, whereas in this case your daughter was seen once a month. On admission, she was described as having had Dysthymia, in partial remission, Major Depressive Disorder in

> remission but having an Anxiety Disorder and what is termed a rule out for Group
> B Traits (meaning personality issues). These diagnoses did not change and
> medication changes were minimal. There was no evidence of self-injurious
> behavior. This would appear to address the goals of admission which were to
> consolidate your daughter's gains so that she could control her self injurious
> behavior. When this was achieved, care became custodial, which is not a covered
> service. Finally, reimbursable residential treatment is defined as a 24 hour/7day
> assessment and diagnostic services with active behavior health treatment. For all
> the reasons noted above, the services provided by Discovery Ranch were not
> consistent with this requirement.

(Rec. 2052–54.) This denial letter's language is almost identical to the reasoning and language

from the third denial letter. Having exhausted their internal appeal obligations, Plaintiffs

requested an independent, external review.

The external review upheld Defendants' third and fourth denial rationale—namely, that

medical necessity was not met. (Rec. 2597–607.) Specifically, this external review stated:

> The patients' providers prior to her hospitalization recommended a lengthy
> residential program, but the records provided for review do not indicate that as of
> 02/2014 through 11/2014 she continued to meet criteria for the most appropriate
> level of care. She had improved. She could have been treated in a therapeutic school
> environment for example. She was able to focus on school work. She required
> structure and support but this could be obtained out of an acute residential setting
> with coordinated therapeutic school, outpatient providers and either a residential
> based school or family and individual therapy supports. There is not evidence
> during this time period that remainder in a residential setting was the safest and
> most effective level of care. She continued to have residential resistant behaviors.
> She continued to act out behaviorally. These could have been managed at a
> therapeutic school with intensive outpatient behavioral supports for individual and
> family.

(Rec. 2606.) This fifth, external review was the final decision before Plaintiffs brought the

present suit.

### Procedural History

On December 29, 2017, Plaintiffs filed the present action. (ECF No. 1.) In their Third

Amended Complaint, Plaintiffs assert two causes of action. (ECF No. 39.) In the First Cause of

Action, Plaintiffs assert an ERISA claim for recovery of benefits under 29 U.S.C. §

1132(a)(1)(B). (ECF No. 39.) The Second Cause of Action alleges a violation of the Mental Health Parity and Addiction Equity Act (the "Parity Act") under 29 U.S.C. §1132(a)(3). (ECF No. 39.) On February 18, 2021, both parties filed cross-motions for summary judgment, seeking summary judgment on both claims. (ECF No. 75, 77.) During the hearing on these motions, Plaintiffs abandoned their Parity Act claim.

### DISCUSSION

Since Plaintiffs abandoned their Parity Act claim, the court focuses only on Plaintiffs' ERISA claim. Thus, this Order will proceed by discussing: (A) which standard of review applies in this instance; (B) the merits of Plaintiffs' ERISA claim; and (C) the appropriate relief that should be awarded.

### A. **Standard of Review**

The Supreme Court has held that "a denial of benefits challenged under [ERISA] must be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibly for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989). When a plan gives an administrator this discretion, a court applies a "deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citation and internal quotation marks omitted). A plan administrator may forfeit the deferential standard when it fails to follow certain ERISA procedures.

Plaintiffs claim that the deferential standard is forfeited "if [the claims administrator] fails to comply with ERISA's procedural requirements." (ECF No. 77 at 31.) The ERISA procedural standards are lengthy, and a full recitation of the procedures is not necessary here. Relevant to

10

this action are ERISA's requirements that the plan administrator: (1) provide adequate notice, "setting forth the specific reasons for [a] denial"; (2) afford a "full and fair review. . . of the decision denying the claim"; (3) give "[t]he specific reason. . . for the adverse determination"; (4) "[r]eference the specific plan provisions upon which the determination is based"; and (5) in the context of denials for lack of medical necessity, explain "the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances." 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1.

Plaintiffs seem to argue that almost any failure to comply with these procedural requirements results in de novo review of the claim unless the failure is a *de minimis* violation or done for good cause. Plaintiffs cite *Rasenack v. AIG Life Insurance Co.*, 585 F.3d 1311, 1361–17 (10th Cir. 2009), 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1)–(2), and *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42 (2d Cir. 2016) to support this claim. The court is unpersuaded that any of these citations supports Plaintiffs' claim that the de novo standard should apply in this instance.

First, the claims administrator in *Rasenack* did indeed forfeit the deferential standard but not for generally failing to comply with ERISA's procedures. 585 F.3d at 1315–16. Rather, *Rasenack's* holding that the claim was subject to de novo review was based upon the administrator's failure to issue a claim determination within its self-imposed time limits. *Id.* Specifically, the court held that "where the plan and applicable regulations place temporal limits on the administrator's discretion and the administrator fails to render a final decision within those limits, the administrator's 'deemed denied' decision is by operation of law rather than the exercise of discretion, and thus falls outside the *Firestone* exception." *Id.* at 1316 (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 115). Thus, the administrator's failure resulted in the

11

claim being "deemed denied" due to procedural issues, not a substantive determination of the claim's merits. *Id.* That is not what happened here when Defendants stated that they reviewed the medical records and found a lack of medical necessity.

Second, and relatedly, 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1)–(2) does not provide that *any* ERISA procedural violation results in an administrator forfeiting the deferential standard. Subsection (F) deals with when ERISA deems that the internal claims and appeals process is exhausted. Specifically, Subsection (F)(1) states that a claimant may seek relief under section 502(a) of ERISA for an administrator's failure to comply with all of the requirements of paragraph (b)(i). This challenge, however, must be "on the basis that the plan or issuer has failed to provide a reasonable internal claims and appeals process that would *yield a decision on the merits of the claim.*" *Id.* (emphasis added). Thus, it is only when the internal decision process does not yield a decision on the merits of the claim that an administrator's determination is done "without the exercise of discretion." *Id.* In this instance, UBH's decision was—at least for the final three reviews—based on the merits regarding the medical necessity of A.K.'s claim and, therefore, does not result in Defendants forfeiting the deferential standard.

Third, Plaintiffs cites the Second Circuit's opinion in *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.* to support their contention that the alleged ERISA procedural violations in this instance warrant de novo review. 819 F.3d 42 (2d Cir. 2016). This argument, urging courts in this district to adopt *Halo's* reasoning, has been frequently rejected by the Utah District Court judges—including this very court. *See Joel S. v. Cigna*, 356 F. Supp. 3d 1305, 1313 (D. Utah 2018); *James C. v. Aetna Health & Life Ins. Co.*, Case No. 218-cv-00717-DBB-CMR, 2020 WL 6382043, at *6 (D. Utah Oct. 30, 2020); *H. v. Cigna Behavioral Health*, Case No. 2:17-cv-110-TC, 2018 WL 4082275, at *8 n.3 (D. Utah August 27, 2018); *C. v.*

*ValueOptions*, Case No. 1:16-cv-93-DAK, 2017 WL 4564737, at *4 (D. Utah October 11, 2017)

(10th Cir. Nov. 9, 2017).

All these courts rejected the *Halo* framework and then looked to the Tenth Circuit

precedent for determining the correct standard of review. The court finds Judge Barlow's opinion

persuasive on the Tenth Circuit precedent for when the deferential standard is forfeited:

> Under Tenth Circuit precedent, de novo review is appropriate despite a plan's conferral of discretion on a plan administrator if: the administrator fails to exercise discretion within the required timeframe; the administrator fails to apply its expertise to a particular decision; the case involves serious procedural irregularities; the case involves procedural irregularities in the administrative review process; or where the plan members lack notice of the conferral of administrator discretion over the plan.

*James C.*, 2020 WL 6382043, at *7 (footnotes and quotation marks omitted). None of those

situations are present here. Accordingly, the court will apply the deferential arbitrary and

capricious standard.

## B. **ERISA Claim**

Now that the court has determined the standard of review, it must determine if

Defendants' adverse benefits decisions were arbitrary and capricious under the terms of the Plan.

Under this standard, the administrator's "decision will be upheld unless it is not grounded on any

reasonable basis." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (emphasis in

original) (citation omitted). "This standard is a difficult one for a claimant to overcome." *Tracy*

*O. v. Anthem Blue Cross Life & Health Ins.*, 807 F. App'x 845, 853–54 (10th Cir. 2020) (citation

omitted). The arbitrary and capricious review of an ERISA benefits decision looks to whether the

decision: "(1) . . . was the result of a reasoned and principled process, (2) is consistent with any

prior interpretations by the plan administrator, (3) is reasonable in light of any external standards,

and (4) is consistent with the purposes of the plan." *Id.* at 854 (citations omitted). Additionally,

failure to "consistently apply the terms of an ERISA plan" and inconsistent interpretations with the "plans unambiguous language" are considered arbitrary and capricious. *Id.* (citations omitted).

In this case, Plaintiffs raise three reasons why Defendants' determinations were arbitrary and capricious: (1) medical necessity was met under the terms of the Plan; (2) Defendants incorrectly disregarded A.K.'s treating physicians' opinions; and (3) Defendants did not articulate how they applied the terms of the Plan to A.K.'s medical history or current condition. The court will add another consideration, and discuss (4) the implications of UBH's inconsistent denial rationales. Plaintiffs certainly raised this fourth issue but the court wishes to address it separately. This court will discuss each issue in turn.

### 1. Medically Necessary

The court divides Plaintiffs' medically necessary arguments into two categories: (i) the "why now" factors and (ii) the "Custodial Care" portions of the Plan and how the reviewers interpreted those terms. Additionally, the court will not redefine the relevant terms of the Plan here, as those are detailed above. *See* BACKGROUND, *supra*.

#### i. The "Why Now" Factors

Plaintiffs take aim at the third and fourth letters' reasoning that coverage would be denied because the "why now" reasons for admission had been addressed. According to Plaintiffs, the "why now" factors had not been addressed because the purpose of admission was not to ensure that A.K. stopped self-harming behavior while at Discovery, but rather to provide long-term care until she had developed the tools to break the cycle of relapsing into self-harming behavior upon leaving inpatient care. The final three reviews stated that this admission goal had been satisfied because she had improved or had not shown self-harming behavior.

The court finds that, under the deferential standard, the final three reviewers did not abuse their discretion because the evidence could reasonably be interpreted to show that A.K. could have been discharged to a lower level of care because her most pressing admission factors had allegedly subsided. Indeed, the evidence can support a finding that during her first 90 days at Discovery that A.K. had improved in important ways. The court notes, however, that this is a particularly hard issue: at some point during long-term residential treatment, a patient must be discharged to a lower level of care to see if the treatment helped stop self-harming behavior. There is no sure way to tell if discharge would be appropriate after three months, or six months, or a year. The court cannot properly say that the final three reviewers arbitrarily or capriciously found that A.K.'s three months of treatment had met the "why now" factors and that a lower level of care would be appropriate.

For the foregoing reasons, the court finds that the final three reviewers did not abuse their discretion in interpreting the "why now" factors as used in their denial rationales.

### ii. Custodial Care

Plaintiffs argue that the third and fourth denial letters arbitrarily concluded that because the "why now" factors of A.K.'s admission had been addressed that her care became "Custodial." Plaintiffs state this is an incorrect conclusion because the care A.K. received at Discovery does not meet the Plan's definition of "Custodial Care." As noted above, the Plan defines "Custodial Care" as:

> Treatment or service prescribed by a medical professional, that could be rendered safely and reasonably by a person not medically skilled, or that is designed mainly to help the patient with daily living activities. These activities are the following:
> (g) Personal care such as help in: walking, getting in and out of bed, bathing, eating by spoon, tube or gastronomy, exercising and dress;
> (h) Homemaking, such as preparing meals or special diets;
> (i) Moving the patient
> (j) Acting as a companion or sitter;

(k) Supervising medication that can usually be self-administered; or
(l) Treatment or services that any person may be able to perform with minimal instruction including, but not limited to, recording temperature, pulse, and respirations, or administration and monitoring of feeding systems.

(Rec. 19.) According to Plaintiffs, the mere fact that A.K. was no longer exhibiting self-injurious behavior does not demonstrate that her care, for example, "could be rendered . . . by a person not medically skilled" or was "designed to mainly help the patient with daily living activities." (Rec. 19.) Defendants do not rebut this argument in any of their summary judgment papers. Without the help of Defendants' briefing, the court is persuaded by Plaintiffs' arguments.

The treatment and care that A.K. received at Discovery continued to include physician visits, counseling, therapy, medication changes, etc. Those are not services that can be rendered by a medically unskilled person. Additionally, A.K.'s care had nothing to do with her assisting her with daily activities. There is no evidence that A.K. was being assisted with any of the things listed in (m)–(r) above—or that anything that is remotely like those services. Therefore, the care A.K. received at Discovery was not Custodial Care as defined by the Plan. In short, under the Plan, treatment does not automatically become Custodial Care just because it is not medically necessary. Such an interpretation of the Plan's terms is erroneous and a denial based thereon is arbitrary.

For the foregoing reasons, the court concludes that Defendants abused their discretion in finding that A.K.'s care had become "Custodial" under the Plan.

## 2. A.K.'s Treating Professionals' Opinions

"Nothing in [ERISA] itself . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black &*

16

*Decker Disability Plan v. Nord,* 538 U.S. 822, 831 (2003). However, "[p]lan administrators . . .

may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a

treating physician." *Id.* at 834. The Tenth Circuit phrases this rule as a "narrow principle that

fiduciaries cannot shut their eyes to readily available information when the evidence in the

record suggests that the information might confirm the beneficiary's theory of entitlement and

when they have little or no evidence in the record to refute that theory." *Gaither v. Aetna Life*

*Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004)

> If benefits are denied . . . the reason for the denial must be stated in reasonably clear
> language, . . . [and] if the plan administrators believe that more information is
> needed to make a reasoned decision, they must ask for it. There is nothing
> extraordinary about this: it's how civilized people communicate with each other
> regarding important matters.

*Id.*

Plaintiffs claim that Defendants' decisions were arbitrary because Defendants

disregarded and failed to engage with the opinions of A.K.'s treating professionals. The court

finds that the claims administrators clearly reviewed the treating professionals' opinions. For

example, Defendants third denial letter states that the administrator reviewed: (1) a "[l]etter from

K.K. detailing the reasons she believed the decision was in error"; (2) "correspondence from

K.K. with exhibits"; (3) the IPRO letter; (4) "Note from Kimberly Weater"; (5) letter from

Andrew Dieterich MD; (6) "Letter from Tim Lowe PhD and Ryan Williams MD of Discovery

Ranch"; and (7) "Attending Physician Progress notes." (Rec. 2004.) The fourth denial letter is

less detailed but still states that the administrator reviewed the medical record, case management

notes, and appeal letter—presumably from K.K., including attachments. (Rec. 2052–54.) Lastly,

the fifth, external determination states that it was based upon a review of the appeal information,

denial letters, correspondence between K.K. and UBH, submitted medical information,

submitted criteria, and the Summary Plan Description. Again, these files likely included A.K.'s

treating professionals' opinions. (Rec. 2606.) Thus, the evidence shows the claims administrators did not disregard the treating professionals' opinions. Whether Defendants engaged with those opinions is an entirely different matter.

In this instance, the evidence shows the administrators did not engage with A.K.'s treating physicians' opinions. As noted above, A.K. received extensive out- and in-patient treatment in the 20 months leading up to her admission to Discovery. None of that treatment was sufficient to keep A.K. from reverting to self-harming behavior. During that time, several physicians recommended that A.K. receive long-term care. All of A.K.'s medical history and her treating professionals' opinions stand in stark contrast to the denial letters' scant reasoning. For example, the *only* reference to all of A.K.'s treatment and professionals' opinions is a passing reference stating that the purpose of the treatment was to "consolidate" A.K.'s "gains." This language comes directly from Dr. Riedel's September 10th letter to the IPRO. That is it. There is no more acknowledgement of A.K.'s serious mental health history. Indeed, this strikes the court as an instance where Defendants "shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the [Plaintiffs'] theory of entitlement." *Gaither*, 394 F.3d at 807.

Thus, the court finds that Defendants abused their discretion by not fairly engaging with A.K.'s treating professionals' opinions.

### 3. Applying the Terms of the Plan to A.K.'s Medical History

Plaintiffs argue that Defendants abused their discretion by failing to apply the specific terms of the Plan to any specific portion of A.K.'s medical records. The law is not very clear on what level of specificity is required from claims administrators in applying a plan's terms to the medical records. Plaintiffs relied upon Judge Parrish's reasoning from *Raymond M.*, wherein

claims denials were deemed arbitrary and capricious because the letters "contain[ed] neither citations to the medical record nor references to the report by [the plaintiff's] doctors" and were merely "conclusory statements without factual support." 463 F. Supp. 3d at 1282.[1]

In *Raymond M.*, Judge Parrish draws the standard of review from *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697 (10th Cir. 2018).[2] In *McMillan*, the Tenth Circuit took issue with a plan administrator's denial of short-term disability benefits. *Id.* at 705–06. The court stated that the problem with the denials was "the lack of *any* analysis, let alone a reasoned analysis. For example, the reviews by [the claims administrators] contain[ed] nothing more than conclusory statements that [the plaintiff] could travel without any discussion whatsoever." *Id.* at 706 (emphasis in original). Indeed, a review of the facts in that case indicates that the reviewers did not do *any* analysis about the patient's ability to travel. *Id.* at 699–705. Thus, *McMillan* concluded that when a claims administrator makes a health conclusion it must provide reasoning and citation to the record. *Id.*

Extrapolating from *McMillan*, Judge Parrish concluded that the denial letters in *Raymond M.* similarly failed to fulfill their obligation to conduct a fair review of the claims. *Raymond M.*, 463 F. Supp. 3d at 1282. For example, the most detailed of denial letters from *Raymond M.* states:

> You are a 17 year old female admitted to the mental health residential treatment service level of care on 12/21/2015. On admission, you were withdrawn and not fully cooperative with the treatment programming. You were treated with individual, group, family, horse, and milieu therapies. You successfully ventured away from the facility several times without incident and had not engaged in any

---

[1] This case is currently on appeal to the Tenth Circuit. *Raymond M. v. Beacon Health Options*, Appeal No. 21-4041(Mar. 30, 2021).

[2] Judge Parrish also relies on *Kerry W. v. Anthem Blue Cross & Blue Shield*, 444 F. Supp. 3d 1305, 1313 (D. Utah 2020). That case similarly draws its standard from *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697 (10th Cir. 2018). Thus, the court does not discuss *Kerry W* since the standard is what is at issue here.

self-harming behaviors. You were not psychotic or aggressive and you have a supportive family. As of 01/19/2016 it was not medically necessary for your symptoms to be treated with residential treatment service monitoring and they could have been safely addressed in a less restrictive level of care such as in outpatient treatment with individual treatment, family work and medication management.

*Id.* at 1264. It is this denial letter that prompted Judge Parrish to hold that the "denial letters contain[ed] neither citations to the medical record nor references to the reports . . . concerning the state of [the patient's] condition." *Id.* at 1282. Thus, Judge Parrish concluded the denial was arbitrary. *Id.*

Here, the denial letters similarly do not contain any specific citation to the medical record whatsoever. Instead, the denial letters simply contain general statements about A.K.'s condition on admission and minimal statements about her treatment while at Discovery. As noted, there is no specific reference to any of her medical history or professionals' opinions prior to her admission to Discovery. For example, the letters generally state: (1) that when A.K. was admitted she was diagnosed as having "Dysthymia, in partial remission, Major Depressive Disorder in remission but having an Anxiety Disorder and what is termed a rule out for Group B Traits (meaning personality issues)"; (2) A.K.'s diagnoses upon admission "did not change" during her first three months; (3) A.K.'s "medication changes were minimal"; (4) "[t]here was no evidence of self-injurious behavior"; (5) A.K.'s "goals of admission"—to consolidate her gains and control self-injurious behavior—appeared to have been met; (6) because her goals had been met care became custodial; and (7) the Plan's guidelines for Residential Treatment required "evidence of active treatment, including that the psychiatrist see the patient twice a week, whereas [A.K.] was seen once a month." (Rec. 2052–54.) Of these seven statements, only two make a general reference to A.K.'s condition: that her diagnoses "did not change" and there was no evidence of self-injurious behavior. Neither of these statements are supported by citations to

20

the record or explained in the context of A.K.'s prior, extensive mental health medical history. Additionally, the letters do not explain or cite to any evidence to support its conclusion that A.K.s goals of admission had been met and that she would not return to self-harming behavior upon discharge. Without any support, the court finds that these conclusory statements result in an arbitrary denial of A.K.'s treatment.

At the hearing, Defendants urged the court to look at the claims administrators' notes and not just the denial letters sent to Plaintiffs. Defendants claim that these notes are more substantive and explain in more detail A.K.'s medical history and the reason why coverage for Discovery was no longer medically necessary. Plaintiffs' counsel argues that it would be improper for the court to consider these documents as they were not provided to Plaintiffs. The court agrees with Plaintiffs.

The court was unable to find any Tenth Circuit case law that speaks to this issue. The First Circuit has, however, discussed "whether a plan administrator may defend a denial of benefits on the basis of a different reason than that articulated to the claimant during the internal review process." *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 115 (1st Cir. 2004). In deciding this issue, the *Glista* court declined to adopt a "hard-and-fast rule" on this issue, instead opting to take this on a case-by-case basis. *Id.* In finding that the administrator could not rely on reasons that had not been articulated to the claimant, the *Glista* court considered the following: (1) would "traditional insurance law place[] the burden on the insurer to prove that the applicability" of a similar benefits exclusion rationale; (2) did the plan "expressly provide that participants 'must receive a written explanation of the reasons for the denial'"; (3) did the administrator give an "explanation for why it did not explain earlier" its unstated reason for

denying the claim; and (4) did the facts of the situation require that the controversy be resolved quickly? *Id.* at 131

The court finds *Glista* persuasive and will rely on its reasoning. Here, the court must hold Defendants to their denial rationales articulated in the denial letters because two of the *Glista* considerations are satisfied. First, the Plan requires "written notification from the applicable Claims Administrator" that would include: "(a) The specific reason or reasons for the denial; [and] (b) specific reference to any pertinent Plan provisions on which the denial was based[.]" (Rec. 129–30.) In fact, if a denial was "based on Medical Necessity," the notification must provide "an explanation of the scientific or clinical judgment of the determination, applying the terms of the Plan to the Participant's circumstances." (Rec. 129–30.) As explained above, that did not happen here. Second, Defendants have not given any reason why they did not include their full reasoning for the denial in the letters sent to Plaintiffs. Without any reason justifying their failure to explain their internal reasoning for denying A.K.'s claims, Defendants cannot now rely on those rationales.

Even were the court to consider those additional materials, the court is unpersuaded that the internal documents make any difference. The internal documents behind the third denial letter are, in fact, more detailed. (Rec. 1544–46.) This document details A.K.'s medical history quite thoroughly, noting her in-patient admissions, partial hospitalizations, residential treatment center stays, emergency room visits, out-patient treatment, and her history of regressing after discharge. (Rec. 1545.) The problem with these records—besides the fact that they were not communicated to Plaintiffs—is that they undermine the denial letters' conclusions and assertions. For example, the internal document states "[t]he chart [from Discovery] is absent of treatment plan updates that review her progress in attaining her objectives. Updated goals or

objectives are never stated. Of significance is *the absence of notes* relating to her progress in

controlling suicidal threats, runaway behavior and self-injurious behavior." (Rec. 1545

(emphasis added).) In the third denial letter, however, Defendants assert that "[t]he treatment

record indicates no evidence of ongoing self-injurious behavior." (Rec. 2004.) This is misleading

because it suggests that A.K. had not had self-injurious or suicidal thoughts when the record

actually indicates that there was simply an absence of notes on that subject. A lack of notes about

self-injurious behavior does not mean A.K. was not struggling with such thoughts or behavior.

As the aphorism goes, absence of evidence is not evidence of absence. Additionally, the third

denial letter expressly states that "[t]hroughout the treatment, the attending psychiatrist did not

change [A.K.'s] diagnoses." (Rec. 2004.) That statement is directly contrary to Defendants

internal documents noting that "[t]he Master Treatment Plan changed the diagnosis to Major

Depressive Disorder, recurrent and severe, Reactive Attachment Disorder and Anxiety Disorder

NOS." (Rec. 1545.) Similar problems are present in the fourth denial letters' internal supporting

notes. (*Compare* Rec. 2575–76 *with* Rec. 2052–53.) Thus, the internal documents that were not

shared with Plaintiffs actually work to show that the denial letters' rationales were unsupported

by the record, including Defendants own notes.

For the foregoing reasons, the court concludes that the denials were arbitrary because

they lacked "any analysis, let alone a reasoned analysis," consisting of "nothing more than

conclusory statements." *See McMillan*, 746 Fed. App'x at 706 (emphasis omitted).

### 4.  Inconsistent Denial Letters

As noted above, one of the factors that a court must consider in ERISA benefits decision

is the consistency of the denial reason between the administrators. *See Tracy O.*, 807 F. App'x at

853–54. Plaintiffs argue that the first two denial letters are wildly inconsistent with the last three

23

denials. Defendants attempt to distance themselves from the first two letters by: (1) claiming that those letters did not constitute a medical necessity review; (2) asserting that the last three denials were consistent; and (3) arguing that the first two denials were based upon different versions of the Plan. The court will address each argument in turn.

First, the court is concerned at Defendants argument that the first two reviewers did not conduct a medical necessity review. This argument is unsupported by the evidence. This is manifest by looking at the first two denial letters and the supporting internal documents. The first two denial letters clearly state that the reviewers looked at the medical records:

> Based upon current clinical [sic] member appears to require Mental Health Residential Treatment Center long term level of care.
> * * *
> Based upon current medical records, the member appears to require Mental Health Residential long term level of care.

(Rec. 442, 1904.). The plain language indicates that the claims administrator reviewed the records and that A.K. appeared to require additional long-term care. Indeed, Defendants have not pointed to any portion of the Plan or the record that demonstrates there was any meaningful difference in the reviews' underlying the denial letters. The internal document supporting the second denial letter states that A.K. "does meet [the criteria for continued [mental health Residential Treatment level of care]; but long term residential care as defined below is not a covered service." (Rec 1872.) Therefore, the first and second denial letters stand in direct opposition to the final three letters. These conflicting reasons alone are enough for the court to find that the Defendants' denials were arbitrary.

Second, the final external denial letter's rationale is different from the third and fourth denial letters, contrary to Defendants' assertions. While it is true that all three of the final reviewers found that medical necessity was not met, their reasoning for why it was not met

24

differed. Specifically, the external review focused mainly on the Plan's requirement that treatment be the "most appropriate, safest, and most effective level of care." (Rec. 2606.) The external reviewer's opinion was, in short, that A.K.'s "remainder in a residential setting" was not "the safest and most effective level of care" because her conditions "could have been managed at a therapeutic school with intensive outpatient behavioral supports." (Rec. 2606.) This reasoning is different than the third and fourth reviewers' assertions that A.K.'s care had "become custodial." (Rec. 2004, 2053.) As noted above, A.K.'s care did not meet the Plan's definition of custodial care. This custodial care error is only further illustrated by the external reviewer not making that same misinterpretation.

Third, Defendants did not show that the outdated version of the Plan would require a different type of claims review process. In fact, it appears from the record that the only difference in the plan was that the exclusion for residential treatment care had been deleted. Thus, Defendants' assertion that it should not be held to account for an interpretation based on an old version of the Plan is not well taken because the Plan was—in all relevant and important ways—the same as the Plan upon which the final three reviews were based.

For the foregoing reasons, the court finds that the Defendants' shifting and inconsistent denial rationale is arbitrary and capricious.

## C. __Appropriate Relief__

"[W]hen a reviewing court concludes that a plan administrator has acted arbitrarily and capriciously in handling a claim for benefits, it can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006) (citations and internal quotation marks omitted). "The remedy when an ERISA administrator

25

fails to make adequate findings or to explain adequately the grounds of her decision is to remand the case to the administrator for further findings or explanation." *Id.* at 1288 (citation omitted). On the other hand, remand is unnecessary only when "the evidence clearly shows that the administrator's actions were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Id.* (citations and quotation marks omitted).

In this instance, the court finds that Defendants' denials were, in part, arbitrary and remand is not required. Although Defendants "fail[ed] to make adequate findings or to explain adequately the grounds of [their] decision"—which would require remand—that is not the basis for the court's decision to decline to remand this case. *Id.* Instead, the court basis its decision on the fact that Defendants' denials were arbitrary and capricious. The denials were arbitrary because Defendants gave inconsistent denial rationales and erroneously interpretated and applied the Plans' terms. These two types of denials fall into the category of denials for which remand is not necessary according to *Caldwell*. Accordingly, the court will not remand these claims to Defendants and instead orders Defendants to pay for A.K.'s treatment at Discovery.

## CONCLUSION

For the foregoing reasons the court GRANTS IN PART AND DENIES IN PART Plaintiffs Motion for Summary Judgment. (ECF No. 77.) Plaintiffs' Motion is GRANTED as to their First Cause of Action for ERISA violations. The court DENIES Plaintiffs' Motion on their Second Cause of Action for Parity Act violations. (ECF No. 77.) This means that the court similarly GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment. (ECF No. 75.) Defendants' Motion is DENIED as to Plaintiffs' First Cause of Action for ERISA violations and GRANTED as to Plaintiffs' Second Cause of Action for violations of

the Parity Act. Since Defendants' denials were arbitrary and capricious, the court will not

remand the claims to Defendants and instead orders Defendants to pay for A.K.'s treatment at

Discovery.

DATED this 22nd day of June, 2021.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

27

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| D.K. and A.K., <br><br>     **Plaintiffs,** <br><br> **vs.** <br><br> **UNITED BEHAVIORAL HEALTH and ALCATEL–LUCENT MEDICAL EXPENSE PLAN FOR ACTIVE MANAGEMENT EMPLOYEES,** <br><br>     **Defendants**. | **JUDGMENT** <br><br> **Case No. 2:17-CV-01328-DAK** <br><br> **Judge Dale A. Kimball** |

    This matter is before the court on the parties' Cross-Motions for Summary Judgment (ECF No. 75, 77.) In the court's Memorandum Decision and Order, dated June 23, 2021, the court awarded Plaintiffs summary judgment on their ERISA claim and denied their claim under the Mental Health Parity and Addiction Equity Act (29 U.S.C. §1132(a)(3)). Accordingly, Defendants are ordered to pay for A.K.'s treatment at Discovery and Plaintiffs' Mental Health Parity and Addiction Equity Act claim is denied and dismissed with prejudice. This action is closed.

    DATED this 22nd day of June, 2021.

                       BY THE COURT:

                       DALE A. KIMBALL
                       United States District Judge

Scott M. Petersen, #7599
Clint R. Hansen, #12108
FABIAN VANCOTT
215 South State Street, Ste. 1200
Salt Lake City, Utah 84151
Telephone: (801) 531-8900
spetersen@fabianvancott.com
chansen@fabianvancott.com

Michael H. Bernstein (*pro hac vice*)
ROBINSON & COLE LLP
666 Third Avenue, 20th Floor
New York, New York 10017
Telephone: (212) 451-2900
mbernstein@rc.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| D.K. and A.K.,<br><br>           Plaintiffs,<br><br>   -against-<br><br>UNITED BEHAVIORAL HEALTH and ALCATEL-LUCENT MEDICAL EXPENSE PLAN FOR ACTIVE MANAGEMENT EMPLOYEES,<br><br>           Defendants. | Civ. Act. No.: 2:17-cv-01328-DAK-JCB<br><br>**NOTICE OF APPEAL** |

Notice is hereby given that defendants United Behavioral Health and Nokia Medical Expense Plan for Management Employees, sued herein as Alcatel-Lucent Medical Expense Plan for Active Management Employees, hereby appeal to the Unites States Court of Appeals for the Tenth Circuit from the Judgment of the United States District Court for the District of Utah entered

41

in the above-named case on June 22, 2021 (Doc. No. 97), as well as from each and every part of

the Memorandum Decision and Order of the Hon. Dale A. Kimball, U.S.D.J. that was filed in the

United States District Court for the District of Utah on June 22, 2021 (Doc. No. 96), that denied

Defendants' motion for summary judgment dismissing the Plaintiffs' Third Amended Complaint

in its entirety, granted Plaintiffs' motion for summary judgment on its first cause of action for an

award of benefits pursuant to ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1(B), and directed entry

of judgment in Plaintiffs' favor.

DATED this 21st day of July, 2021.


        /s/ Clint R. Hansen
        Scott M. Petersen
        Clint R. Hansen
        Michael H. Bernstein, *pro hac vice*
        *Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| D.K. and A.K.,<br><br>          **Plaintiffs,**<br><br>**vs.**<br><br>**UNITED BEHAVIORAL HEALTH and ALCATEL–LUCENT MEDICAL EXPENSE PLAN FOR ACTIVE MANAGEMENT EMPLOYEES,**<br><br>          **Defendants**. | **JUDGMENT**<br><br>**Case No. 2:17-CV-01328-DAK**<br><br>**Judge Dale A. Kimball** |

This matter is before the court on the parties' Cross-Motions for Summary Judgment (ECF No. 75, 77.) In the court's Memorandum Decision and Order, dated June 23, 2021, the court awarded Plaintiffs summary judgment on their ERISA claim and denied their claim under the Mental Health Parity and Addiction Equity Act (29 U.S.C. §1132(a)(3)). Accordingly, Defendants are ordered to pay for A.K.'s treatment at Discovery and Plaintiffs' Mental Health Parity and Addiction Equity Act claim is denied and dismissed with prejudice. This action is closed.

DATED this 22nd day of June, 2021.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge

43

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| D.K. and A.K., <br><br> **Plaintiffs,** <br><br> vs. <br><br> **UNITED BEHAVIORAL HEALTH and ALCATEL–LUCENT MEDICAL EXPENSE PLAN FOR ACTIVE MANAGEMENT EMPLOYEES,** <br><br> **Defendants**. | **MEMORANDUM DECISION AND ORDER** <br><br> **Case No. 2:17-CV-01328-DAK** <br><br> **Judge Dale A. Kimball** |

## INTRODUCTION

This matter is before the court on the parties' Cross-Motions for Summary Judgment. (ECF No. 75, 77.) On June 21, 2021, the court held a hearing on these motions. At the hearing, Brian S. King represented D.K and A.K (collectively, "Plaintiffs") and Michael H. Bernstein represented United Behavioral Health ("UBH") and Alcatel-Lucent Medical ("ALM") (collectively, "Defendants"). The court took the matter under advisement. Now being fully informed, the court issues the following Memorandum Decision and Order.

## BACKGROUND

### The Plan & Its Terms

The plan (the "Plan") at issue is self-funded by Nokia of America Corporation (formerly known as Alcatel-Lucent USA Inc.). It is undisputed that the Plan is an employee welfare benefit plan governed by ERISA and that at all relevant times, Plaintiff D.K., A.K.'s father, was a member of the Plan. Defendant UnitedHealthcare ("United") and United's affiliate,

UnitedHealthcare Behavior Health ("UHB"), are some of the Plan's designated claim administrators.

There are three provisions in the Plan that are germane to this case: the provision detailing "Medical Necessity"; the conditions for qualifying for care in a "Residential Treatment Facility"; and the definition of "Custodial Care." Those provisions are quoted in turn.

**Medically Necessary**: (Rec. 27)

Medically Necessary treatment must meet the following criteria:

> (i) . . . accepted by the health care profession in the U.S. as the most appropriate level of care
> (ii) . . . the safest and most effective level of care for the condition being treated.
> (iii) . . . appropriate and required for the diagnosis or treatment of the accidental injury, Illness, or Pregnancy.
> (iv) There is not a less intensive or more appropriate place of service . . .
> (v) . . . provided in a clinically controlled research setting using a specific research protocol that meets standards equivalent to that as used by the National Institute of Health for a life-threatening or seriously debilitating condition. The treatment must be considered safe with promising efficacy as demonstrated by accepted clinical evidence reported by generally recognized medical professionals or publications.

**Residential Treatment Facility**: (Rec. 36–37)

To qualify for Residential Treatment the following conditions must be met:

> • The member is not in imminent or current risk of harm to self and others and/or property.
> <u>AND</u>
> • Co-occurring behavior health and physical condition can be safely managed.
> <u>AND</u>
> • The "why now" factors leading to admission cannot be safely efficiently, or effectively addressed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychological and environmental factors. Examples include:
> > o Acute impairment of behavioral or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.
> > o Psychological and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.

2

**Custodial Care**: (Rec. 19)

> Treatment or service prescribed by a medical professional, that could be rendered safely and reasonably by a person not medically skilled, or that is designed mainly to help the patient with daily living activities. These activities are the following:
> (a) Personal care such as help in: walking, getting in and out of bed, bathing, eating by spoon, tube or gastronomy, exercising and dress;
> (b) Homemaking, such as preparing meals or special diets;
> (c) Moving the patient;
> (d) Acting as a companion or sitter;
> (e) Supervising medication that can usually be self-administered; or
> (f) Treatment or services that any person may be able to perform with minimal instruction including, but not limited to, recording temperature, pulse, and respirations, or administration and monitoring of feeding systems.

### A.K.'s Mental Health Disorders & Treatment Before Long-Term Residential Treatment

Beginning in 2010, A.K. began having issues with her mental health. Initially, A.K. struggled with fairly typical bouts of anxiety, Attention Deficit Disorder ("ADD"), and depression. A.K.'s symptoms escalated quite quickly, and she began secretly cutting herself with razor blades. A.K.'s parents did not discover that she had been cutting herself until February 2012, when she cut herself so severely that she was frightened into showing her parents. That same month, A.K. began seeing a therapist. Despite the therapy, A.K. attempted suicide by cutting herself on March 4, 2012.

The same day that A.K. attempted suicide, she was admitted to Seay Behavior Center ("Seay"), an inpatient unit where she received treatment for her mental health disorders. On March 13, 2012, A.K. transitioned to Seay's day patient program and, on March 23, 2012, A.K. was discharged from Seay.

On March 31, 2012, A.K. ran away from home and, when the police found A.K., she was readmitted to Seay's in-patient unit. After two weeks at Seay's in-patient unit, A.K. was discharged to Cedar Crest Residential Center ("Cedar Crest"), a sub-acute inpatient mental health provider. While at Cedar Crest, providers diagnosed A.K. with "major depressive

3

disorder, severe and recurrent." On May 21, 2012, A.K. was discharged from Cedar Crest. Following this discharge, A.K. began attending a day program at Children's Medical Center ("Children's Medical"), resumed seeing her therapist, and started seeing a psychiatrist to manage her medications.

In September 2012, A.K. started cutting herself again. Some of these cutting events required visits to the emergency department. Due to her escalating and recurring pattern of self-harm, A.K. was re-enrolled in the day program at Children's Medical. Despite the treatment at Children's Medical, A.K.'s self-harm continued to escalate. A.K. was again discharged from the Children's Medical day program on October 6, 2012.

A month later, A.K. became upset with her parents and ran away from home. When she returned home, her anger toward her parents escalated and A.K. threatened—and then attempted—to commit suicide by strangulation. That same evening, A.K. was again admitted to Children's Medical. This time, however, A.K. was admitted to Children's Medical's inpatient program. A.K. only stayed a few days at the in-patient unit.

From October 18, 2012, to December 13, 2012, A.K. received treatment at Meridell Achievement Center ("Meridell"), a residential treatment center. After discharge from Meridell, A.K. transitioned to a day patient program at The Excel Center ("Excel"). Things were seemingly improving for A.K. until she failed an exam in March 2013. After failing her exam, A.K. began engaging in self-harming behaviors again.

On March 8, 2013, A.K. was admitted to the University Behavior Center ("University") for major depressive disorder and suicidal ideation. A.K.'s stay at University lasted only one month. The day after being discharged, A.K. was readmitted to the hospital due to suicidal ideation. Following her discharge from the hospital, A.K. continued to cut herself until she was

4

readmitted to University on May 4, 2013. After a week-long stay at University, A.K. restarted
the program at Meridell for residential treatment.

***Treatment Professionals Recommend Long-Term Residential Treatment for A.K.***

In May 2013, while A.K. was at Meridell, the treating professionals began suggesting to
A.K.'s parents that A.K. would need long-term residential treatment to treat her mental health
disorders. A.K.'s parents then contacted Mr. William Johnson, A "Care Advocate Lead" at
Optum Healthcare (a subsidiary of UnitedHealth Group). Mr. Johnson counseled A.K.'s parents
to identify long-term treatment programs in order to request coverage. While A.K.'s parents
searched for a long-term treatment program, Defendants decided they would stop coverage for
A.K. at Meridell on July 30, 2013. Three days after leaving Meridell, A.K. cut herself again—
nearly severing her femoral artery and requiring 12 stitches. This self-harm incident required that
A.K. be readmitted to the inpatient program at Children's Medical.

On August 14, 2013, A.K. was transferred from Children's Medical to Meridell. Again,
A.K.'s treatment team at Meridell recommended that A.K. be placed in a structured, long-term
residential treatment program. Specifically, Ms. Kimberly Weaster, M.Ed., opined that A.K.
would need "ongoing specialized residential treatment . . . upon discharge from Meridell." Dr.
Andrew Diedrich also wrote that "[b]ased on [his] experience with [A.K.], it [was] [his] clinical
recommendation that she needs a long-term residential placement." Dr. K.K. Riedel, M.D., also
recommended that A.K. received "a long-term residential treatment center placement to
accomplish the goals necessary for her to succeed and have a chance at sustaining a healthy life."

***Defendants Approval & Denials for Coverage for Treatment at Discovery***

Following the treating team's advice that A.K. receive long-term residential care, A.K.'s
parents hired a consultant to help find appropriate long-term residential treatment options. This

consultant eventually homed in on two facilities. A.K.'s parents informed Mr. Johnson (Optum Healthcare's Care Advocate) of these options and Mr. Johnson told A.K.'s parents to submit a request for coverage to Defendants. A.K.'s parents submitted their request for long-term treatment. Eventually, Defendants notified A.K.'s parents that it had approved A.K.'s treatment at Discovery Girls Ranch ("Discovery") for an initial 90 days and that a review should be conducted after the 90 days to see if continued treatment would be necessary. (Rec. 2027.) On November 4, 2013, A.K. enrolled at Discovery. (Rec 2035.)

All told, in the 20 months between her first suicide attempt on March 4, 2012 and her admission to Discovery, A.K. had: 11 psychiatric emergency room visits; five in-patient hospitalizations (totaling 58 days); four stints of residential treatment centers lasting 38 days, 57, days, 63 days, and 79 days (totaling 237 days); six enrollments into partial hospitalization programs (totaling 69 days); weekly individual therapy; family therapy; medication management from a psychiatrist; and some DBT therapy. None of this—or the sum of all these forms of treatment—had proven sufficient to keep A.K. from regressing to her self-harming ways. Discovery and long-term residential treatment were the professionals' recommended—and obvious— next steps.

Near the end of the 90-days, Defendants informed A.K.'s parents that they would be denying coverage for treatment at Discovery beginning on February 9, 2014. This Adverse Benefit Decision stated:

> I have reviewed your child's treatment plan that was submitted by Discovery Ranch for Girls, and I have determined that coverage is not available under your child's benefit plan for the requested services of long term residential treatment. Based upon current clinical member appears to require Mental health Residential Treatment Center long term Level of Care but due to excluded service a denial will be submitted.

6

(Rec. 442–43.) A.K.'s parents did not anticipate this denial—especially a denial based on the service being unavailable under the plan since they received prior approval for treatment at Discovery. So, A.K.'s parents requested more information about why the coverage was denied. Defendants responded by stating that the service was not covered due to the provision titled "Alternative treatment facilities accessed or Out-of-Network is excluded." Defendants had, however, retroactively eliminated this provision from the Plan.

On June 25, 2014, A.K.'s parents appealed the first denial of coverage, pointing out that the provision that Defendants relied on to deny coverage had been removed. On August 1, 2014, Defendants responded again, affirming their denial of coverage. This denial, performed by a different reviewer, stated:

> Based upon current medical records, the member appears to require Mental Health Residential long term level of care but due to excluded service, a denial will be submitted.. . . We are unable to authorize benefit coverage for Long Term Residential treatment as the member's benefit contract does not provide mental health coverage for this type of treatment or service.

(Rec. 1904–05.) Notably, this language is nearly identical to the first denial decision letter.

On September 25, 2014, A.K.'s parents appealed the second denial, reminding Defendants that the exclusion for "Alternative Treatment Facilities Accessed or Provided Out-of-Network" had been deleted from the Plan. Defendants acknowledged that these denials were erroneous. (Rec. 468.) Upon recognizing—and admitting—that these first two denials were an error, Defendants conducted another review of the submitted claims.

On December 10, 2014, Defendants submitted a third denial letter after conducting a new medical necessity review. In this denial letter, Defendants stated that they reviewed several documents (e.g., medical records, letters from K.K., the Plan's Guidelines, etc.) and concluded

that the coverage would be denied because the treatment was not medically necessary.

Specifically, the relevant portion of the letter states:

> As of the last covered day, . . . medical necessity was not met. UBH Leve of Care Guidelines for Residential Treatment requires evidence of active treatment. It requires that the physician is seeing the patient two times per week. The attending psychiatrist during your daughter's stay at Discovery Ranch assessed her only on a monthly basis. The guideline also requires the treatment plan is targeted and addresses the "why now" reason for the admission. The purpose of the admission was to consolidate her gains, as she had a history of regressing when not in a structured environment. However, on admission the attending psychiatrist found little evidence of active psychiatric illness. She was described as having had Dysthymia, in partial remission, Major Depressive Disorder, in remission but having an Anxiety Disorder and what is termed a rule out for Group B Traits (meaning personality issues). The treatment record indicates no evidence of ongoing self-injurious behavior in the three months prior to the adverse determination (or for that matter during her most recent treatment at Meridell, thus providing objective evidence of significantly improved ability to control self-injurious behavior. The "why now" reason for the admission had been addressed. When the "why now" reason for admission has been addressed, the care is considered custodial.

(Rec. 2004.) The letter also made a brief mention that A.K.'s treatment at Discovery was mainly "focus[ed] on her personality issues" and that "personality issues are a long-term issue and are not expected to respond within a reasonable amount of time. As such the focus of the treatment, the personality issues, also would be considered custodial." (Rec. 2004.)

On February 5, 2015, A.K.'s parents file another appeal. On March 6, 2015, Defendants provided Plaintiffs with a fourth and final, internal denial letter. The letter states that the claims administrator reviewed the medical record, case management notes, appeal letter, and the Level of Care Guidelines before addressing why UBH was denying coverage. The denial portion of the letter states:

> As of the last covered day, 01/31/2014, medical necessity was not met. Optum Level of Care Guidelines for Residential Treatment requires evidence of active treatment, including that the psychiatrist see the patient twice a week, whereas in this case your daughter was seen once a month. On admission, she was described as having had Dysthymia, in partial remission, Major Depressive Disorder in

8

remission but having an Anxiety Disorder and what is termed a rule out for Group B Traits (meaning personality issues). These diagnoses did not change and medication changes were minimal. There was no evidence of self-injurious behavior. This would appear to address the goals of admission which were to consolidate your daughter's gains so that she could control her self injurious behavior. When this was achieved, care became custodial, which is not a covered service. Finally, reimbursable residential treatment is defined as a 24 hour/7day assessment and diagnostic services with active behavior health treatment. For all the reasons noted above, the services provided by Discovery Ranch were not consistent with this requirement.

(Rec. 2052–54.) This denial letter's language is almost identical to the reasoning and language from the third denial letter. Having exhausted their internal appeal obligations, Plaintiffs requested an independent, external review.

The external review upheld Defendants' third and fourth denial rationale—namely, that medical necessity was not met. (Rec. 2597–607.) Specifically, this external review stated:

The patients' providers prior to her hospitalization recommended a lengthy residential program, but the records provided for review do not indicate that as of 02/2014 through 11/2014 she continued to meet criteria for the most appropriate level of care. She had improved. She could have been treated in a therapeutic school environment for example. She was able to focus on school work. She required structure and support but this could be obtained out of an acute residential setting with coordinated therapeutic school, outpatient providers and either a residential based school or family and individual therapy supports. There is not evidence during this time period that remainder in a residential setting was the safest and most effective level of care. She continued to have residential resistant behaviors. She continued to act out behaviorally. These could have been managed at a therapeutic school with intensive outpatient behavioral supports for individual and family.

(Rec. 2606.) This fifth, external review was the final decision before Plaintiffs brought the present suit.

### Procedural History

On December 29, 2017, Plaintiffs filed the present action. (ECF No. 1.) In their Third Amended Complaint, Plaintiffs assert two causes of action. (ECF No. 39.) In the First Cause of Action, Plaintiffs assert an ERISA claim for recovery of benefits under 29 U.S.C. §

9

1132(a)(1)(B). (ECF No. 39.) The Second Cause of Action alleges a violation of the Mental

Health Parity and Addiction Equity Act (the "Parity Act") under 29 U.S.C. §1132(a)(3). (ECF

No. 39.) On February 18, 2021, both parties filed cross-motions for summary judgment, seeking

summary judgment on both claims. (ECF No. 75, 77.) During the hearing on these motions,

Plaintiffs abandoned their Parity Act claim.

### DISCUSSION

Since Plaintiffs abandoned their Parity Act claim, the court focuses only on Plaintiffs'

ERISA claim. Thus, this Order will proceed by discussing: (A) which standard of review applies

in this instance; (B) the merits of Plaintiffs' ERISA claim; and (C) the appropriate relief that

should be awarded.

### A. **Standard of Review**

The Supreme Court has held that "a denial of benefits challenged under [ERISA] must be

reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibly for benefits or to construe the terms of the plan."

*Firestone Tire and Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989). When a plan gives an

administrator this discretion, a court applies a "deferential standard of review, asking only

whether the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance

Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citation and internal quotation marks omitted). A

plan administrator may forfeit the deferential standard when it fails to follow certain ERISA

procedures.

Plaintiffs claim that the deferential standard is forfeited "if [the claims administrator] fails

to comply with ERISA's procedural requirements." (ECF No. 77 at 31.) The ERISA procedural

standards are lengthy, and a full recitation of the procedures is not necessary here. Relevant to

10

this action are ERISA's requirements that the plan administrator: (1) provide adequate notice, "setting forth the specific reasons for [a] denial"; (2) afford a "full and fair review. . . of the decision denying the claim"; (3) give "[t]he specific reason. . . for the adverse determination"; (4) "[r]eference the specific plan provisions upon which the determination is based"; and (5) in the context of denials for lack of medical necessity, explain "the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances." 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1.

Plaintiffs seem to argue that almost any failure to comply with these procedural requirements results in de novo review of the claim unless the failure is a *de minimis* violation or done for good cause. Plaintiffs cite *Rasenack v. AIG Life Insurance Co.*, 585 F.3d 1311, 1361–17 (10th Cir. 2009), 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1)–(2), and *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42 (2d Cir. 2016) to support this claim. The court is unpersuaded that any of these citations supports Plaintiffs' claim that the de novo standard should apply in this instance.

First, the claims administrator in *Rasenack* did indeed forfeit the deferential standard but not for generally failing to comply with ERISA's procedures. 585 F.3d at 1315–16. Rather, *Rasenack's* holding that the claim was subject to de novo review was based upon the administrator's failure to issue a claim determination within its self-imposed time limits. *Id.* Specifically, the court held that "where the plan and applicable regulations place temporal limits on the administrator's discretion and the administrator fails to render a final decision within those limits, the administrator's 'deemed denied' decision is by operation of law rather than the exercise of discretion, and thus falls outside the *Firestone* exception." *Id.* at 1316 (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 115). Thus, the administrator's failure resulted in the

11

claim being "deemed denied" due to procedural issues, not a substantive determination of the

claim's merits. *Id.* That is not what happened here when Defendants stated that they reviewed the

medical records and found a lack of medical necessity.

Second, and relatedly, 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1)–(2) does not provide

that *any* ERISA procedural violation results in an administrator forfeiting the deferential

standard. Subsection (F) deals with when ERISA deems that the internal claims and appeals

process is exhausted. Specifically, Subsection (F)(1) states that a claimant may seek relief under

section 502(a) of ERISA for an administrator's failure to comply with all of the requirements of

paragraph (b)(i). This challenge, however, must be "on the basis that the plan or issuer has failed

to provide a reasonable internal claims and appeals process that would *yield a decision on the*

*merits of the claim*." *Id.* (emphasis added). Thus, it is only when the internal decision process

does not yield a decision on the merits of the claim that an administrator's determination is done

"without the exercise of discretion." *Id.* In this instance, UBH's decision was—at least for the

final three reviews—based on the merits regarding the medical necessity of A.K.'s claim and,

therefore, does not result in Defendants forfeiting the deferential standard.

Third, Plaintiffs cites the Second Circuit's opinion in *Halo v. Yale Health Plan, Dir. of*

*Benefits & Records Yale Univ.* to support their contention that the alleged ERISA procedural

violations in this instance warrant de novo review. 819 F.3d 42 (2d Cir. 2016). This argument,

urging courts in this district to adopt *Halo's* reasoning, has been frequently rejected by the Utah

District Court judges—including this very court. *See Joel S. v. Cigna*, 356 F. Supp. 3d 1305,

1313 (D. Utah 2018); *James C. v. Aetna Health & Life Ins. Co.*, Case No. 218-cv-00717-DBB-

CMR, 2020 WL 6382043, at *6 (D. Utah Oct. 30, 2020); *H. v. Cigna Behavioral Health*, Case

No. 2:17-cv-110-TC, 2018 WL 4082275, at *8 n.3 (D. Utah August 27, 2018); *C. v.*

*ValueOptions*, Case No. 1:16-cv-93-DAK, 2017 WL 4564737, at *4 (D. Utah October 11, 2017)

(10th Cir. Nov. 9, 2017).

All these courts rejected the *Halo* framework and then looked to the Tenth Circuit

precedent for determining the correct standard of review. The court finds Judge Barlow's opinion

persuasive on the Tenth Circuit precedent for when the deferential standard is forfeited:

> Under Tenth Circuit precedent, de novo review is appropriate despite a plan's
> conferral of discretion on a plan administrator if: the administrator fails to exercise
> discretion within the required timeframe; the administrator fails to apply its
> expertise to a particular decision; the case involves serious procedural irregularities;
> the case involves procedural irregularities in the administrative review process; or
> where the plan members lack notice of the conferral of administrator discretion over
> the plan.

*James C.*, 2020 WL 6382043, at *7 (footnotes and quotation marks omitted). None of those

situations are present here. Accordingly, the court will apply the deferential arbitrary and

capricious standard.

## B. ERISA Claim

Now that the court has determined the standard of review, it must determine if

Defendants' adverse benefits decisions were arbitrary and capricious under the terms of the Plan.

Under this standard, the administrator's "decision will be upheld unless it is not grounded on any

reasonable basis." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (emphasis in

original) (citation omitted). "This standard is a difficult one for a claimant to overcome." *Tracy

O. v. Anthem Blue Cross Life & Health Ins.*, 807 F. App'x 845, 853–54 (10th Cir. 2020) (citation

omitted). The arbitrary and capricious review of an ERISA benefits decision looks to whether the

decision: "(1) . . . was the result of a reasoned and principled process, (2) is consistent with any

prior interpretations by the plan administrator, (3) is reasonable in light of any external standards,

and (4) is consistent with the purposes of the plan." *Id.* at 854 (citations omitted). Additionally,

failure to "consistently apply the terms of an ERISA plan" and inconsistent interpretations with the "plans unambiguous language" are considered arbitrary and capricious. *Id.* (citations omitted).

In this case, Plaintiffs raise three reasons why Defendants' determinations were arbitrary and capricious: (1) medical necessity was met under the terms of the Plan; (2) Defendants incorrectly disregarded A.K.'s treating physicians' opinions; and (3) Defendants did not articulate how they applied the terms of the Plan to A.K.'s medical history or current condition. The court will add another consideration, and discuss (4) the implications of UBH's inconsistent denial rationales. Plaintiffs certainly raised this fourth issue but the court wishes to address it separately. This court will discuss each issue in turn.

### 1. Medically Necessary

The court divides Plaintiffs' medically necessary arguments into two categories: (i) the "why now" factors and (ii) the "Custodial Care" portions of the Plan and how the reviewers interpreted those terms. Additionally, the court will not redefine the relevant terms of the Plan here, as those are detailed above. *See* BACKGROUND, *supra*.

#### i.    The "Why Now" Factors

Plaintiffs take aim at the third and fourth letters' reasoning that coverage would be denied because the "why now" reasons for admission had been addressed. According to Plaintiffs, the "why now" factors had not been addressed because the purpose of admission was not to ensure that A.K. stopped self-harming behavior while at Discovery, but rather to provide long-term care until she had developed the tools to break the cycle of relapsing into self-harming behavior upon leaving inpatient care. The final three reviews stated that this admission goal had been satisfied because she had improved or had not shown self-harming behavior.

14

The court finds that, under the deferential standard, the final three reviewers did not

abuse their discretion because the evidence could reasonably be interpreted to show that A.K.

could have been discharged to a lower level of care because her most pressing admission factors

had allegedly subsided. Indeed, the evidence can support a finding that during her first 90 days at

Discovery that A.K. had improved in important ways. The court notes, however, that this is a

particularly hard issue: at some point during long-term residential treatment, a patient must be

discharged to a lower level of care to see if the treatment helped stop self-harming behavior.

There is no sure way to tell if discharge would be appropriate after three months, or six months,

or a year. The court cannot properly say that the final three reviewers arbitrarily or capriciously

found that A.K.'s three months of treatment had met the "why now" factors and that a lower

level of care would be appropriate.

For the foregoing reasons, the court finds that the final three reviewers did not abuse their

discretion in interpreting the "why now" factors as used in their denial rationales.

ii.  *Custodial Care*

Plaintiffs argue that the third and fourth denial letters arbitrarily concluded that because

the "why now" factors of A.K.'s admission had been addressed that her care became

"Custodial." Plaintiffs state this is an incorrect conclusion because the care A.K. received at

Discovery does not meet the Plan's definition of "Custodial Care." As noted above, the Plan

defines "Custodial Care" as:

> Treatment or service prescribed by a medical professional, that could be rendered
> safely and reasonably by a person not medically skilled, or that is designed mainly
> to help the patient with daily living activities. These activities are the following:
> (g)  Personal care such as help in: walking, getting in and out of bed,
>       bathing, eating by spoon, tube or gastronomy, exercising and dress;
> (h)  Homemaking, such as preparing meals or special diets;
> (i)  Moving the patient
> (j)  Acting as a companion or sitter;

15

(k) Supervising medication that can usually be self-administered; or
(l) Treatment or services that any person may be able to perform with minimal instruction including, but not limited to, recording temperature, pulse, and respirations, or administration and monitoring of feeding systems.

(Rec. 19.) According to Plaintiffs, the mere fact that A.K. was no longer exhibiting self-injurious behavior does not demonstrate that her care, for example, "could be rendered . . . by a person not medically skilled" or was "designed to mainly help the patient with daily living activities." (Rec. 19.) Defendants do not rebut this argument in any of their summary judgment papers. Without the help of Defendants' briefing, the court is persuaded by Plaintiffs' arguments.

The treatment and care that A.K. received at Discovery continued to include physician visits, counseling, therapy, medication changes, etc. Those are not services that can be rendered by a medically unskilled person. Additionally, A.K.'s care had nothing to do with her assisting her with daily activities. There is no evidence that A.K. was being assisted with any of the things listed in (m)–(r) above—or that anything that is remotely like those services. Therefore, the care A.K. received at Discovery was not Custodial Care as defined by the Plan. In short, under the Plan, treatment does not automatically become Custodial Care just because it is not medically necessary. Such an interpretation of the Plan's terms is erroneous and a denial based thereon is arbitrary.

For the foregoing reasons, the court concludes that Defendants abused their discretion in finding that A.K.'s care had become "Custodial" under the Plan.

## 2.  A.K.'s Treating Professionals' Opinions

"Nothing in [ERISA] itself . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black &*

16

*Decker Disability Plan v. Nord,* 538 U.S. 822, 831 (2003). However, "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834. The Tenth Circuit phrases this rule as a "narrow principle that fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004)

> If benefits are denied . . . the reason for the denial must be stated in reasonably clear language, . . . [and] if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this: it's how civilized people communicate with each other regarding important matters.

*Id.*

Plaintiffs claim that Defendants' decisions were arbitrary because Defendants disregarded and failed to engage with the opinions of A.K.'s treating professionals. The court finds that the claims administrators clearly reviewed the treating professionals' opinions. For example, Defendants third denial letter states that the administrator reviewed: (1) a "[l]etter from K.K. detailing the reasons she believed the decision was in error"; (2) "correspondence from K.K. with exhibits"; (3) the IPRO letter; (4) "Note from Kimberly Weater"; (5) letter from Andrew Dieterich MD; (6) "Letter from Tim Lowe PhD and Ryan Williams MD of Discovery Ranch"; and (7) "Attending Physician Progress notes." (Rec. 2004.) The fourth denial letter is less detailed but still states that the administrator reviewed the medical record, case management notes, and appeal letter—presumably from K.K., including attachments. (Rec. 2052–54.) Lastly, the fifth, external determination states that it was based upon a review of the appeal information, denial letters, correspondence between K.K. and UBH, submitted medical information, submitted criteria, and the Summary Plan Description. Again, these files likely included A.K.'s

17

treating professionals' opinions. (Rec. 2606.) Thus, the evidence shows the claims administrators did not disregard the treating professionals' opinions. Whether Defendants engaged with those opinions is an entirely different matter.

In this instance, the evidence shows the administrators did not engage with A.K.'s treating physicians' opinions. As noted above, A.K. received extensive out- and in-patient treatment in the 20 months leading up to her admission to Discovery. None of that treatment was sufficient to keep A.K. from reverting to self-harming behavior. During that time, several physicians recommended that A.K. receive long-term care. All of A.K.'s medical history and her treating professionals' opinions stand in stark contrast to the denial letters' scant reasoning. For example, the *only* reference to all of A.K.'s treatment and professionals' opinions is a passing reference stating that the purpose of the treatment was to "consolidate" A.K.'s "gains." This language comes directly from Dr. Riedel's September 10th letter to the IPRO. That is it. There is no more acknowledgement of A.K.'s serious mental health history. Indeed, this strikes the court as an instance where Defendants "shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the [Plaintiffs'] theory of entitlement." *Gaither*, 394 F.3d at 807.

Thus, the court finds that Defendants abused their discretion by not fairly engaging with A.K.'s treating professionals' opinions.

### 3.    Applying the Terms of the Plan to A.K.'s Medical History

Plaintiffs argue that Defendants abused their discretion by failing to apply the specific terms of the Plan to any specific portion of A.K.'s medical records. The law is not very clear on what level of specificity is required from claims administrators in applying a plan's terms to the medical records. Plaintiffs relied upon Judge Parrish's reasoning from *Raymond M.*, wherein

claims denials were deemed arbitrary and capricious because the letters "contain[ed] neither citations to the medical record nor references to the report by [the plaintiff's] doctors" and were merely "conclusory statements without factual support." 463 F. Supp. 3d at 1282.[1]

In *Raymond M.*, Judge Parrish draws the standard of review from *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697 (10th Cir. 2018).[2] In *McMillan*, the Tenth Circuit took issue with a plan administrator's denial of short-term disability benefits. *Id.* at 705–06. The court stated that the problem with the denials was "the lack of *any* analysis, let alone a reasoned analysis. For example, the reviews by [the claims administrators] contain[ed] nothing more than conclusory statements that [the plaintiff] could travel without any discussion whatsoever." *Id.* at 706 (emphasis in original). Indeed, a review of the facts in that case indicates that the reviewers did not do *any* analysis about the patient's ability to travel. *Id.* at 699–705. Thus, *McMillan* concluded that when a claims administrator makes a health conclusion it must provide reasoning and citation to the record. *Id.*

Extrapolating from *McMillan*, Judge Parrish concluded that the denial letters in *Raymond M.* similarly failed to fulfill their obligation to conduct a fair review of the claims. *Raymond M.*, 463 F. Supp. 3d at 1282. For example, the most detailed of denial letters from *Raymond M.* states:

> You are a 17 year old female admitted to the mental health residential treatment service level of care on 12/21/2015. On admission, you were withdrawn and not fully cooperative with the treatment programming. You were treated with individual, group, family, horse, and milieu therapies. You successfully ventured away from the facility several times without incident and had not engaged in any

---

[1] This case is currently on appeal to the Tenth Circuit. *Raymond M. v. Beacon Health Options,* Appeal No. 21-4041(Mar. 30, 2021).

[2] Judge Parrish also relies on *Kerry W. v. Anthem Blue Cross & Blue Shield*, 444 F. Supp. 3d 1305, 1313 (D. Utah 2020). That case similarly draws its standard from *McMillan v. AT&T Umbrella Benefit Plan No.* 1, 746 F. App'x 697 (10th Cir. 2018). Thus, the court does not discuss *Kerry W* since the standard is what is at issue here.

19

self-harming behaviors. You were not psychotic or aggressive and you have a supportive family. As of 01/19/2016 it was not medically necessary for your symptoms to be treated with residential treatment service monitoring and they could have been safely addressed in a less restrictive level of care such as in outpatient treatment with individual treatment, family work and medication management.

*Id.* at 1264. It is this denial letter that prompted Judge Parrish to hold that the "denial letters contain[ed] neither citations to the medical record nor references to the reports . . . concerning the state of [the patient's] condition." *Id.* at 1282. Thus, Judge Parrish concluded the denial was arbitrary. *Id.*

Here, the denial letters similarly do not contain any specific citation to the medical record whatsoever. Instead, the denial letters simply contain general statements about A.K.'s condition on admission and minimal statements about her treatment while at Discovery. As noted, there is no specific reference to any of her medical history or professionals' opinions prior to her admission to Discovery. For example, the letters generally state: (1) that when A.K. was admitted she was diagnosed as having "Dysthymia, in partial remission, Major Depressive Disorder in remission but having an Anxiety Disorder and what is termed a rule out for Group B Traits (meaning personality issues)"; (2) A.K.'s diagnoses upon admission "did not change" during her first three months; (3) A.K.'s "medication changes were minimal"; (4) "[t]here was no evidence of self-injurious behavior"; (5) A.K.'s "goals of admission"—to consolidate her gains and control self-injurious behavior—appeared to have been met; (6) because her goals had been met care became custodial; and (7) the Plan's guidelines for Residential Treatment required "evidence of active treatment, including that the psychiatrist see the patient twice a week, whereas [A.K.] was seen once a month." (Rec. 2052–54.) Of these seven statements, only two make a general reference to A.K.'s condition: that her diagnoses "did not change" and there was no evidence of self-injurious behavior. Neither of these statements are supported by citations to

the record or explained in the context of A.K.'s prior, extensive mental health medical history. Additionally, the letters do not explain or cite to any evidence to support its conclusion that A.K.s goals of admission had been met and that she would not return to self-harming behavior upon discharge. Without any support, the court finds that these conclusory statements result in an arbitrary denial of A.K.'s treatment.

At the hearing, Defendants urged the court to look at the claims administrators' notes and not just the denial letters sent to Plaintiffs. Defendants claim that these notes are more substantive and explain in more detail A.K.'s medical history and the reason why coverage for Discovery was no longer medically necessary. Plaintiffs' counsel argues that it would be improper for the court to consider these documents as they were not provided to Plaintiffs. The court agrees with Plaintiffs.

The court was unable to find any Tenth Circuit case law that speaks to this issue. The First Circuit has, however, discussed "whether a plan administrator may defend a denial of benefits on the basis of a different reason than that articulated to the claimant during the internal review process." *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 115 (1st Cir. 2004). In deciding this issue, the *Glista* court declined to adopt a "hard-and-fast rule" on this issue, instead opting to take this on a case-by-case basis. *Id.* In finding that the administrator could not rely on reasons that had not been articulated to the claimant, the *Glista* court considered the following: (1) would "traditional insurance law place[] the burden on the insurer to prove that the applicability" of a similar benefits exclusion rationale; (2) did the plan "expressly provide that participants 'must receive a written explanation of the reasons for the denial'"; (3) did the administrator give an "explanation for why it did not explain earlier" its unstated reason for

denying the claim; and (4) did the facts of the situation require that the controversy be resolved quickly? *Id.* at 131

The court finds *Glista* persuasive and will rely on its reasoning. Here, the court must hold Defendants to their denial rationales articulated in the denial letters because two of the *Glista* considerations are satisfied. First, the Plan requires "written notification from the applicable Claims Administrator" that would include: "(a) The specific reason or reasons for the denial; [and] (b) specific reference to any pertinent Plan provisions on which the denial was based[.]" (Rec. 129–30.) In fact, if a denial was "based on Medical Necessity," the notification must provide "an explanation of the scientific or clinical judgment of the determination, applying the terms of the Plan to the Participant's circumstances." (Rec. 129–30.) As explained above, that did not happen here. Second, Defendants have not given any reason why they did not include their full reasoning for the denial in the letters sent to Plaintiffs. Without any reason justifying their failure to explain their internal reasoning for denying A.K.'s claims, Defendants cannot now rely on those rationales.

Even were the court to consider those additional materials, the court is unpersuaded that the internal documents make any difference. The internal documents behind the third denial letter are, in fact, more detailed. (Rec. 1544–46.) This document details A.K.'s medical history quite thoroughly, noting her in-patient admissions, partial hospitalizations, residential treatment center stays, emergency room visits, out-patient treatment, and her history of regressing after discharge. (Rec. 1545.) The problem with these records—besides the fact that they were not communicated to Plaintiffs—is that they undermine the denial letters' conclusions and assertions. For example, the internal document states "[t]he chart [from Discovery] is absent of treatment plan updates that review her progress in attaining her objectives. Updated goals or

22

objectives are never stated. Of significance is *the absence of notes* relating to her progress in

controlling suicidal threats, runaway behavior and self-injurious behavior." (Rec. 1545

(emphasis added).) In the third denial letter, however, Defendants assert that "[t]he treatment

record indicates no evidence of ongoing self-injurious behavior." (Rec. 2004.) This is misleading

because it suggests that A.K. had not had self-injurious or suicidal thoughts when the record

actually indicates that there was simply an absence of notes on that subject. A lack of notes about

self-injurious behavior does not mean A.K. was not struggling with such thoughts or behavior.

As the aphorism goes, absence of evidence is not evidence of absence. Additionally, the third

denial letter expressly states that "[t]throughout the treatment, the attending psychiatrist did not

change [A.K.'s] diagnoses." (Rec. 2004.) That statement is directly contrary to Defendants

internal documents noting that "[t]he Master Treatment Plan changed the diagnosis to Major

Depressive Disorder, recurrent and severe, Reactive Attachment Disorder and Anxiety Disorder

NOS." (Rec. 1545.) Similar problems are present in the fourth denial letters' internal supporting

notes. (*Compare* Rec. 2575–76 *with* Rec. 2052–53.) Thus, the internal documents that were not

shared with Plaintiffs actually work to show that the denial letters' rationales were unsupported

by the record, including Defendants own notes.

 For the foregoing reasons, the court concludes that the denials were arbitrary because

they lacked "any analysis, let alone a reasoned analysis," consisting of "nothing more than

conclusory statements." *See McMillan*, 746 Fed. App'x at 706 (emphasis omitted).

### 4. Inconsistent Denial Letters

 As noted above, one of the factors that a court must consider in ERISA benefits decision

is the consistency of the denial reason between the administrators. *See Tracy O.*, 807 F. App'x at

853–54. Plaintiffs argue that the first two denial letters are wildly inconsistent with the last three

denials. Defendants attempt to distance themselves from the first two letters by: (1) claiming that

those letters did not constitute a medical necessity review; (2) asserting that the last three denials

were consistent; and (3) arguing that the first two denials were based upon different versions of

the Plan. The court will address each argument in turn.

First, the court is concerned at Defendants argument that the first two reviewers did not

conduct a medical necessity review. This argument is unsupported by the evidence. This is

manifest by looking at the first two denial letters and the supporting internal documents. The first

two denial letters clearly state that the reviewers looked at the medical records:

> Based upon current clinical [sic] member appears to require Mental Health
> Residential Treatment Center long term level of care.
> * * *
> Based upon current medical records, the member appears to require Mental Health
> Residential long term level of care.

(Rec. 442, 1904.). The plain language indicates that the claims administrator reviewed the

records and that A.K. appeared to require additional long-term care. Indeed, Defendants have not

pointed to any portion of the Plan or the record that demonstrates there was any meaningful

difference in the reviews' underlying the denial letters. The internal document supporting the

second denial letter states that A.K. "does meet [the criteria] for continued [mental health

Residential Treatment level of care]; but long term residential care as defined below is not a

covered service." (Rec 1872.) Therefore, the first and second denial letters stand in direct

opposition to the final three letters. These conflicting reasons alone are enough for the court to

find that the Defendants' denials were arbitrary.

Second, the final external denial letter's rationale is different from the third and fourth

denial letters, contrary to Defendants' assertions. While it is true that all three of the final

reviewers found that medical necessity was not met, their reasoning for why it was not met

24

differed. Specifically, the external review focused mainly on the Plan's requirement that treatment be the "most appropriate, safest, and most effective level of care." (Rec. 2606.) The external reviewer's opinion was, in short, that A.K.'s "remainder in a residential setting" was not "the safest and most effective level of care" because her conditions "could have been managed at a therapeutic school with intensive outpatient behavioral supports." (Rec. 2606.) This reasoning is different than the third and fourth reviewers' assertions that A.K.'s care had "become custodial." (Rec. 2004, 2053.) As noted above, A.K.'s care did not meet the Plan's definition of custodial care. This custodial care error is only further illustrated by the external reviewer not making that same misinterpretation.

Third, Defendants did not show that the outdated version of the Plan would require a different type of claims review process. In fact, it appears from the record that the only difference in the plan was that the exclusion for residential treatment care had been deleted. Thus, Defendants' assertion that it should not be held to account for an interpretation based on an old version of the Plan is not well taken because the Plan was—in all relevant and important ways—the same as the Plan upon which the final three reviews were based.

For the foregoing reasons, the court finds that the Defendants' shifting and inconsistent denial rationale is arbitrary and capricious.

### C. <u>Appropriate Relief</u>

"[W]hen a reviewing court concludes that a plan administrator has acted arbitrarily and capriciously in handling a claim for benefits, it can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006) (citations and internal quotation marks omitted). "The remedy when an ERISA administrator

fails to make adequate findings or to explain adequately the grounds of her decision is to remand the case to the administrator for further findings or explanation." *Id.* at 1288 (citation omitted). On the other hand, remand is unnecessary only when "the evidence clearly shows that the administrator's actions were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Id.* (citations and quotation marks omitted).

In this instance, the court finds that Defendants' denials were, in part, arbitrary and remand is not required. Although Defendants "fail[ed] to make adequate findings or to explain adequately the grounds of [their] decision"—which would require remand—that is not the basis for the court's decision to decline to remand this case. *Id.* Instead, the court basis its decision on the fact that Defendants' denials were arbitrary and capricious. The denials were arbitrary because Defendants gave inconsistent denial rationales and erroneously interpretated and applied the Plans' terms. These two types of denials fall into the category of denials for which remand is not necessary according to *Caldwell*. Accordingly, the court will not remand these claims to Defendants and instead orders Defendants to pay for A.K.'s treatment at Discovery.

<u>CONCLUSION</u>

For the foregoing reasons the court GRANTS IN PART AND DENIES IN PART Plaintiffs Motion for Summary Judgment. (ECF No. 77.) Plaintiffs' Motion is GRANTED as to their First Cause of Action for ERISA violations. The court DENIES Plaintiffs' Motion on their Second Cause of Action for Parity Act violations. (ECF No. 77.) This means that the court similarly GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment. (ECF No. 75.) Defendants' Motion is DENIED as to Plaintiffs' First Cause of Action for ERISA violations and GRANTED as to Plaintiffs' Second Cause of Action for violations of

26

the Parity Act. Since Defendants' denials were arbitrary and capricious, the court will not

remand the claims to Defendants and instead orders Defendants to pay for A.K.'s treatment at

Discovery.

DATED this 22nd day of June, 2021.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

27