## ORAL ARGUMENT REQUESTED

### No. 21-04088

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

DAVID K., KATHLEEN K., AND AMY K.,
*Plaintiffs-Appellees,*

v.

UNITED BEHAVIORAL HEALTH AND ALCATEL-LUCENT MEDICAL
EXPENSE PLAN FOR ACTIVE MANAGEMENT EMPLOYEES,
*Defendants-Appellants*

---

On Appeal from the U.S. District Court for the District of
Utah (No. 2:17-cv-01328)
The Honorable Dale A. Kimball

---

### BRIEF OF APPELLANTS

---

Jennifer S. Romano
Andrew Holmer
CROWELL & MORING LLP
515 South Flower Street
40th Floor
Los Angeles, CA  90071
Phone: (213) 622-4750

Amanda Shafer Berman
April N. Ross
Amy M. Pauli
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
Fax: (202) 628-5116
sberman@crowell.com

## CORPORATE DISCLOSURE STATEMENT

Appellant United Behavioral Health is a wholly owned subsidiary of OptumHealth Holdings, LLC. OptumHealth Holdings, LLC is a wholly owned subsidiary of Optum, Inc., which is a wholly owned subsidiary of United HealthCare Services, Inc., which is a wholly owned subsidiary of UnitedHealth Group Incorporated. UnitedHealth Group Incorporated, a publicly held corporation, does not have a parent corporation, nor does any publicly held corporation own 10% or more of UnitedHealth Group Incorporated's stock.

Appellant Nokia Medical Expense Plan for Management Employees (formerly known as the Alcatel-Lucent Medical Expense Plan for Management Employees and sued herein as the Alcatel-Lucent Medical Expense Plan for Active Management Employees) is an employee welfare benefit plan established and maintained by Nokia of America Corporation ("NoAC"). NoAC is an indirect wholly owned subsidiary of Nokia Corporation, a Finnish corporation based in Espoo, Finland. Nokia Corporation's shares are publicly traded on the Nasdaq Helsinki, Euronext Paris, and New York Stock exchanges.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT............................................i

STATEMENT OF RELATED CASES ................................................... viii

GLOSSARY .......................................................................................ix

INTRODUCTION .............................................................................. 1

JURISDICTIONAL STATEMENT ...................................................... 4

STATEMENT OF ISSUES.................................................................. 4

STATEMENT OF THE CASE ............................................................. 5

I.    The Plan and UBH's Guidelines.................................................. 5

    A.    The Plan's terms ...................................................................... 5

    B.    UBH's Guidelines .................................................................... 7

II.   A.K.'s Treatment and Benefits Claims......................................... 10

III.  UBH's Multiple Determinations That A.K.'s Continued Residential Treatment Was Not Covered Under the Plan ......................................................................................... 12

    A.    UBH mistakenly denies benefits as excluded..................... 12

    B.    UBH's medical necessity reviewers conclude that the continued services are not covered under the Plan. ....................................................................................... 14

    C.    The external reviewer also concludes that benefits should be denied..................................................... 18

IV.   The District Court's Decision.................................................... 20

SUMMARY OF ARGUMENT ............................................................ 23

ARGUMENT .................................................................................... 25

I.    The Standard of Review Below and On Appeal. .......................... 25

II.   UBH's Denial of Benefits for Extended Residential Treatment Care Was Not Arbitrary and Capricious. ................. 28

A.    Substantial evidence and sound reasoning support UBH's conclusion that continued 24-hour residential treatment was not medically necessary. .............................................................30

B.    UBH complied with ERISA's requirements and faithfully applied the Plan's terms......................................38

C.    The district court's conclusion that A.K.'s care at Discovery was not "custodial" does not undermine the reviewers' medical necessity decisions. ........................43

D.    UBH's initial denial of benefits as excluded does not render the subsequent denial on medical necessity grounds arbitrary or capricious...........................47

III.   The District Court Should Have Remanded the Claim Rather than Awarding Benefits. ..................................................50

CONCLUSION .....................................................................57

ORAL ARGUMENT STATEMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

ATTACHMENT A – MEMORANDUM DECISION AND ORDER FILED 06/22/21

ATTACHMENT B – DISTRICT COURT JUDGMENT FILED 06/22/21

ATTACHMENT C – MEMORANDUM DECISION AND ORDER ON FEES AND COSTS FILED 09/07/21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Adamson v. Unum Life Ins. Co. Of Am.*,
    455 F.3d 1209 (10th Cir. 2006).....................................................27, 31

*Alexandra H. v. Oxford Health Ins., Inc.*,
    763 F. App'x 865 (11th Cir. 2019) ...........................................34-35, 43

*Amy G. v. United Healthcare*,
    No. 2:17–CV–00427–BSJ, 2018 WL 2303156
    (D. Utah May 21, 2018) ...............................................33, 34, 37, 38, 45

*Buffonge v. Prudential Ins. Co. of Am.*,
    426 F.3d 20 (1st Cir. 2005) ...........................................................55-56

*Carlo B. ex rel. C.B. v. Blue Cross Blue Shield of Mass.*,
    No. 2:08–CV–0059 BSJ, 2010 WL 1257755
    (D. Utah Mar. 26, 2010)..........................................................26, 27, 33

*Caldwell v. Life Ins. Co. of N. Am.*,
    287 F.3d 1276 (10th Cir. 2002)........................................50, 51, 53, 54

*Collins v. Pension & Ins. Comm. of S. Cal. Rock Prods. &*
    *Ready Mixed Concrete Ass'ns*,
    144 F.3d 1279 (9th Cir. 1998)..............................................................47

*DeGrado v. Jefferson Pilot Fin. Ins. Co.*,
    451 F.3d 1161 (10th Cir. 2006)...............................................52, 53, 54

*Dickens v. Aetna Life Ins. Co.*,
    2011 WL 1258854 (S.D.W.Va. Mar. 28, 2011) ..............................56-57

*DiGregorio v. Hartford Comprehensive Emp. Benefit Serv.*
    *Co.*, 423 F.3d 6 (1st Cir. 2005)...........................................................54

*Downie v. Indep. Drivers Ass'n Pension Plan*,
    934 F.2d 1168 (10th Cir. 1991)...........................................................28

*Duncan v. Hartford Life & Accident Ins. Co.*,
  2013 WL 1785904 (E.D. Cal. Apr. 25, 2013) ....................................... 56

*Elliott v. Metro. Life Ins. Co.*,
  473 F.3d 613 (6th Cir. 2006) ....................................................... 52

*Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*,
  663 F.3d 1124 (10th Cir. 2011) .................................................. 25

*Flinders v. Workforce Stabilization Plan of Phillips*
  *Petroleum Co.*, 491 F.3d 1180 (10th Cir. 2007) ......................... 28, 41

*Glista v. Unum Life Insurance Co. of America*,
  378 F.3d 113 (1st Cir. 2004) ...................................................... 41

*Jeffrey F. v. McGraw Hill Fin., Inc.*,
  No. 2:15-CV-00874-BSJ, 2017 WL 1424027
  (D. Utah Apr. 20, 2017) ............................................................. 46

*LaAsmar v. Phelps Dodge Corp. Life, Accidental Death &*
  *Dismemberment & Dependent Life Ins. Plan*,
  605 F.3d 789 (10th Cir. 2010) ................................................. 4, 25

*M & G Polymers USA, LLC v. Tackett*,
  574 U.S. 427 (2015) .................................................................. 47

*Mark M. v. United Behavioral Health*,
  No. 2:18-CV-00018-BSJ, 2020 WL 5259345
  (D. Utah Sept. 3, 2020) ....................................................... 35, 36

*Martinez v. Plumbers & Pipefitters Nat'l Pension Plan*,
  795 F.3d 1211 (10th Cir. 2015) ................................................. 26

*Mary D. v. Anthem Blue Cross Blue Shield*,
  778 F. App'x 580 (10th Cir. 2019) .............................. 38, 39, 40, 41, 54

*McCartha v. Nat'l City Corp.*,
  419 F.3d 437 (6th Cir. 2005) ..................................................... 44

*Miles v. Principal Life Ins. Co.*,
  720 F.3d 472 (2d Cir. 2013) ...................................................... 52

*Rademacher v. Colo. Ass'n of Soil Conservation Dists. Med.*
  *Benefit Plan*, 11 F.3d 1567 (10th Cir. 1993) ....................... 4, 26, 33, 50

*Raymond M. v. Beacon Health Options, Inc.*,
  463 F. Supp. 3d 1250 (D. Utah 2020) .................................................. 53

*Rekstad v. U.S. Bancorp*,
  451 F.3d 1114 (10th Cir. 2006) ................................................. 51-52, 55

*Robert O. v. Harvard Pilgrim Health Care, Inc.*,
  No. 2:17-cv-1251-TC, 2019 WL 3358706
  (D. Utah July 25, 2019) ................................................................. 36, 46

*Saffle v. Sierra Pacific Power Co. Long Term*
  *Disability Income Plan*, 875 F.3d 455 (9th Cir. 1996) ........................ 56

*Sandoval v. Aetna Life & Cas. Ins. Co.*,
  967 F.2d 377 (10th Cir. 1992) ................................................. 27, 28, 50

*Stacy S. v. Boeing Co. Emp. Health Benefit Plan (Plan 626)*,
  344 F. Supp. 3d 1324 (D. Utah 2018) ..................................... 36-37, 40

*Stephens v. Westinghouse Benefits Plan*,
  1 F. App'x 478 (6th Cir. 2001) ............................................................ 45

*Tracy O. v. Anthem Blue Cross Life & Health Ins.*,
  807 F. App'x 845 (10th Cir. 2020) ................................................. 37, 42

*Weber v. GE Grp. Life Assurance Co.*,
  541 F.3d 1002 (10th Cir. 2008) ...................................................... 26, 51

*Williby v. Aetna Life Ins. Co.*,
  867 F.3d 1129 (9th Cir. 2017) ...................................................... 32-33

*Woolsey v. Marion Labs, Inc.*,
  934 F.2d 1452 (10th Cir. 1991) ......................................... 26, 29, 37, 43

**Statutes**

28 U.S.C. § 1291.................................................................. 4

29 U.S.C. § 1001 *et seq.* ..................................................... 1

29 U.S.C. § 1132................................................................. 4

29 U.S.C. § 1132(a)(1)(B).................................................. 20

**Regulations**

29 C.F.R. § 2560.503-1....................................................... 38

29 C.F.R. § 2560.503-1(g)(1)(vii) ...................................... 39

## STATEMENT OF RELATED CASES

Pursuant to Tenth Circuit Rule 28.2(C)(3), Appellants are not aware of any related cases pending before this Court.

## GLOSSARY

| | |
|---|---|
| AACAP | American Academy of Child and Adolescent Psychiatry |
| APA | American Psychiatric Association |
| CASII | Child and Adolescent Service Intensity Instrument |
| ERISA | Employee Retirement Income Security Act of 1974 |
| UBH | United Behavioral Health |

## INTRODUCTION

Appellees D.K. and A.K. ("Claimants") sued to recover benefits for A.K.'s extended residential treatment for depressive and other disorders under an employee welfare benefit plan (the "Plan") governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). IPRO, a third-party reviewer for Appellant United Behavioral Health ("UBH") approved a three month stay at a 24-hour Residential Treatment Center, the Discovery Ranch for Girls ("Discovery"). Claimants then sought benefits for ten additional months of residential care at Discovery. Three board-certified psychiatrists— including an independent external reviewer—agreed that continued residential treatment was not medically necessary, and thus not covered under the Plan. The district court admitted that the reviewers' unanimous conclusion was supported by record evidence, but found UBH's denial of benefits arbitrary and capricious. It then awarded benefits outright, rather than remanding so that UBH could reassess the claim. The district court's decision was wrong in both respects.

UBH's denial of benefits is supported by substantial record evidence, including the unanimous decisions of three psychiatrists, based

on a thorough review of the record, that continued residential care was not medically necessary under the Plan. The fact that A.K. was seen by a psychiatrist only once a month while at Discovery, contrary to UBH's Guidelines for care under the Plan, also supports the denial of benefits. Although the district court correctly held that the denial of benefits must be reviewed under the deferential arbitrary and capricious standard, it did not properly apply that standard. Rather, the court effectively, but improperly, conducted a *de novo* review of UBH's discretionary decision.

The district court acknowledged that UBH's board-certified psychiatrists *did not abuse their discretion* when they denied additional benefits based on record evidence supporting their conclusion that continued residential treatment was not medically necessary. The court's inquiry should have ended there. Instead, it second-guessed the reviewers' analyses, improperly refused to consider the entire record, and found UBH's decision arbitrary and capricious based on the Court's own conclusion that A.K.'s treatment was not subject to the distinct Plan exclusion for "Custodial Care." But that is a separate basis for denying benefits under the Plan. Even if the Custodial Care exclusion does not apply, that does not undermine UBH's denial of benefits based on failure

to satisfy the Plan's independent medical necessity requirement. The district court also found inconsistency between the medical necessity determinations and UBH's earlier, and erroneous, denial of benefits as falling under a Plan exclusion for out-of-network residential services. But UBH's initial denial of benefits as excluded was not inconsistent with, and does not undermine, multiple reviewers' subsequent conclusions that residential treatment was not medically necessary. Under the deferential arbitrary and capricious standard, the question is whether UBH's decision was reasonable and supported by record evidence. The district court admitted it was, and therefore should have upheld that decision.

The district court also was wrong to award benefits. Under the law of this circuit, remand is the appropriate remedy unless the evidence is clear that claimants are entitled to receive benefits under the Plan. Having admitted that record evidence supported the reviewers' conclusion that benefits were *not* due, the district court erred when it awarded benefits. Thus, even if this Court were to conclude that the denial of benefits was arbitrary and capricious, it should instruct the district court to remand the claim to UBH for reassessment.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction to consider this matter under 29 U.S.C. § 1132. *Rademacher v. Colo. Ass'n of Soil Conservation Dists. Med. Benefit Plan*, 11 F.3d 1567, 1569 (10th Cir. 1993). It issued a final judgment disposing of all claims on June 22, 2021. App. Vol. 1 at 42–69.

UBH timely filed its Notice of Appeal on July 21, 2021. App. Vol. 1 at 70–71. This Court has jurisdiction to review the district court's decision under 28 U.S.C. § 1291. *See LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 794 (10th Cir. 2010).

## STATEMENT OF ISSUES

1.    The district court conceded that record evidence and sound reasoning supported three medical reviewers' unanimous conclusion that residential treatment was not medically necessary as required for coverage under the Plan, but reversed UBH's denial of benefits. Was that a proper application of the deferential arbitrary and capricious standard of review?

2.    Based solely on its conclusion that the denial of benefits was arbitrary and capricious, the district court awarded benefits to Appellees. Should the court have remanded instead, as is required under this

circuit's case law where the record evidence does not clearly show that benefits are due under the Plan?

## STATEMENT OF THE CASE

### I.    The Plan and UBH's Guidelines.

The Plan—the Nokia Medical Expense Plan for Management Employees (formerly named the Alcatel-Lucent Medical Expense Plan for Management Employees and sued herein as the Alcatel-Lucent Medical Expense Plan for Active Management Employees)—is a self-funded employee welfare benefit plan established and maintained by Nokia of America Corporation (formerly known as Alcatel-Lucent USA Inc.). App. Vol. 2 at 19. UBH, an affiliate of UnitedHealthcare, administers mental health benefits under the Plan in compliance with ERISA. App. Vol. 2 at 2, 20. The operative Plan document became effective January 1, 2008, and was amended in 2010. App. Vol. 2 at 1, 21. Before January 10, 2010, the Plan excluded "Alternative Treatment Facilities accessed or provided Out-of-Network," which included out-of-network treatment at Residential Treatment Centers.  App. Vol. 2 at 16, 22.

### A.    The Plan's terms.

The Plan defines the terms under which coverage is available. The Plan covers both inpatient and outpatient mental health services. App.

Vol. 2 at 23, 25. "Covered Services" include "those expenses or costs that satisfy all of the terms and conditions necessary for payment under the Plan." App. Vol. 2 at 5. "For Plan expenses to be covered, they must be Medically Necessary and provided in conformance with all terms and conditions of the Plan." App. Vol. 2 at 2; *see also id.* at 11 ("Medically Necessary treatment that is certified by the MH/CD Program Claims Administrator will be covered[.]"). The Plan does not cover "services or supplies that are not Medically Necessary[.]" *Id.* at 14; *see also id.* at 13 ("If, for any reason, the MH/CD Program Claims Administrator determines that the admission or service is not Medically Necessary . . . no benefits will be paid under the Plan.").

Under the Plan, "Medically Necessary" services include those that the Claims Administrator determines are "medically appropriate for the diagnosis or treatment of an Illness, Pregnancy or accidental injury." *Id.* at 7. The Claims Administrator relies on its medical personnel to develop standards for determining whether treatment is medically appropriate. *Id.* The Plan provides that UBH develops the standards "with consideration as to whether the service … meets all of the following," including that:

(i) It is accepted by the health care profession in the U.S. as the most appropriate level of care . . . .

(ii) It is the safest and most effective level of care for the condition being treated. . . . [and]

(iv) There is not a less intensive or more appropriate place of service, diagnostic or treatment alternative that could have been used in lieu of the place of service or supply given.

*Id.* Care must meet all of the above criteria to qualify as "Medically Necessary." *See id.*

The Plan also provides that "Custodial Care" services are not covered. App. Vol. 2 at 14. It defines "Custodial Care" as "treatment or service prescribed by a medical professional, that could be rendered safely and reasonably by a person not medically skilled, or that is designed mainly to help the patient with daily living activities." *Id.* at 6.

## B.   UBH's Guidelines.

When Claimants sought benefits to cover A.K.'s stay at Discovery, UBH relied on "Level of Care" Guidelines to determine whether services are Medically Necessary. *Id.* at 26.[1] Under the Guidelines, a Residential Treatment Center was described as a

---

[1] UBH no longer uses its Level of Care Guidelines. In 2020, UBH began using the Child and Adolescent Service Intensity Instrument (CASII) criteria in determining the medical necessity of level of care placements for covered mental health services for children aged 6 to 18 under (Continued…)

> facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members . . . The course of treatment in a Residential Treatment Center is focused on addressing the 'why now' factors that precipitated admission (e.g., changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning) to the point that the member's condition can be safely, efficiently and effectively treated in a less intensive level of care.

*Id.* The Guidelines identified criteria for admission to a Residential Treatment Center, including that: "The 'why now' factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors." *Id.* at 26–27.

The Guidelines outlined "Clinical Best Practices" for residential treatment. *Id.* These included that a psychiatrist must "see[] the member at least 2 times per week, and supervise[] and evaluate[] the treatment program to determine the extent to which treatment goals are being realized and whether changes in the treatment plan are needed." *Id.*

---

ERISA-governed benefit plans. The CASII criteria were created by the American Academy of Child and Adolescent Psychiatry (AACAP). For children ages 6 through 18, UBH now uses the CALOCUS-CASII criteria, which are the product of a partnership between AACAP and the American Association of Community Psychiatry.

The Guidelines also identified criteria for determining whether continued residential care is needed, including that the services should not be "primarily for the purpose of providing custodial care." *Id.* at 26. The Guidelines described "custodial" services as including those "that don't seek to cure, are provided when the member's condition is unchanging, are not required to maintain stabilization, or don't have to be delivered by trained clinical personnel." *Id.* at 26–27.

UBH also developed Guidelines for the treatment of Major Depressive Disorder and Dysthymic Disorder. *Id.* at 34. They excluded from coverage "any" services that were not "consistent with generally accepted standards of medical practice for the treatment of such conditions"; "backed by credible research"; or "clinically appropriate for the member's Mental Illness or condition based on generally accepted standards of medical practice and benchmarks." *Id.* at 35. They also directed UBH's administrators to consider whether "[t]here is a reasonable expectation that services will improve the member's presenting problems within a reasonable period of time[,]" or whether the care is instead "primarily for the purpose of providing social, custodial, recreational, or respite care." *Id.* at 37. And they advised that discharge

is appropriate when "[t]he goals for the current episode have been accomplished" or "[t]he member requires primarily social, custodial, recreational or respite care[.]" *Id.* at 39.

## II.   A.K.'s Treatment and Benefits Claims.

In September 2013, D.K., a Plan participant, sought an exception under the Plan from Alcatel-Lucent USA Inc. so that his 14-year old daughter, A.K., could receive residential treatment for 12 consecutive months. App. Vol. 2 at 40–42. At that point, A.K. had been struggling with suicidal thoughts, self-injurious behavior, and other mental health disorders for approximately a year. *Id.* at 54–56. Acknowledging that the Plan generally only "cover[s] residential treatment until a patient is stabilized and the symptoms that resulted in admission have abated," D.K. sought a "case exception" to allow for longer-term residential care after A.K. experienced multiple ER visits, in-patient hospitalizations, and short-term residential treatment placements despite stabilizing during treatment. *Id.* at 54.

In his letter, D.K. explained that he understood that the Plan's "goal[s] [are] to treat patients in the least restrictive care setting they need," and that the Plan's coverage determination guidelines cover

residential treatment only "until a patient is stabilized and the symptoms that resulted in admission have abated." *Id.* But he stated that his daughter needed extended treatment to avoid regressive behaviors once she returned home. *Id.* He sought coverage for 12 months of extended care for A.K. at Discovery in Cedar City, Utah, so that she could "receive therapy to regulate her emotions, practice positive coping skills, and develop relationship skills." *Id.* at 55–56.

A third-party reviewer, IPRO, responded to D.K.'s request, granting it, but only for three months of coverage. App. Vol. 2 at 44. The reviewer, a physician board-certified in child and adolescent psychiatry, considered several letters from A.K.'s medical providers, multiple emails, A.K.'s medical records from previous residential stays, and other documents. *Id.* After analyzing A.K.'s file, the reviewer agreed that residential treatment would allow A.K. to "improve and sustain the improved coping skills and emotional regulation needed to exist outside of a 24-hour setting without being a high risk to harm herself again." *Id.* at 46. But, he noted, "[t]he [American Psychiatric Association ("APA")] Practice Guidelines for the Treatments of Patients with Major Depressive or Bipolar Disorders report that the least restrictive level of care for safe

and effective treatment is appropriate" and "one year is not considered the standard." *Id.* IPRO agreed to cover A.K.'s Discovery stay for "three months to address her progress and further treatment needs[.]" *Id.*

On November 4, 2013, A.K. began treatment at Discovery. App. Vol. 2 at 48. On January 31, 2014, UBH agreed that the Plan would cover seven additional days to accommodate A.K.'s transition out of the program. *Id.* at 51. UBH thus covered 97 days of A.K.'s Discovery stay. *Id.* at 53, 50, 54–56, 96. Claimants nevertheless chose to have A.K. remain at Discovery for over ten additional months. *Id.* at 58.

## III. UBH's Multiple Determinations That A.K.'s Continued Residential Treatment Was Not Covered Under the Plan.

### A. UBH mistakenly denies benefits as excluded.

On February 5, 2014, A.K.'s family requested coverage for additional time at Discovery, from February 9, 2014 forward. *Id.* at 60–61. Jennifer Dunning, a Licensed Professional Counselor, issued a letter denying coverage for the additional stay. *Id.* at 62. She noted that "[b]ased upon current clinical member appears to require Mental Health Residential Treatment Center long term Level of Care but due to excluded service a denial will be submitted." *Id.* Ms. Dunning's determination was based on a mistaken belief that the Plan contained an

exclusion for out-of-network residential treatment. But Ms. Dunning did not conclude that A.K.'s treatment would otherwise be covered under the Plan. She noted that Discovery's long term residential services were "not consistent with generally accepted standards of medical practice for the treatment of such conditions" or "backed by credible research"; "[n]ot clinically appropriate for the patient's mental illness . . . or condition based on generally accepted standards of medical practice and benchmarks"; and "[e]ducational/behavioral services that are focused on primarily building skills and capabilities in communication, social interaction and learning." *Id.* at 63.

In June 2014, D.K. and his wife, K.K., submitted a first-level appeal of Ms. Dunning's decision. *Id.* at 64–71. A board-certified psychiatrist, Dr. Kho, reviewed the appeal and supporting documents. *Id.* at 72–74. On August 1, 2014, Dr. Kho upheld the initial denial of benefits. *Id.* at 75–76. Dr. Kho explained that he denied coverage because he believed out-of-network residential treatment services were excluded under the Plan. *Id.* But Dr. Kho also explained that Discovery's services were inconsistent with the accepted standard of medical practice and research

13

and were "focused on primarily building skills and capabilities in communication, social interaction and learning." *Id.* at 74.

A.K.'s parents appealed again. App. Vol. 2 at 77–83. They argued that "UBH appear[ed] to not be fully aware of the 2010 plan amendment eliminating the out-of-network exclusion." *Id.* at 82. UBH then recognized it had erred in relying on that exclusion, which had been deleted from the Plan. UBH therefore converted D.K. and K.K.'s September 2014 appeal from a second-level review to a first-level review, thus giving them an additional opportunity to address the bases for the decision. *Id.* at 84. During a late November 2014 phone call between K.K. and UBH, UBH advised K.K. that Discovery's services were a "covered benefit and Dr. Baker has agreed to review the medical records for medical necessity." *Id.* at 86. UBH told K.K. that Dr. Baker "request[ed] 2 weeks time to review" A.K.'s medical records to complete the medical necessity analysis. *Id.* "All parties [ ] agreed" to proceed on that path. *Id.*

## B.    UBH's medical necessity reviewers conclude that the continued services are not covered under the Plan.

Two weeks later, Dr. Baker, a board-certified child and adolescent psychiatrist, issued his determination, finding that continued Residential Treatment Care of A.K. beyond February 9, 2014 was not

medically necessary. App. Vol. 2 at 87–89. He reviewed the appeal materials, as well as UBH's internal notes and records relating to A.K.'s condition and treatment ("LINX" notes) beginning in early 2012; letters from A.K.'s therapists and doctors; A.K.'s Discovery treatment plan; her treatment and therapy notes "from admission [to Discovery] through 10/15/2014," and psychological testing. *Id.* at 87–88. Dr. Baker concluded that continued residential treatment beyond February 9, 2014 was not medically necessary for three main reasons.

<u>First</u>, Discovery's services did not include evidence of active treatment. Under UBH's Guidelines, "active treatment" includes seeing a physician "two times per week." *Id.* at 88. But Discovery's psychiatrist only assessed A.K. monthly. *Id.* Dr. Baker acknowledged that A.K. had been admitted to Discovery to "consolidate her gains, as she had a history of regressing," but noted that, upon "admission, the attending psychiatrist found little evidence of active psychiatric illness." *Id.* Dr. Baker pointed to notes in the treatment record describing A.K.'s Dysthymia as "in partial remission" and her Major Depressive Disorder as "in remission." *Id.* He also found that "[t]he treatment record indicates no evidence of ongoing self-injurious behavior in the three months prior

to the adverse determination." *Id.* Dr. Baker thus concluded that the reasons for admission had been addressed. *Id.*

Second, Dr. Baker found "no evidence the attending psychiatrist supervised and reassessed the treatment plan," as also required by the Guidelines. *Id.* Rather, Dr. Baker found that the record indicated that, as of February 8, 2014, the "main focus" of A.K.'s treatment was her "personality issues, i.e. problems with rejection sensitivity, identity, self-esteem, appropriate communication and so on." *Id.* "[P]ersonality issues are a long-term issue and are not expected to respond within a reasonable period of time," Dr. Baker explained. *Id.*

Third, Dr. Baker observed that A.K.'s Discovery services were not a "24 hour/7 day assessment and diagnostic service[] with active behavior health treatment," as the Guidelines require for a facility to qualify as a Residential Treatment Center. *Id.* For all these reasons, Dr. Baker concluded that continuing treatment at Discovery was not medically necessary, and therefore denied additional benefits. *Id.*

K.K. then submitted a renewed second-level appeal. *Id.* at 91–92. Dr. Donald Manning, a UBH Associate Medical Director and a board-certified psychiatrist, conducted that analysis. *Id.* at 122–23. He

examined A.K.'s medical record, case management notes, K.K.'s appeal letter, and UBH's Guidelines. *Id.*

On March 6, 2015, Dr. Manning upheld Dr. Baker's denial. *Id.* at 57–58. Like Dr. Baker, Dr. Manning found that continued treatment at Discovery was not medically necessary. *Id.* at 57. Dr. Manning observed that, when admitted, A.K.'s Dysthymia was in "partial remission" and her Major Depressive Disorder was "in remission." *Id.* at 57–58. Though A.K. had Anxiety Disorder and "personality issues," "[t]hese diagnoses did not change and medication changes were minimal." *Id.* at 58. Dr. Manning explained that, because "the goals of admission" at Discovery— to "consolidate [A.K.'s] gains so that she could control her[] [self-]injurious behavior"—had been achieved, further residential treatment was not medically necessary. *Id.*

Dr. Manning also explained that Discovery's services did not meet UBH's Guidelines. *Id.* Among other issues, Discovery did not provide A.K. with "active treatment, including that the psychiatrist see the patient twice a week," as the UBH Guidelines require. *Id.* As in Dr. Baker's decision, this major discrepancy between A.K.'s treatment at Discovery and UBH's Guidelines was cited as a key reason for Dr.

Manning's conclusion that additional treatment at Discovery was not medically necessary, and therefore benefits should be denied.

### C. The external reviewer also concludes that benefits should be denied.

D.K. and K.K. next requested an external review. App. Vol. 2 at 124–33. K.K. asserted that "UBH has never provided me with positive proof that a fair review was ever conducted." *Id.* at 125. So she asked for "a full, fair, and thorough independent third party review[.]" *Id.* at 132.

MCMC, the external reviewer not affiliated with UBH, completed its analysis on November 5, 2015. *Id.* at 134–44. The MCMC review was completed by a board-certified psychiatrist with a sub-certification in Child and Adolescent Psychiatry. *Id.* at 144. The MCMC decision includes a detailed timeline and citations to A.K.'s treatment notes from Discovery. *Id.* at 134–44. For example, A.K.'s Discovery treatment team noted that, by at least March 5, 2014, A.K. "lack[ed] [the] urges to self-harm." *Id.* at 134–35. Later Discovery team notes confirmed A.K.'s improvement. *Id.* at 135 (noting A.K. had "identified the coping skills that she is using" to repress "urges to cut"). In August 2014, A.K.'s team noted she had "stagnat[ed]." *Id.* at 136. Her parents agreed and conveyed that A.K. had "become too comfortable." *Id.*

Based on the Plan and academic youth therapy articles, the independent MCMC psychiatrist found that Discovery's services were not medically necessary after February 9, 2014. *Id.* at 143. He explained that, under the Plan,

> care is considered medically necessary if: it is accepted by the healthcare profession in the U.S. as the most appropriate, safest, and most effective level of care for the condition being treated; it is based upon recognized standards of the healthcare specialty involved; it represents the most appropriate level of care — the frequency of services, the duration of services and the site of services, depending on the seriousness of the condition being treated.

*Id.* The independent psychiatrist acknowledged that A.K. continued to "act out", but found that she "had improved", and there was no "evidence during this time period that remainder [sic] in a residential setting was the safest and most effective level of care." *Id.* Rather, her behavior "could have been managed at a therapeutic school with intensive outpatient behavioral supports[.]" *Id.* Therefore, like the two UBH psychiatrists before, the MCMC psychiatrist concluded that continued treatment at a Residential Care Facility was not medically necessary and denied coverage for additional residential treatment services beyond the 97 days UBH had already covered.

## IV.    The District Court's Decision.

On December 29, 2017, D.K. and A.K. filed this action. App. Vol. 1 at 15. In their Third Amended Complaint, A.K.'s family asserted an ERISA claim for recovery of benefits under 29 U.S.C. § 1132(a)(1)(B). App. Vol. 1 at 27. They also asserted a claim under the Mental Health Parity and Addiction Equity Act, but later abandoned it. App. Vol. 1 at 51. In February 2021, the parties cross moved for summary judgment. *Id.*

The district court correctly held that UBH's determinations were subject to review under the arbitrary and capricious standard. *Id.* at 51–54. It did so because the Plan grants UBH significant discretion when analyzing coverage eligibility. App. Vol. 2 at 151. Claimants protested, arguing that UBH violated ERISA's procedures by providing different bases for denying coverage and thus had forfeited the deferential standard of review. App. Vol. 1 at 51–52. The district court disagreed because the final three reviews by UBH and MCMC were "based on the merits regarding the medical necessity of A.K.'s claim[.]" *Id.* at 53.

Turning to the merits, the district court admitted that, "under the deferential standard, the final three reviewers did not abuse their discretion because the evidence could reasonably be interpreted to show

that A.K. could have been discharged to a lower level of care because her most pressing admission factors had allegedly subsided." App. Vol. 1 at 56. The court also agreed that "the evidence can support a finding that during her first 90 days at Discovery [] A.K. had improved in important ways." *Id.* And the district court admitted that it "cannot properly say that the final three reviewers arbitrarily or capriciously found that A.K.'s three months of treatment had met the 'why now' factors and that a lower level of care would be appropriate." *Id.* But the court nonetheless found UBH's denial of benefits arbitrary and capricious on the ground that A.K.'s care did not meet the Plan's definition of "custodial care," stating that treatment "does not automatically become Custodial Care just because it is not medically necessary." *Id.* at 56–57.

The district court also admitted that "the claims administrators clearly reviewed the treating professionals' opinions." *Id.* at 57–58; *see also id.* at 59 (the medical reviewers "did not disregard the treating professionals' opinions"). But the court nonetheless found that the reviewers had failed to "engage" with "A.K.'s treating physicians' opinions" and lacked "specific citation to the medical record", pointing to A.K.'s medical history *before* being admitted to Discovery in September

2013. *Id.* at 59–61. The court did not explain why it thought that A.K.'s *pre-Discovery* medical history should determine whether *continued* residential treatment at Discovery was medically necessary as of February 9, 2014. The court opined, however, that UBH had not provided its "full reasoning" to Claimants in the denial letters. *Id.* at 63.

To further support its decision in Claimants' favor, the court pointed to UBH's first two denials erroneously relying on the obsolete Plan exclusion for out-of-network residential treatment. *Id.* at 64–66. The court viewed those earlier denials based on the exclusion as in "direct opposition" to the subsequent denials based on the lack of medical necessity because the earlier denials included a statement that the "member appears to require . . . Residential Treatment Center long term level of care." *Id.* at 65. The court asserted that "[t]hese conflicting reasons alone are enough for the court to find that the Defendants' denials were arbitrary." *Id.* The court also found inconsistency between the external reviewer decision and those of the internal reviewers. *Id.* at 66 (pointing to MCMC's statement that A.K. could have received treatment at a lower level of care as "different" from the internal reviewers' statements that care had become "custodial").

The district court therefore entered summary judgment for A.K. and D.K. It then awarded benefits rather than remanding to UBH for further explanation. *Id.* at 66–67. UBH now appeals.

## SUMMARY OF ARGUMENT

UBH's denial of benefits for A.K.'s continued residential treatment at Discovery was not arbitrary or capricious. Three board certified psychiatrist reviewers—two internal, one external—agreed that, after three months at Discovery, further residential treatment was not medically necessary and thus not covered under the Plan. Those determinations were reasoned and supported by substantial evidence, including treatment notes from Discovery indicating that A.K. had improved and the reasons for her admission had been addressed, as well as the undisputed fact that A.K. was seen by a psychiatrist only once a month at Discovery, contrary to the requirements for residential care.

The district court admitted that the reviewers' reasoning and the record evidence were sufficient to support the conclusion that residential care was not medically necessary. It nevertheless reversed and awarded benefits after finding that A.K.'s treatment did not qualify for the "Custodial Care" exclusion under the Plan. But that is a *separate* basis

for denying benefits. Thus, even if correct, the district court's conclusion does not undermine UBH's denial of benefits on medical necessity grounds. The district court also found inconsistencies between the reviewers' analyses, but again the record does not support the court's findings. And even if there were some inconsistency between different reviewers' analyses, that does not undermine UBH's denial of benefits where *all* of the medical necessity reviewers reviewed the record and agreed that continued residential care was not medically necessary under the Plan. Under the deferential arbitrary and capricious standard, the question below was whether the denial of benefits was reasoned and supported by record evidence. The district court so admitted, which should have been the end of the analysis, resulting in a decision upholding the denial of benefits.

Finally, even if this Court were to conclude that the denial of benefits was arbitrary and capricious, it should reverse the district court's award of benefits and instruct the court to remand to UBH so that UBH can address any deficiencies in its process or decision in the first instance. The law of this circuit instructs that, unless the record evidence clearly shows that the claimant is entitled to benefits under the Plan, the

court is to remand to the claims administrator. Otherwise, the court is improperly substituting its judgment for that of medical experts—which is precisely what the district court did here. Given that three board-certified psychiatrist reviewers agreed, based on A.K.'s treatment record, that continued residential care was not medically necessary, this is not a case where the evidence undisputedly shows that benefits are due. Therefore, if this Court finds UBH's denial of benefits arbitrary and capricious, the appropriate remedy is to remand the claim to UBH for further assessment in light of this Court's reasoning.

## ARGUMENT

### I.    The Standard of Review Below and On Appeal.

On appeal, this Court reviews orders granting summary judgment "de novo, applying the same standard as the district court." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011). Where the parties both move for summary judgment, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the

usual inferences in its favor." *LaAsmar*, 605 F.3d at 796 (internal quotation marks and citation omitted).

The trial court correctly recognized that UBH's denial of benefits must be reviewed under the deferential arbitrary and capricious standard. App. Vol. 1 at 52–54. This is because the Plan explicitly gives its administrator "sole and complete discretionary authority to determine conclusively . . . eligibility for benefits[.]" App. Vol. 2 at 151. As this Court has explained, "[w]here an ERISA provider has . . . retained [discretionary] authority 'in explicit terms, we employ a deferential standard of review,' asking only whether the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citations omitted); *Martinez v. Plumbers & Pipefitters Nat'l Pension Plan*, 795 F.3d 1211, 1214 (10th Cir. 2015).

Under the arbitrary and capricious standard, a plan decision having "any reasonable basis will be upheld; it need not be [the] only logical or even best decision." *Rademacher*, 11 F.3d at 1570. The court may not "substitute [its] judgment for the judgment of the [Plan] unless the actions of the [Plan] are not grounded on *any* reasonable basis." *Woolsey v. Marion Labs, Inc.*, 934 F.2d 1452, 1460 (10th Cir. 1991)

(internal quotation marks and citation omitted). It "matters not whether this court disagrees with the conclusions of the . . . reviewing physicians, or whether upon the evidence in this record, a reasonable person could find that those conclusions were wrong." *Carlo B. ex rel. C.B. v. Blue Cross Blue Shield of Mass.*, No. 2:08–CV–0059 BSJ, 2010 WL 1257755, at *5 (D. Utah Mar. 26, 2010). Rather, the claim decision need only be "somewhere on a continuum of reasonableness—even if on the low end." *Adamson v. Unum Life Ins. Co. Of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006) (internal quotation omitted)

A denial of benefits is not arbitrary and capricious so long as it is supported by "substantial evidence." *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992); *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006). Substantial evidence is:

> of the sort that a reasonable mind could accept as sufficient to support a conclusion. Substantial evidence means more than a scintilla . . . yet less than a preponderance. The substantiality of the evidence is evaluated against the . . . administrative record as a whole.

*Adamson*, 455 F.3d at 1212; *see also Sandoval*, 967 F.2d at 382; *Carlo B.*, 2010 WL 1257755, at *3. Contrary to the district court's assertion, when reviewing a denial of ERISA benefits, the courts are not limited to the

"rationales articulated in the denial letters" sent to Claimants. [App. Vol. 1 at 63]. Rather, they may consider all of "the evidence and arguments that appear in the administrative record." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007), *abrogated on other grounds*, *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008); *see also Sandoval*, 967 F.2d at 380 (district court may consider "the arguments and evidence before the administrator at the time it made that decision").

Finally, this Court reviews the district court's choice of remedy for an abuse of discretion. *Downie v. Indep. Drivers Ass'n Pension Plan*, 934 F.2d 1168, 1170 (10th Cir. 1991).

## II. UBH's Denial of Benefits for Extended Residential Treatment Care Was Not Arbitrary and Capricious.

UBH's denial of benefits was not arbitrary and capricious. Substantial record evidence supported UBH's conclusion that continued residential treatment at Discovery was not medically necessary as of February 2014. That includes three medical reviewers' thorough analyses of A.K.'s treatment records vis-à-vis the requirements of the Plan and Guidelines. Those analyses were well reasoned and complied with ERISA's requirements, discussing the Plan's requirements and

A.K.'s treatment at length. That is more than sufficient to sustain UBH's denial decision under the deferential arbitrary and capricious standard. *See Sandoval*, 967 F.2d at 382.

Instead, the district court improperly "substitute[d] [its] judgment for the judgment of the" claims administrator. *Woolsey*, 934 F.2d at 1460. It improperly restricted review to the denial letters and second-guessed the expert medical reviewers' analyses. The court then overturned UBH's decision as arbitrary and capricious based on its own conclusion that A.K.'s treatment at Discovery was not "Custodial Care" under the Plan, and purported inconsistencies in the reviewers' analyses. But "custodial care" is an exclusion independent from the "medically necessary" requirement under the Plan, so it is not a basis on which to find UBH's denial of benefits arbitrary and capricious. And UBH's initial denial of coverage based on an obsolete Plan exclusion was not inconsistent with UBH's subsequent medical necessity determination.

The district court admitted that UBH's medical necessity determination was supported by substantial evidence and sound reasoning. App. Vol. 1 at 56. It therefore was not arbitrary and capricious. This Court should reverse and uphold UBH's denial of benefits.

## A. Substantial evidence and sound reasoning support UBH's conclusion that continued 24-hour residential treatment was not medically necessary.

Not only did two internal board-certified psychiatrist reviewers conclude that continued residential treatment was not medically necessary as of February 2014, App. Vol. 2 at 57–59, 87–89, an external board-certified psychiatrist did as well. *Id.* at 134–44. All three reviewers' medical necessity determinations were based on an extensive review of A.K.'s medical record. *See id.* at 87–89 (first level review based on clinical "LINX" notes beginning a year-and-a-half before A.K.'s admission to Discovery and extending through her time there; A.K.'s "Physician Progress," therapy; treatment team notes from Discovery; and UBH Guidelines); *id.* at 57–58 (second level review discussing A.K.'s diagnoses, medication, and treatment at Discovery, as well as relevant guidelines); *id.* at 134–35, 143 (external review extensively citing and discussing Discovery treatment notes, comparing to Plan requirements).

The three reviewers discussed the record evidence in their analyses. For example, Dr. Baker noted that "the individual and family notes indicate that treatment was focused on emotional and interpersonal issues, specifically low self-esteem, identity issues, assertiveness,

boundary issues, rejection sensitivity and communication issues." *Id.* at

147. Dr. Manning, in turn, noted:

> [T]he medical record confirms the member's history and
> sequence of treatment . . . Also confirmed were elements that
> indicate this facility does not meet criteria for residential level
> of care; for example, the member was seen by a psychiatrist
> once a month, not twice weekly as required and there is no
> indication of active in progressive treatment as reflected by
> minimal changes in medication and lack of evidence of change
> in treatment plan or progress. … There is no evidence that
> she had any symptom, condition, or behavior that would
> require a 24/7 professional intensity that is required in a
> residential level of care.

*Id.* at 123. MCMC, the external reviewer, extensively cited A.K.'s

treatment notes from Discovery, listing relevant excerpts in a chronology.

*Id.* at 134–42. The medical reviewers' unanimous conclusion that

continued residential treatment was not medically necessary was thus

based on substantial evidence—as the district court admitted. *See* App.

Vol. 1 at 56 (admitting that "the evidence could reasonably be interpreted

to show that A.K. could have been discharged to a lower level of care").

The expert reviewers' medical necessity determinations were, at

the very least, on the "continuum of reasonableness." *Adamson*, 455 F.3d

at 1212. Dr. Baker explained that the record did not show the "active

treatment" required by the Guidelines, including because A.K. was only

seeing a psychiatrist once a month; there was no evidence that A.K. had engaged in self-injurious behavior during her three months at Discovery or immediately before; and A.K.'s treatment was focused on assisting her with long-term "personality issues," such as self-esteem. App. Vol. 2 at 88. Dr. Manning similarly pointed to the lack of self-injurious behavior while at Discovery as indicating that A.K.'s goals of admission had been achieved, as well as the clear discrepancies between the Plan and Guidelines' requirements for residential care—including that the patient see a psychiatrist twice a week—and A.K.'s treatment at Discovery. *Id.* at 58. And the MCMC psychiatrist relied on A.K.'s treatment record from Discovery, pointing to notes stating that A.K. no longer had the urge to self-harm; was using coping skills; and had "stagnat[ed]." *Id.* at 135–136. Applying those facts to the Plan's requirements, MCMC concluded that A.K. could have been treated at a therapeutic school, or through outpatient treatment, and thus continued residential care was not medically necessary. *Id.* at 143. UBH was entitled to rely on the medical judgments of these board-certified psychiatrists. *See Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1138 (9th Cir. 2017) ("the existence of a single

persuasive medical opinion supporting the administrator's decision can be sufficient to affirm") (internal quotation omitted).

The district court admitted that the medical necessity reviewers' reasoning was sound. App. Vol. 1 at 56 (the court "cannot properly say that the final three reviewers arbitrary or capriciously found that A.K.'s three months of treatment had met the 'why now' factors and that a lower level of care would be appropriate"). Having so admitted, it was wrong to reject the medical experts' conclusion that continued 24-hour residential treatment was not medically necessary. *See Rademacher,* 11 F.3d at 1570 (reversing and holding that denial of maternity expense benefit was reasonable under the plan, and therefore not arbitrary and capricious); *Carlo B.*, 2010 WL 1257755, at *5 (it "matters not whether th[e] court disagrees with the conclusions of the . . . reviewing physicians").

This Court should decline to follow the district court's reasoning, which ignored the deferential arbitrary and capricious standard even while purporting to apply it. Instead, this Court should look to *Amy G. v. United Healthcare*, No. 2:17–CV–00427–BSJ, 2018 WL 2303156, at *5 (D. Utah May 21, 2018). There, the court properly upheld UBH's denial of benefits for residential treatment at the same facility, Discovery, based

on multiple reviewers' agreement that such treatment was not medically necessary. That court explained that the denial of benefits for lack of medical necessity was not arbitrary and capricious where "[s]everal health care professionals reviewed Plaintiffs' request" and concluded that 24-hour residential care was no longer needed, and then "the external review performed by an additional health care professional similarly determined that treatment at a residential treatment facility was not appropriate[.]" *Id.* That is exactly what happened here.

The reasoning behind the medical reviewers' denial of benefits in *Amy G.* was very similar to the reasoning behind the medical reviewers' denial of benefits here: the reasons for admission had been addressed, and the patient could have been safely and effectively treated "in a less intensive setting", such as an "Outpatient [ ] with . . . therapy." *Id.*; *compare with* App. Vol. 2 at 88 (explaining that the reasons for A.K.'s admission to Discovery had been addressed), *id.* at 143 (finding A.K. could have been safely and effectively treated in a school or outpatient setting). Thus, as in *Amy G.*, this Court should conclude there was "sufficient evidence in the record to support" the denial of benefits. *See also Alexandra H. v. Oxford Health Ins., Inc.*, 763 F. App'x 865, 866–68

(11th Cir. 2019) (affirming judgment for insurer where two internal and one external reviewer had agreed that partial hospitalization was no longer medically necessary because the medical record showed that the patient had improved and could "safely transition to less intensive care").

Other courts in this circuit have similarly upheld a benefits denial for residential treatment where multiple medical reviewers agreed that 24-hour treatment was not medically necessary. For example, in *Mark M. v. United Behavioral Health*, No. 2:18-CV-00018-BSJ, 2020 WL 5259345, at *12 (D. Utah Sept. 3, 2020), the court granted summary judgment to UBH where "[t]hree physicians . . . reviewed [patient's] medical records and treatment history and determined that treatment at the residential level of treatment was not medically necessary." The court pointed to external reviewer MCMC's reliance on "[p]rogress notes" and its observation that there was "no evidence of behaviors that could not have been managed in an outpatient setting." *Id*. The court found that negative "implication" sufficient to support "UBH's determination that [patient] did not meet the Plan criteria for residential treatment." *Id*.

The medical reviewers' analysis here was far more thorough than in *Mark M*. For example, external reviewer MCMC's denial of benefits

was based on a comprehensive review of A.K.'s treatment notes from Discovery. The MCMC psychiatrist cited to notes stating that, as of March 2013, A.K. was successfully using "coping skills" to repress urges to self-harm, as well as later notes stating that she had "stagnated" and conveying her parents' observation that she had "gotten too comfortable" at Discovery. App. Vol. 2 at 134–35. The two UBH psychiatrists similarly examined the entire record, including A.K.'s treatment plan and clinical LINX notes from both before and during her stay at Discovery, and explained why residential treatment was no longer medically necessary based on the Plan, Guidelines, and A.K.'s treatment history. *See id.* at 88, 58. The reviewers' unanimous conclusion that A.K. could have been treated at a lower level of care as of February 2014 was thus sufficiently supported. *See Mark M.*, 2020 WL 5259345, at *12; *Robert O. v. Harvard Pilgrim Health Care, Inc.*, No. 2:17-cv-1251-TC, 2019 WL 3358706, at **10–11 (D. Utah July 25, 2019) (upholding denial of benefits for residential treatment as not medically necessary based on reviewers' "professional expertise and the voluminous medical records"); *Stacy S. v. Boeing Co. Emp. Health Benefit Plan (Plan 626)*, 344 F. Supp. 3d 1324, 1339 (D. Utah 2018) (granting judgment to plan where two internal and

one external reviewer agreed that residential treatment was not medically necessary based on treatment reports).

Deferring to the conclusion of multiple board-certified psychiatrists is no abdication of the reviewing court's role. The Court can properly review these decisions to ensure that they are supported by "sufficient evidence in the record." *Amy G.*, 2018 WL 2303156, at *5. But this Court has explained that, under the deferential arbitrary and capricious standard, it is a "difficult task" for claimants to overcome multiple experts' conclusions that benefits were not medically necessary. *See Tracy O. v. Anthem Blue Cross Life & Health Ins.*, 807 F. App'x 845, 854 (10th Cir. 2020). The court cannot "substitute [its] judgment" for that of the medical experts unless their decision is "not grounded on any reasonable basis." *Woolsey*, 934 F.2d at 1460; *see also Stacy S.*, 344 F. Supp. 3d at 1339 ("While Plaintiff certainly had grounds for believing [her daughter] satisfied the criteria, the court cannot say that [the] denials were not based on any reasonable basis.").

There was more than a reasonable basis for the medical reviewers' conclusion that continued residential treatment was not medically necessary here. Both internal reviewers found that the reasons for A.K.'s

admission to Discovery had been addressed by February 2014. App. Vol. 2 at 88, 58. The external reviewer also so concluded, relying on notes from A.K.'s treatment record stating that she had improved and developed coping skills to repress urges to harm herself. *Id.* at 134–35, 143. The internal reviewers further pointed to the requirement that patients in residential facilities see a psychiatrist twice a week. *Id.* at 88, 58. Each of the above points is a reasoned basis for denying benefits. Taken together, there can be no question that UBH's denial of benefits was based on "sufficient evidence." *Amy G.*, 2018 WL 230156, at *4–5.

## B. UBH complied with ERISA's requirements and faithfully applied the Plan's terms.

UBH's denial letters contained all the information required under ERISA. In *Mary D*, this Court explained that an administrator denying a medical benefits claim need only "(1) provide the specific reason for the adverse determination, (2) reference the specific provision warranting denial, and (3) for medical-necessity denials, explain the scientific or clinical judgment supporting the determination." *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 589 (10th Cir. 2019) (citing 29 C.F.R. § 2560.503-1). Here, the medical necessity reviewers' decision letters easily met those requirements. As discussed above, each reviewing

psychiatrist found that continued residential treatment was medically unnecessary; referenced specific medical necessity requirements from the Plan and Guidelines; and explained why those requirements were unmet, pointing to record facts such as A.K.'s treatment notes and plan.

The district court criticized UBH for failing to "engage" with A.K.'s treating professionals' opinions. App. Vol. 1 at 59. But as this Court explained in *Mary D.*, unlike the law governing "the denial of long-term disability benefits," ERISA does not require an administrator denying medical benefits to identify its "basis for disagreeing with or not following" the views of the claimant's health care professionals. 778 F. App'x at 589, n.7 (citing 29 C.F.R. § 2560.503-1(g)(1)(vii)). Nor does the administrator have to "affirmatively respond to" the claimant's submissions and arguments; it need only take them "into account." *Id*. at 589. As in *Mary D.*, the medical reviewers here "all stated they considered the letters and records that [Claimants] submitted." *Id*. That is what ERISA requires when deciding a medical benefits claim.

The district court also faulted the medical necessity reviewers for not discussing A.K.'s symptoms "leading up to her admission to Discovery" (App. Vol. 1 at 59). There are several things wrong with this

critique. <u>First</u>, A.K.'s symptoms *before* she spent three months at Discovery logically do not dictate whether *continued* residential treatment is needed *after*. *See Stacy S.*, 344 F. Supp. 3d at 1328–29 (upholding denial of benefits for post-hospital residential treatment where medical reviewer "noted that many of the symptoms reported occurred before [the patient's] hospitalization").

<u>Second</u>, the internal reviewers stated in their denial letters that they reviewed clinical LINX notes and other materials from before A.K.'s admission to Discovery, while the external reviewer explicitly acknowledged her "lengthy history . . . of multiple inpatient hospital stays, residential treatment stays and partial hospital stays." App. Vol. 2 at 134. Under the law of this circuit, that satisfied ERISA's requirements. *See Mary D.*, 778 F. App'x at 589.

<u>Third</u>, the medical reviewers' Case Notes show that UBH thoughtfully considered A.K.'s pre-Discovery medical records, as well as A.K.'s treatment and symptoms while at Discovery. For example, Dr. Baker's notes include, in addition to the substance of the decision letter, a lengthy discussion of A.K.'s pre-Discovery symptoms and treatment at other facilities. App. Vol. 2 at 146–47. Dr. Manning's notes similarly

repeated his reasons for denying benefits and reconfirmed that he had reviewed all of the medical record, and also provided some additional discussion of A.K.'s progress at Discovery:

> From a symptomatic standpoint, the member was not reported to be suicidal or homicidal; she was able to discuss her thoughts of cutting when they occurred . . . . There is no evidence that she had any symptom, condition, or behavior that would require a 24/7 professional intensity that is required in a residential level of care.

*Id.* at 150. The Case Notes thus support what the denial letters state: that the reviewers considered A.K.'s entire medical record.

The district court refused to consider the reviewers' Case Notes—or anything else outside the denial letters. App. Vol. 1 at 62–63. That was an error. This Court has explained that, upon review of a benefits denial under ERISA, courts may consider all of "the evidence and arguments that appear in the administrative record." *Flinders*, 491 F.3d at 1190. In support of its more restrictive approach, the district court cited *Glista v. Unum Life Insurance Co. of America*, 378 F.3d 113, 115 (1st Cir. 2004). *Glista* is inapplicable. It concerned a denial of long-term disability benefits, not medical benefits, to which different standards apply. *See Mary D.*, 778 F. App'x at 589 n.7 (explaining that disability benefits case law is "inapposite" when considering whether a denial of medical benefits

was sufficiently explained). Even setting that aside, *Glista* addressed when an administrator may support a denial decision with reasoning different from what was provided to the claimant. That is not what happened here. The reviewers' decision letters identified the reasons why, under the Plan and Guidelines, continued residential care was not medically necessary; the "Case Notes" repeated those reasons, and included additional background and explanation. It was thus entirely appropriate for UBH to cite the Case Notes as further support for the denial decision—and inappropriate for the district court to ignore that additional evidence. *See Tracy O.*, 807 F. App'x at 854–55 (affirming decision that relied on reviewing physicians' internal notes, which expanded on the reasoning provided in the administrator's denial letters, as evidence supporting the denial of benefits).

The district court also pointed to record evidence that, in its view, conflicted with the denial letters. App. Vol. 1 at 63–64. But the existence of some evidence suggesting that A.K. continued to struggle with mental health does not undermine the reviewers' conclusion that 24-hour residential treatment was no longer needed. As the Eleventh Circuit

explained when affirming a denial of benefits for continued hospitalization:

> [T]he point isn't whether [the patient] was a picture of health. Neither is it whether she was ready to stop treatment altogether. It is whether she had *improved so little* that she continued to need the same kind of care as she had received . . . or instead could handle a step down in treatment.

*Alexandra H.*, 763 F. App'x at 869. Here, three expert reviewers agreed that, after three months of residential care, A.K. could "handle a step down in treatment." *Id*. The district court ignored record evidence supporting that conclusion and impermissibly "substitute[d] [its] judgment" for that of the medical reviewers. *Woolsey*, 934 F.2d at 1460.

## C. The district court's conclusion that A.K.'s care at Discovery was not "custodial" does not undermine the reviewers' medical necessity decisions.

The district court admitted that the expert medical reviewers' unanimous conclusion that A.K.'s care did not meet the Plan and Guidelines' medical necessity requirements was supported by the record. App. Vol. 1 at 56 ("[U]nder the deferential standard, the final three reviewers did not abuse their discretion because the evidence could reasonably be interpreted to show that A.K. could have been discharged to a lower level of care[.]"). Yet the court overturned the denial of benefits

based in part on its finding that A.K.'s treatment at Discovery did not satisfy the Plan's requirements for excluded "Custodial Care" because it was being provided by trained clinical personnel. *Id.* at 57.

The Court misread the Plan. Under the Plan, treatment does not have to qualify as "Custodial Care" for UBH to determine that the treatment is not "Medically Necessary." Rather, the Plan identifies "Custodial Care" as a *separate* basis for denying benefits, independent of the medical necessity analysis. App. Vol. 2 at 14. While the internal reviewers described A.K.'s care at Discovery as having become "custodial", both also found that the treatment was not medically necessary, and rested their decisions on that basis. *See id.* at 88, 57 ("As of the last covered day . . . medical necessity was not met."). Thus, even if the district court was correct that A.K.'s treatment at Discovery was not "Custodial Care," [2] that does not undermine the reviewers'

---

[2] The reviewers' use of "custodial" was consistent with the Guidelines, which describe "custodial" services as including those that "are provided when the member's condition is unchanging, are not required to maintain stabilization, *or* don't have to be delivered by trained clinical personnel." App. Vol. 2 at 26–27 (emphasis added). Here, the medical reviewers found that, after three months at Discovery, A.K.'s condition had stabilized, as she was no longer experiencing urges to self-harm. *Id.* at 134–35.

determinations that 24-hour residential care was no longer "Medically Necessary", and therefore ineligible for coverage under the Plan. *See McCartha v. Nat'l City Corp.*, 419 F.3d 437, 447 (6th Cir. 2005) (where benefit administrator relied on "two independent reasons for denying [] benefits," the fact that one of those two grounds was invalid did "not require a substantive remedy").

The district court was right to observe that not all medically unnecessary care will be "custodial." App. Vol. 1 at 57. But it mistakenly concluded that because (in the court's view) A.K.'s stay at Discovery was not "Custodial Care", it therefore *was* medically necessary. That was a patently incorrect reading of the Plan, which requires that care at a residential facility be *both* medically necessary *and* not "Custodial Care" to be covered. *See Stephens v. Westinghouse Benefits Plan*, 1 F. App'x 478, 485 (6th Cir. 2001) ("The Plan expressly excludes coverage for certain forms of treatment *even when medically necessary* and counts among these exclusions 'custodial care.'") (emphasis added); *Amy G.*, 2018 WL 2303156, at *5 (explaining, in response to argument that patient met one requirement for residential treatment under Guidelines, that the requirement was "necessary—but not sufficient—for coverage").

The district court also was wrong to suggest that the medical reviewers' decisions were inconsistent because the internal reviewers characterized A.K.'s care as "custodial" but the external reviewer did not. All of the medical reviewers concluded that residential care was no longer medically necessary, and rested their denial of benefits on that basis. That two of the reviewers also described A.K.'s care as having become "custodial" does not undermine that conclusion. Even if there was some inconsistency between the multiple medical reviewers' reasoning—which is inevitable—that does not render the denial of benefits arbitrary and capricious. *See Robert O.*, 2019 WL 3358706, at **10–11 (upholding reviewers' conclusion that residential treatment was not medically necessary despite "inconsistencies"; reviewers "approached the question differently" but "reached the same conclusion"); *Jeffrey F. v. McGraw Hill Fin., Inc.*, No. 2:15-CV-00874-BSJ, 2017 WL 1424027, at *4 (D. Utah Apr. 20, 2017) ("[W]hile there is some variance in D.F.'s medical records concerning the severity of D.F.'s symptoms, the administrator's decision that RTC services were not medically necessary was nevertheless based on substantial evidence in the record."). The Court should thus hold that UBH's denial of benefits was not arbitrary or capricious.

### D.   UBH's initial denial of benefits as excluded does not render the subsequent denial on medical necessity grounds arbitrary or capricious.

UBH administers the Plan at issue here—and many others. The first two UBH reviewers were unaware that a provision of the Plan that previously excluded out-of-network residential treatment had been removed. They therefore did not conduct a medical necessity review, but simply denied the claim based on the exclusion. *See* App. Vol. 2 at 62, 75–76. When A.K.'s parents brought that mistake to UBH's attention, UBH conceded the error and explained that it would undertake—for the first time—a medical necessity analysis. *Id.* at 84, 86. UBH also converted Claimants' appeal from a second-level review to a first-level review, thus avoiding any procedural prejudice. *Id.* at 84. It would not have been appropriate, however, for UBH to simply grant benefits, regardless of whether A.K.'s treatment met the Plan's requirements. *See M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (ERISA's "linchpin" is its "focus on the written terms of the plan."); *Collins v. Pension & Ins. Comm. of S. Cal. Rock Prods. & Ready Mixed Concrete Ass'ns*, 144 F.3d 1279, 1282 (9th Cir. 1998) ("The duty to act in accordance

with plan document does not . . . require a fiduciary to resolve every issue . . . in favor of plan beneficiaries."). Claimants have never so argued.

The district court nevertheless overturned UBH's subsequent denial of benefits on medical necessity grounds as inconsistent with the initial denials of benefits based on the removed exclusion. In support, the court pointed to a prefatory statement in the initial denial letters that long-term treatment "appears" necessary. *E.g.*, App. Vol. 2 at 62. But the use of the term "appears" only confirms that the first two reviewers did *not* analyze whether A.K.'s treatment at Discovery was "medically necessary." That is further confirmed by the notes in the record memorializing that, after UBH recognized residential treatment was no longer excluded from the Plan, Claimants agreed that a medical necessity analysis would then be conducted. *Id.* at 86.

Furthermore, while UBH's first two reviewers made no finding as to medical necessity, they did note that the care provided at Discovery did not meet the requirements of the Plan and the Guidelines in other regards. For example, the first reviewer found that A.K.'s treatment at Discovery was "not consistent with generally accepted standards of medical … treatment", "experimental", "[n]ot clinically appropriate for

the patient's mental illness . . . based on generally accepted standards of medical practice and benchmarks", and consisted of "[e]ducational/behavioral services that are focused on primarily building skills and capabilities in communication, social interaction and learning." *Id.* at 63. The second reviewer, Dr. Kho, similarly opined that Discovery's services were inconsistent with the accepted standard of medical practice and research and reflected educational/behavioral services "focused on primarily building skills and capabilities in communication, social interaction and learning." *Id.* at 75–76. While those reviewers did not conduct a medical necessity analysis, this language indicates that, had they done so, they likely would have agreed with the subsequent three reviewers that A.K.'s treatment at Discovery did not qualify as medically necessary under the Plan.

In any event, there is no evidence suggesting that the subsequent three medical necessity analyses conducted by three different board-certified psychiatrists were influenced by the prior denial of benefits on a different basis. And an *independent external* psychiatrist at MCMC conducted the last of those analyses. As discussed above, MCMC's conclusion that continued treatment at Discovery was not medically

necessary was supported by substantial evidence, including A.K.'s treatment notes from Discovery. *See* App. Vol. 2 at 88–89. Indeed, the district court *admitted* that the medical-necessity-based denials were supported by record evidence. App. Vol. 1 at 56. Under the deferential arbitrary and capricious standard, the denial of benefits should have been upheld on that basis alone. *See Rademacher*, 11 F.3d at 1570 (A denial of benefits on "any reasonable basis will be upheld; it need not be only logical . . . decision."); *Sandoval*, 967 F.2d at 382 (denial of benefits is not arbitrary and capricious where supported by "substantial evidence"). This court therefore should reverse the decision below.

## III.    The District Court Should Have Remanded the Claim Rather than Awarding Benefits.

Even if this Court concluded that the denial of benefits was arbitrary and capricious, it should reverse the award of benefits. The district court abused its discretion when it awarded benefits rather than remanding to the plan administrator. Awarding benefits is only appropriate in exceptional cases, where the plan administrator's decision was "clearly" wrong and there was no "disputed evidence." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1289 (10th Cir. 2002). In other words, the court may only award benefits where the Claimants have

proven that there is no question that they are entitled to the benefits under the Plan. That is not the case here, where the court admitted that the record supported the conclusion that continued residential treatment was not medically necessary. *See* App. Vol. 1 at 56. The district court should have applied the default remedy of remand, so that UBH could address the deficiencies it found in the first instance.

Remand to the claims administrator for a renewed evaluation of the benefits claim is the proper remedy unless it "is so clear-cut that it was unreasonable" to deny benefits. *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1121 (10th Cir. 2006); *Caldwell*, 287 F.3d at 1289 ("A remand for further action is unnecessary only if the evidence clearly shows that the administrator's actions were arbitrary and capricious, or 'the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground.'") (citation omitted); *see also Weber*, 541 F.3d at 1015 ("[I]f the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate.") (internal quotation marks and citation omitted).

This remand rule stems from the courts' recognition that they are not medical professionals. *See, e.g.*, *Rekstad*, 451 F.3d at 1121 (noting

that the Court would "not substitute [its] judgment for that of U.S. Bancorp"); *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622–23 (6th Cir. 2006) (the court is not made of "medical specialists and that judgment is not ours to make"). Thus, "even where [the appeals court] conclude[s] a plan administrator's finding was arbitrary and capricious, we will typically not substitute our own judgment, but rather will return the claim for reconsideration[.]'" *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 490 (2d Cir. 2013). That is what should have happened here.

Only in exceptional cases does arbitrary and capricious conduct warrant an award of benefits rather than remand, such as "where there [was] no evidence in the record to support a termination or denial of benefits." *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1176 (10th Cir. 2006) (internal quotation marks and citation omitted). In *DeGrado*, this Court agreed with the district court's conclusion that the administrator's decision that a beneficiary's disability was "recurrent" was arbitrary and capricious. *Id.* at 1174–75. Yet this Court reversed the award of benefits as an abuse of the district court's discretion, explaining that it could not "say there [wa]s no evidence in the record to support [the administrator's] decision, or that the evidence so clearly points the other

way as to make a remand unnecessary." *Id.* at 1176; *see also Caldwell*, 287 F.3d at 1289 (concluding that remand rather than an award of benefits was appropriate, even though benefits denial was arbitrary and capricious, because there was "disputed evidence" regarding eligibility).

Here, the district court awarded benefits simply because it concluded that UBH's "denials were arbitrary and capricious." App. Vol. 1 at 67. But "the court's determination that [the] denial of benefits was arbitrary and capricious 'does not automatically entitle Plaintiffs to the remedy they seek.'" *Raymond M. v. Beacon Health Options, Inc.*, 463 F. Supp. 3d 1250, 1286 (D. Utah 2020) (citation omitted). That approach is contrary to this Court's admonitions that remand is only appropriate where there is "no evidence in the record" that could support the denial of benefits, *DeGrado*, 451 F.3d at 1175, or the evidence was "so clear cut that it w[as] unreasonable" to deny benefits. *Caldwell*, 287 F.3d at 1289. That is not the case here. To the contrary, the district court acknowledged that record evidence supported the three medical reviewers' determination that residential care was not medically necessary as of February 2014. App. Vol. 1 at 56. Those reviewers' decisions, in turn, were supported by treatment notes from Discovery, as well as evidence

that A.K. was seen by a psychiatrist only monthly. App. Vol. 2 at 87–89, 57–59, 134–44. In short, there is far more than a colorable claim that A.K.'s stay at Discovery after February 8, 2014, was not medically necessary under Plan. Thus, as this Court found in *DeGrado*, 451 F.3d at 1176, it "was an abuse of discretion" for the district court to award benefits rather than remanding.

The district court's dissatisfaction with UBH's process[3] was no reason to award benefits outright. As explained above, the record shows that all three psychiatrists *considered* the available evidence, and UBH was not required to discuss, cite, or credit any particular evidence. *See Mary D.*, 778 F. App'x at 589. And even where the denial of benefits is overturned due to procedural deficiencies, such as the failure to "make adequate findings or to explain adequately the grounds of [the] decision," the claims administrator should be given the opportunity to provide "further findings or explanation." *Caldwell*, 287 F.3d at 1288; *see also DiGregorio v. Hartford Comprehensive Emp. Benefit Serv. Co.*, 423 F.3d 6, 16 (1st Cir. 2005) (remand is appropriate where the administrator's

---

[3] *See* App. Vol. 1 at 59–67 (opining that the reviewers had not sufficiently examined the medical record or explained their reasoning, and pointing to alleged inconsistencies in the reviewers' decisions).

procedural failings prejudiced claimant). For example, in *Rekstad*, an ERISA plan participant claimed that a car accident rendered her totally disabled and sought benefits. 451 F.3d at 1116. In denying benefits, the administrator pointed to the claimant's post-accident employment and attendance of classes, but refused to consider affidavits submitted on those issues. *Id.* at 1118–19, 1120–21. This Court found that refusal arbitrary and capricious—but did not award benefits. *Id.* at 1121. It explained that the case was not "so clear-cut that it was unreasonable for U.S. Bancorp to deny Ms. Rekstad benefits[.]" *Id.* Rather, "because [the administrator's] one-sided consideration of Ms. Rekstad's post-accident employment and education permeated U.S. Bancorp's decision," it was unable to determine the substantiality of the evidence supporting the denial, and therefore directed a remand. *Id.* The same result is warranted here if this Court finds UBH's denial of benefits was arbitrary and capricious based on procedural flaws.

"ERISA is not a punitive statute." *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 n.15 (1st Cir. 2005). A standalone arbitrary and capricious exception to remand—as the district court incorrectly interpreted this Circuit's case law to provide—would subvert the

statute's purpose. ERISA grants beneficiaries the right to a full and fair review of the plan administrator's decision, not an award of benefits anytime a court finds a flaw in that decision or the process leading to it. *See id.* (directing remand even after finding denial of benefits arbitrary and capricious because the "evidence does not compel" the conclusion that the administrator "denied benefits to which [claimant] was clearly entitled"; rather "[t]he appropriate response is to let the claimant have the benefit of an untainted process").

Thus, even if this Court were to hold that UBH's denial of benefits was arbitrary and capricious, it should instruct the lower court to remand so that UBH can re-assess the claim and address the Court's concerns. The Court also should vacate the district court's grant of attorneys' fees (App. Vol. 1 at 72-78). *See Saffle v. Sierra Pacific Power Co. Long Term Disability Income Plan*, 85 F.3d 455 (9th Cir. 1996) (remanding but concluding that it was premature to award fees before claim was reprocessed); *Duncan v. Hartford Life & Accident Ins. Co.*, 2013 WL 1785904, at *2 (E.D. Cal. Apr. 25, 2013) (denying fees where claim was remanded because "Plaintiff has not shown that her success was other than a procedural victory"); *Dickens v. Aetna Life Insurance Co.*, 2011 WL

1258854, at *5-6 (S.D.W.Va. Mar. 28, 2011) (remanding claim but denying request for fees under ERISA because a remand, without a finding of entitlement to benefits, is a purely procedural victory).

## CONCLUSION

For these reasons, the district court's grant of summary judgment to Claimants should be reversed. Even if the Court holds that UBH's denial of benefits was arbitrary and capricious, it should vacate the grant of benefits and instruct the court to remand the claim to UBH.

<u>s/ Amanda Shafer Berman</u>
Amanda Shafer Berman
April N. Ross
Amy M. Pauli
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
Fax: (202) 628-5116

Jennifer S. Romano
Andrew Holmer
CROWELL & MORING LLP
515 South Flower Street
40th Floor
Los Angeles, CA 90071
Phone: (213) 622-4750

*Counsel for Appellants*

## ORAL ARGUMENT STATEMENT

Appellants respectfully submit that oral argument should be held due to the importance of the legal issues raised in this appeal, as well as the multiple issues in contention. Oral argument will also allow this Court to clarify any legal or factual questions raised by the papers.

<u>/s/ Amanda Shafer Berman</u>
Amanda Shafer Berman

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation contained in Fed. R. App. P. 32(a)(7) because, excluding the portions exempted by Rule 32(f), this brief contains 11,517 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook.

s/ Amanda Shafer Berman
Amanda Shafer Berman

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing brief:

(1) all required privacy redactions have been made pursuant to 10th Cir. R. 25.5;

(2) if required to file additional hardcopies, that this ECF submission is an exact copy of those documents;

(3) this digital submission has been scanned for viruses with the most recent version of Microsoft Defender, version 1.353.2267.0, and according to the program is free of viruses.

/s/ Amanda Shafer Berman
Amanda Shafer Berman

## CERTIFICATE OF SERVICE

I certify that on December 9, 2021, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Tenth Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


/s/ Amanda Shafer Berman
Amanda Shafer Berman

ATTACHMENT A

MEMORANDUM DECISION AND ORDER FILED 06/22/21

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| D.K. and A.K.,<br><br>        **Plaintiffs,**<br><br>vs.<br><br>**UNITED BEHAVIORAL HEALTH and ALCATEL–LUCENT MEDICAL EXPENSE PLAN FOR ACTIVE MANAGEMENT EMPLOYEES,**<br><br>        **Defendants**. | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 2:17-CV-01328-DAK**<br><br>**Judge Dale A. Kimball** |

## Introduction

This matter is before the court on the parties' Cross-Motions for Summary Judgment. (ECF No. 75, 77.) On June 21, 2021, the court held a hearing on these motions. At the hearing, Brian S. King represented D.K and A.K (collectively, "Plaintiffs") and Michael H. Bernstein represented United Behavioral Health ("UBH") and Alcatel-Lucent Medical ("ALM") (collectively, "Defendants"). The court took the matter under advisement. Now being fully informed, the court issues the following Memorandum Decision and Order.

## Background

### *The Plan & Its Terms*

The plan (the "Plan") at issue is self-funded by Nokia of America Corporation (formerly known as Alcatel-Lucent USA Inc.). It is undisputed that the Plan is an employee welfare benefit plan governed by ERISA and that at all relevant times, Plaintiff D.K., A.K.'s father, was a member of the Plan. Defendant UnitedHealthcare ("United") and United's affiliate,

UnitedHealthcare Behavior Health ("UHB"), are some of the Plan's designated claim administrators.

There are three provisions in the Plan that are germane to this case: the provision detailing "Medical Necessity"; the conditions for qualifying for care in a "Residential Treatment Facility"; and the definition of "Custodial Care." Those provisions are quoted in turn.

**Medically Necessary**: (Rec. 27)

Medically Necessary treatment must meet the following criteria:

> (i) . . . accepted by the health care profession in the U.S. as the most appropriate level of care
> (ii) . . . the safest and most effective level of care for the condition being treated.
> (iii) . . . appropriate and required for the diagnosis or treatment of the accidental injury, Illness, or Pregnancy.
> (iv) There is not a less intensive or more appropriate place of service . . .
> (v) . . . provided in a clinically controlled research setting using a specific research protocol that meets standards equivalent to that as used by the National Institute of Health for a life-threatening or seriously debilitating condition. The treatment must be considered safe with promising efficacy as demonstrated by accepted clinical evidence reported by generally recognized medical professionals or publications.

**Residential Treatment Facility**: (Rec. 36–37)

To qualify for Residential Treatment the following conditions must be met:

> • The member is not in imminent or current risk of harm to self and others and/or property.
> AND
> • Co-occurring behavior health and physical condition can be safely managed.
> AND
> • The "why now" factors leading to admission cannot be safely efficiently, or effectively addressed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychological and environmental factors. Examples include:
> > o Acute impairment of behavioral or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.
> > o Psychological and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.

2

**Custodial Care**: (Rec. 19)

> Treatment or service prescribed by a medical professional, that could be rendered safely and reasonably by a person not medically skilled, or that is designed mainly to help the patient with daily living activities. These activities are the following:
> (a) Personal care such as help in: walking, getting in and out of bed, bathing, eating by spoon, tube or gastronomy, exercising and dress;
> (b) Homemaking, such as preparing meals or special diets;
> (c) Moving the patient;
> (d) Acting as a companion or sitter;
> (e) Supervising medication that can usually be self-administered; or
> (f) Treatment or services that any person may be able to perform with minimal instruction including, but not limited to, recording temperature, pulse, and respirations, or administration and monitoring of feeding systems.

### *A.K.'s Mental Health Disorders & Treatment Before Long-Term Residential Treatment*

Beginning in 2010, A.K. began having issues with her mental health. Initially, A.K. struggled with fairly typical bouts of anxiety, Attention Deficit Disorder ("ADD"), and depression. A.K.'s symptoms escalated quite quickly, and she began secretly cutting herself with razor blades. A.K.'s parents did not discover that she had been cutting herself until February 2012, when she cut herself so severely that she was frightened into showing her parents. That same month, A.K. began seeing a therapist. Despite the therapy, A.K. attempted suicide by cutting herself on March 4, 2012.

The same day that A.K. attempted suicide, she was admitted to Seay Behavior Center ("Seay"), an inpatient unit where she received treatment for her mental health disorders. On March 13, 2012, A.K. transitioned to Seay's day patient program and, on March 23, 2012, A.K. was discharged from Seay.

On March 31, 2012, A.K. ran away from home and, when the police found A.K., she was readmitted to Seay's in-patient unit. After two weeks at Seay's in-patient unit, A.K. was discharged to Cedar Crest Residential Center ("Cedar Crest"), a sub-acute inpatient mental health provider. While at Cedar Crest, providers diagnosed A.K. with "major depressive

3

disorder, severe and recurrent." On May 21, 2012, A.K. was discharged from Cedar Crest. Following this discharge, A.K. began attending a day program at Children's Medical Center ("Children's Medical"), resumed seeing her therapist, and started seeing a psychiatrist to manage her medications.

In September 2012, A.K. started cutting herself again. Some of these cutting events required visits to the emergency department. Due to her escalating and recurring pattern of self-harm, A.K. was re-enrolled in the day program at Children's Medical. Despite the treatment at Children's Medical, A.K.'s self-harm continued to escalate. A.K. was again discharged from the Children's Medical day program on October 6, 2012.

A month later, A.K. became upset with her parents and ran away from home. When she returned home, her anger toward her parents escalated and A.K. threatened—and then attempted—to commit suicide by strangulation. That same evening, A.K. was again admitted to Children's Medical. This time, however, A.K. was admitted to Children's Medical's inpatient program. A.K. only stayed a few days at the in-patient unit.

From October 18, 2012, to December 13, 2012, A.K. received treatment at Meridell Achievement Center ("Meridell"), a residential treatment center. After discharge from Meridell, A.K. transitioned to a day patient program at The Excel Center ("Excel"). Things were seemingly improving for A.K. until she failed an exam in March 2013. After failing her exam, A.K. began engaging in self-harming behaviors again.

On March 8, 2013, A.K. was admitted to the University Behavior Center ("University") for major depressive disorder and suicidal ideation. A.K.'s stay at University lasted only one month. The day after being discharged, A.K. was readmitted to the hospital due to suicidal ideation. Following her discharge from the hospital, A.K. continued to cut herself until she was

4

readmitted to University on May 4, 2013. After a week-long stay at University, A.K. restarted
the program at Meridell for residential treatment.

***Treatment Professionals Recommend Long-Term Residential Treatment for A.K.***

In May 2013, while A.K. was at Meridell, the treating professionals began suggesting to
A.K.'s parents that A.K. would need long-term residential treatment to treat her mental health
disorders. A.K.'s parents then contacted Mr. William Johnson, A "Care Advocate Lead" at
Optum Healthcare (a subsidiary of UnitedHealth Group). Mr. Johnson counseled A.K.'s parents
to identify long-term treatment programs in order to request coverage. While A.K.'s parents
searched for a long-term treatment program, Defendants decided they would stop coverage for
A.K. at Meridell on July 30, 2013. Three days after leaving Meridell, A.K. cut herself again—
nearly severing her femoral artery and requiring 12 stitches. This self-harm incident required that
A.K. be readmitted to the inpatient program at Children's Medical.

On August 14, 2013, A.K. was transferred from Children's Medical to Meridell. Again,
A.K.'s treatment team at Meridell recommended that A.K. be placed in a structured, long-term
residential treatment program. Specifically, Ms. Kimberly Weaster, M.Ed., opined that A.K.
would need "ongoing specialized residential treatment . . . upon discharge from Meridell." Dr.
Andrew Diedrich also wrote that "[b]ased on [his] experience with [A.K.], it [was] [his] clinical
recommendation that she needs a long-term residential placement." Dr. K.K. Riedel, M.D., also
recommended that A.K. received "a long-term residential treatment center placement to
accomplish the goals necessary for her to succeed and have a chance at sustaining a healthy life."

***Defendants Approval & Denials for Coverage for Treatment at Discovery***

Following the treating team's advice that A.K. receive long-term residential care, A.K.'s
parents hired a consultant to help find appropriate long-term residential treatment options. This

consultant eventually homed in on two facilities. A.K.'s parents informed Mr. Johnson (Optum

Healthcare's Care Advocate) of these options and Mr. Johnson told A.K.'s parents to submit a

request for coverage to Defendants. A.K.'s parents submitted their request for long-term

treatment. Eventually, Defendants notified A.K.'s parents that it had approved A.K.'s treatment

at Discovery Girls Ranch ("Discovery") for an initial 90 days and that a review should be

conducted after the 90 days to see if continued treatment would be necessary. (Rec. 2027.) On

November 4, 2013, A.K. enrolled at Discovery. (Rec 2035.)

All told, in the 20 months between her first suicide attempt on March 4, 2012 and her

admission to Discovery, A.K. had: 11 psychiatric emergency room visits; five in-patient

hospitalizations (totaling 58 days); four stints of residential treatment centers lasting 38 days, 57,

days, 63 days, and 79 days (totaling 237 days); six enrollments into partial hospitalization

programs (totaling 69 days); weekly individual therapy; family therapy; medication management

from a psychiatrist; and some DBT therapy. None of this—or the sum of all these forms of

treatment—had proven sufficient to keep A.K. from regressing to her self-harming ways.

Discovery and long-term residential treatment were the professionals' recommended—and

obvious— next steps.

Near the end of the 90-days, Defendants informed A.K.'s parents that they would be

denying coverage for treatment at Discovery beginning on February 9, 2014. This Adverse

Benefit Decision stated:

> I have reviewed your child's treatment plan that was submitted by Discovery Ranch
> for Girls, and I have determined that coverage is not available under your child's
> benefit plan for the requested services of long term residential treatment. Based
> upon current clinical member appears to require Mental health Residential
> Treatment Center long term Level of Care but due to excluded service a denial will
> be submitted.

(Rec. 442–43.) A.K.'s parents did not anticipate this denial—especially a denial based on the service being unavailable under the plan since they received prior approval for treatment at Discovery. So, A.K.'s parents requested more information about why the coverage was denied. Defendants responded by stating that the service was not covered due to the provision titled "Alternative treatment facilities accessed or Out-of-Network is excluded." Defendants had, however, retroactively eliminated this provision from the Plan.

On June 25, 2014, A.K.'s parents appealed the first denial of coverage, pointing out that the provision that Defendants relied on to deny coverage had been removed. On August 1, 2014, Defendants responded again, affirming their denial of coverage. This denial, performed by a different reviewer, stated:

> Based upon current medical records, the member appears to require Mental Health Residential long term level of care but due to excluded service, a denial will be submitted.. . . We are unable to authorize benefit coverage for Long Term Residential treatment as the member's benefit contract does not provide mental health coverage for this type of treatment or service.

(Rec. 1904–05.) Notably, this language is nearly identical to the first denial decision letter.

On September 25, 2014, A.K.'s parents appealed the second denial, reminding Defendants that the exclusion for "Alternative Treatment Facilities Accessed or Provided Out-of-Network" had been deleted from the Plan. Defendants acknowledged that these denials were erroneous. (Rec. 468.) Upon recognizing—and admitting—that these first two denials were an error, Defendants conducted another review of the submitted claims.

On December 10, 2014, Defendants submitted a third denial letter after conducting a new medical necessity review. In this denial letter, Defendants stated that they reviewed several documents (e.g., medical records, letters from K.K., the Plan's Guidelines, etc.) and concluded

that the coverage would be denied because the treatment was not medically necessary.

Specifically, the relevant portion of the letter states:

> As of the last covered day, . . . medical necessity was not met. UBH Leve of Care Guidelines for Residential Treatment requires evidence of active treatment. It requires that the physician is seeing the patient two times per week. The attending psychiatrist during your daughter's stay at Discovery Ranch assessed her only on a monthly basis. The guideline also requires the treatment plan is targeted and addresses the "why now" reason for the admission. The purpose of the admission was to consolidate her gains, as she had a history of regressing when not in a structured environment. However, on admission the attending psychiatrist found little evidence of active psychiatric illness. She was described as having had Dysthymia, in partial remission, Major Depressive Disorder, in remission but having an Anxiety Disorder and what is termed a rule out for Group B Traits (meaning personality issues). The treatment record indicates no evidence of ongoing self-injurious behavior in the three months prior to the adverse determination (or for that matter during her most recent treatment at Meridell, thus providing objective evidence of significantly improved ability to control self-injurious behavior. The "why now" reason for the admission had been addressed. When the "why now" reason for admission has been addressed, the care is considered custodial.

(Rec. 2004.) The letter also made a brief mention that A.K.'s treatment at Discovery was mainly "focus[ed] on her personality issues" and that "personality issues are a long-term issue and are not expected to respond within a reasonable amount of time. As such the focus of the treatment, the personality issues, also would be considered custodial." (Rec. 2004.)

On February 5, 2015, A.K.'s parents file another appeal. On March 6, 2015, Defendants provided Plaintiffs with a fourth and final, internal denial letter. The letter states that the claims administrator reviewed the medical record, case management notes, appeal letter, and the Level of Care Guidelines before addressing why UBH was denying coverage. The denial portion of the letter states:

> As of the last covered day, 01/31/2014, medical necessity was not met. Optum Level of Care Guidelines for Residential Treatment requires evidence of active treatment, including that the psychiatrist see the patient twice a week, whereas in this case your daughter was seen once a month. On admission, she was described as having had Dysthymia, in partial remission, Major Depressive Disorder in

remission but having an Anxiety Disorder and what is termed a rule out for Group B Traits (meaning personality issues). These diagnoses did not change and medication changes were minimal. There was no evidence of self-injurious behavior. This would appear to address the goals of admission which were to consolidate your daughter's gains so that she could control her self injurious behavior. When this was achieved, care became custodial, which is not a covered service. Finally, reimbursable residential treatment is defined as a 24 hour/7day assessment and diagnostic services with active behavior health treatment. For all the reasons noted above, the services provided by Discovery Ranch were not consistent with this requirement.

(Rec. 2052–54.) This denial letter's language is almost identical to the reasoning and language from the third denial letter. Having exhausted their internal appeal obligations, Plaintiffs requested an independent, external review.

The external review upheld Defendants' third and fourth denial rationale—namely, that medical necessity was not met. (Rec. 2597–607.) Specifically, this external review stated:

The patients' providers prior to her hospitalization recommended a lengthy residential program, but the records provided for review do not indicate that as of 02/2014 through 11/2014 she continued to meet criteria for the most appropriate level of care. She had improved. She could have been treated in a therapeutic school environment for example. She was able to focus on school work. She required structure and support but this could be obtained out of an acute residential setting with coordinated therapeutic school, outpatient providers and either a residential based school or family and individual therapy supports. There is not evidence during this time period that remainder in a residential setting was the safest and most effective level of care. She continued to have residential resistant behaviors. She continued to act out behaviorally. These could have been managed at a therapeutic school with intensive outpatient behavioral supports for individual and family.

(Rec. 2606.) This fifth, external review was the final decision before Plaintiffs brought the present suit.

### Procedural History

On December 29, 2017, Plaintiffs filed the present action. (ECF No. 1.) In their Third Amended Complaint, Plaintiffs assert two causes of action. (ECF No. 39.) In the First Cause of Action, Plaintiffs assert an ERISA claim for recovery of benefits under 29 U.S.C. §

1132(a)(1)(B). (ECF No. 39.) The Second Cause of Action alleges a violation of the Mental Health Parity and Addiction Equity Act (the "Parity Act") under 29 U.S.C. §1132(a)(3). (ECF No. 39.) On February 18, 2021, both parties filed cross-motions for summary judgment, seeking summary judgment on both claims. (ECF No. 75, 77.) During the hearing on these motions, Plaintiffs abandoned their Parity Act claim.

**DISCUSSION**

Since Plaintiffs abandoned their Parity Act claim, the court focuses only on Plaintiffs' ERISA claim. Thus, this Order will proceed by discussing: (A) which standard of review applies in this instance; (B) the merits of Plaintiffs' ERISA claim; and (C) the appropriate relief that should be awarded.

### A. Standard of Review

The Supreme Court has held that "a denial of benefits challenged under [ERISA] must be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibly for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989). When a plan gives an administrator this discretion, a court applies a "deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citation and internal quotation marks omitted). A plan administrator may forfeit the deferential standard when it fails to follow certain ERISA procedures.

Plaintiffs claim that the deferential standard is forfeited "if [the claims administrator] fails to comply with ERISA's procedural requirements." (ECF No. 77 at 31.) The ERISA procedural standards are lengthy, and a full recitation of the procedures is not necessary here. Relevant to

this action are ERISA's requirements that the plan administrator: (1) provide adequate notice, "setting forth the specific reasons for [a] denial"; (2) afford a "full and fair review. . . of the decision denying the claim"; (3) give "[t]he specific reason. . . for the adverse determination"; (4) "[r]eference the specific plan provisions upon which the determination is based"; and (5) in the context of denials for lack of medical necessity, explain "the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances." 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1.

Plaintiffs seem to argue that almost any failure to comply with these procedural requirements results in de novo review of the claim unless the failure is a *de minimis* violation or done for good cause. Plaintiffs cite *Rasenack v. AIG Life Insurance Co.*, 585 F.3d 1311, 1361–17 (10th Cir. 2009), 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1)–(2), and *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42 (2d Cir. 2016) to support this claim. The court is unpersuaded that any of these citations supports Plaintiffs' claim that the de novo standard should apply in this instance.

First, the claims administrator in *Rasenack* did indeed forfeit the deferential standard but not for generally failing to comply with ERISA's procedures. 585 F.3d at 1315–16. Rather, *Rasenack's* holding that the claim was subject to de novo review was based upon the administrator's failure to issue a claim determination within its self-imposed time limits. *Id.* Specifically, the court held that "where the plan and applicable regulations place temporal limits on the administrator's discretion and the administrator fails to render a final decision within those limits, the administrator's 'deemed denied' decision is by operation of law rather than the exercise of discretion, and thus falls outside the *Firestone* exception." *Id.* at 1316 (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 115). Thus, the administrator's failure resulted in the

11

claim being "deemed denied" due to procedural issues, not a substantive determination of the claim's merits. *Id.* That is not what happened here when Defendants stated that they reviewed the medical records and found a lack of medical necessity.

Second, and relatedly, 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1)–(2) does not provide that *any* ERISA procedural violation results in an administrator forfeiting the deferential standard. Subsection (F) deals with when ERISA deems that the internal claims and appeals process is exhausted. Specifically, Subsection (F)(1) states that a claimant may seek relief under section 502(a) of ERISA for an administrator's failure to comply with all of the requirements of paragraph (b)(i). This challenge, however, must be "on the basis that the plan or issuer has failed to provide a reasonable internal claims and appeals process that would *yield a decision on the merits of the claim.*" *Id.* (emphasis added). Thus, it is only when the internal decision process does not yield a decision on the merits of the claim that an administrator's determination is done "without the exercise of discretion." *Id.* In this instance, UBH's decision was—at least for the final three reviews—based on the merits regarding the medical necessity of A.K.'s claim and, therefore, does not result in Defendants forfeiting the deferential standard.

Third, Plaintiffs cites the Second Circuit's opinion in *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.* to support their contention that the alleged ERISA procedural violations in this instance warrant de novo review. 819 F.3d 42 (2d Cir. 2016). This argument, urging courts in this district to adopt *Halo's* reasoning, has been frequently rejected by the Utah District Court judges—including this very court. *See Joel S. v. Cigna*, 356 F. Supp. 3d 1305, 1313 (D. Utah 2018); *James C. v. Aetna Health & Life Ins. Co.*, Case No. 218-cv-00717-DBB-CMR, 2020 WL 6382043, at *6 (D. Utah Oct. 30, 2020); *H. v. Cigna Behavioral Health*, Case No. 2:17-cv-110-TC, 2018 WL 4082275, at *8 n.3 (D. Utah August 27, 2018); *C. v.*

*ValueOptions*, Case No. 1:16-cv-93-DAK, 2017 WL 4564737, at *4 (D. Utah October 11, 2017)

(10th Cir. Nov. 9, 2017).

All these courts rejected the *Halo* framework and then looked to the Tenth Circuit

precedent for determining the correct standard of review. The court finds Judge Barlow's opinion

persuasive on the Tenth Circuit precedent for when the deferential standard is forfeited:

> Under Tenth Circuit precedent, de novo review is appropriate despite a plan's conferral of discretion on a plan administrator if: the administrator fails to exercise discretion within the required timeframe; the administrator fails to apply its expertise to a particular decision; the case involves serious procedural irregularities; the case involves procedural irregularities in the administrative review process; or where the plan members lack notice of the conferral of administrator discretion over the plan.

*James C.*, 2020 WL 6382043, at *7 (footnotes and quotation marks omitted). None of those

situations are present here. Accordingly, the court will apply the deferential arbitrary and

capricious standard.

### B. <u>ERISA Claim</u>

Now that the court has determined the standard of review, it must determine if

Defendants' adverse benefits decisions were arbitrary and capricious under the terms of the Plan.

Under this standard, the administrator's "decision will be upheld unless it is not grounded on any

reasonable basis." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (emphasis in

original) (citation omitted). "This standard is a difficult one for a claimant to overcome." *Tracy*

*O. v. Anthem Blue Cross Life & Health Ins.*, 807 F. App'x 845, 853–54 (10th Cir. 2020) (citation

omitted). The arbitrary and capricious review of an ERISA benefits decision looks to whether the

decision: "(1) . . . was the result of a reasoned and principled process, (2) is consistent with any

prior interpretations by the plan administrator, (3) is reasonable in light of any external standards,

and (4) is consistent with the purposes of the plan." *Id.* at 854 (citations omitted). Additionally,

13

failure to "consistently apply the terms of an ERISA plan" and inconsistent interpretations with the "plans unambiguous language" are considered arbitrary and capricious. *Id.* (citations omitted).

In this case, Plaintiffs raise three reasons why Defendants' determinations were arbitrary and capricious: (1) medical necessity was met under the terms of the Plan; (2) Defendants incorrectly disregarded A.K.'s treating physicians' opinions; and (3) Defendants did not articulate how they applied the terms of the Plan to A.K.'s medical history or current condition. The court will add another consideration, and discuss (4) the implications of UBH's inconsistent denial rationales. Plaintiffs certainly raised this fourth issue but the court wishes to address it separately. This court will discuss each issue in turn.

### 1. Medically Necessary

The court divides Plaintiffs' medically necessary arguments into two categories: (i) the "why now" factors and (ii) the "Custodial Care" portions of the Plan and how the reviewers interpreted those terms. Additionally, the court will not redefine the relevant terms of the Plan here, as those are detailed above. *See* BACKGROUND, *supra*.

### i. The "Why Now" Factors

Plaintiffs take aim at the third and fourth letters' reasoning that coverage would be denied because the "why now" reasons for admission had been addressed. According to Plaintiffs, the "why now" factors had not been addressed because the purpose of admission was not to ensure that A.K. stopped self-harming behavior while at Discovery, but rather to provide long-term care until she had developed the tools to break the cycle of relapsing into self-harming behavior upon leaving inpatient care. The final three reviews stated that this admission goal had been satisfied because she had improved or had not shown self-harming behavior.

14

The court finds that, under the deferential standard, the final three reviewers did not abuse their discretion because the evidence could reasonably be interpreted to show that A.K. could have been discharged to a lower level of care because her most pressing admission factors had allegedly subsided. Indeed, the evidence can support a finding that during her first 90 days at Discovery that A.K. had improved in important ways. The court notes, however, that this is a particularly hard issue: at some point during long-term residential treatment, a patient must be discharged to a lower level of care to see if the treatment helped stop self-harming behavior. There is no sure way to tell if discharge would be appropriate after three months, or six months, or a year. The court cannot properly say that the final three reviewers arbitrarily or capriciously found that A.K.'s three months of treatment had met the "why now" factors and that a lower level of care would be appropriate.

For the foregoing reasons, the court finds that the final three reviewers did not abuse their discretion in interpreting the "why now" factors as used in their denial rationales.

### ii.   Custodial Care

Plaintiffs argue that the third and fourth denial letters arbitrarily concluded that because the "why now" factors of A.K.'s admission had been addressed that her care became "Custodial." Plaintiffs state this is an incorrect conclusion because the care A.K. received at Discovery does not meet the Plan's definition of "Custodial Care." As noted above, the Plan defines "Custodial Care" as:

> Treatment or service prescribed by a medical professional, that could be rendered safely and reasonably by a person not medically skilled, or that is designed mainly to help the patient with daily living activities. These activities are the following:
> (g)  Personal care such as help in: walking, getting in and out of bed, bathing, eating by spoon, tube or gastronomy, exercising and dress;
> (h) Homemaking, such as preparing meals or special diets;
> (i) Moving the patient
> (j) Acting as a companion or sitter;

(k) Supervising medication that can usually be self-administered; or
(l) Treatment or services that any person may be able to perform with minimal instruction including, but not limited to, recording temperature, pulse, and respirations, or administration and monitoring of feeding systems.

(Rec. 19.) According to Plaintiffs, the mere fact that A.K. was no longer exhibiting self-injurious behavior does not demonstrate that her care, for example, "could be rendered . . . by a person not medically skilled" or was "designed to mainly help the patient with daily living activities." (Rec. 19.) Defendants do not rebut this argument in any of their summary judgment papers. Without the help of Defendants' briefing, the court is persuaded by Plaintiffs' arguments.

The treatment and care that A.K. received at Discovery continued to include physician visits, counseling, therapy, medication changes, etc. Those are not services that can be rendered by a medically unskilled person. Additionally, A.K.'s care had nothing to do with her assisting her with daily activities. There is no evidence that A.K. was being assisted with any of the things listed in (m)–(r) above—or that anything that is remotely like those services. Therefore, the care A.K. received at Discovery was not Custodial Care as defined by the Plan. In short, under the Plan, treatment does not automatically become Custodial Care just because it is not medically necessary. Such an interpretation of the Plan's terms is erroneous and a denial based thereon is arbitrary.

For the foregoing reasons, the court concludes that Defendants abused their discretion in finding that A.K.'s care had become "Custodial" under the Plan.

**2. A.K.'s Treating Professionals' Opinions**

"Nothing in [ERISA] itself . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black &*

16

*Decker Disability Plan v. Nord,* 538 U.S. 822, 831 (2003). However, "[p]lan administrators . . .

may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a

treating physician." *Id.* at 834. The Tenth Circuit phrases this rule as a "narrow principle that

fiduciaries cannot shut their eyes to readily available information when the evidence in the

record suggests that the information might confirm the beneficiary's theory of entitlement and

when they have little or no evidence in the record to refute that theory." *Gaither v. Aetna Life

Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004)

> If benefits are denied . . . the reason for the denial must be stated in reasonably clear
> language, . . . [and] if the plan administrators believe that more information is
> needed to make a reasoned decision, they must ask for it. There is nothing
> extraordinary about this: it's how civilized people communicate with each other
> regarding important matters.

*Id.*

Plaintiffs claim that Defendants' decisions were arbitrary because Defendants

disregarded and failed to engage with the opinions of A.K.'s treating professionals. The court

finds that the claims administrators clearly reviewed the treating professionals' opinions. For

example, Defendants third denial letter states that the administrator reviewed: (1) a "[l]etter from

K.K. detailing the reasons she believed the decision was in error"; (2) "correspondence from

K.K. with exhibits"; (3) the IPRO letter; (4) "Note from Kimberly Weater"; (5) letter from

Andrew Dieterich MD; (6) "Letter from Tim Lowe PhD and Ryan Williams MD of Discovery

Ranch"; and (7) "Attending Physician Progress notes." (Rec. 2004.) The fourth denial letter is

less detailed but still states that the administrator reviewed the medical record, case management

notes, and appeal letter—presumably from K.K., including attachments. (Rec. 2052–54.) Lastly,

the fifth, external determination states that it was based upon a review of the appeal information,

denial letters, correspondence between K.K. and UBH, submitted medical information,

submitted criteria, and the Summary Plan Description. Again, these files likely included A.K.'s

treating professionals' opinions. (Rec. 2606.) Thus, the evidence shows the claims administrators did not disregard the treating professionals' opinions. Whether Defendants engaged with those opinions is an entirely different matter.

In this instance, the evidence shows the administrators did not engage with A.K.'s treating physicians' opinions. As noted above, A.K. received extensive out- and in-patient treatment in the 20 months leading up to her admission to Discovery. None of that treatment was sufficient to keep A.K. from reverting to self-harming behavior. During that time, several physicians recommended that A.K. receive long-term care. All of A.K.'s medical history and her treating professionals' opinions stand in stark contrast to the denial letters' scant reasoning. For example, the *only* reference to all of A.K.'s treatment and professionals' opinions is a passing reference stating that the purpose of the treatment was to "consolidate" A.K.'s "gains." This language comes directly from Dr. Riedel's September 10th letter to the IPRO. That is it. There is no more acknowledgement of A.K.'s serious mental health history. Indeed, this strikes the court as an instance where Defendants "shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the [Plaintiffs'] theory of entitlement." *Gaither*, 394 F.3d at 807.

Thus, the court finds that Defendants abused their discretion by not fairly engaging with A.K.'s treating professionals' opinions.

### 3. Applying the Terms of the Plan to A.K.'s Medical History

Plaintiffs argue that Defendants abused their discretion by failing to apply the specific terms of the Plan to any specific portion of A.K.'s medical records. The law is not very clear on what level of specificity is required from claims administrators in applying a plan's terms to the medical records. Plaintiffs relied upon Judge Parrish's reasoning from *Raymond M.*, wherein

18

claims denials were deemed arbitrary and capricious because the letters "contain[ed] neither citations to the medical record nor references to the report by [the plaintiff's] doctors" and were merely "conclusory statements without factual support." 463 F. Supp. 3d at 1282.[1]

In *Raymond M.*, Judge Parrish draws the standard of review from *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697 (10th Cir. 2018).[2] In *McMillan*, the Tenth Circuit took issue with a plan administrator's denial of short-term disability benefits. *Id.* at 705–06. The court stated that the problem with the denials was "the lack of *any* analysis, let alone a reasoned analysis. For example, the reviews by [the claims administrators] contain[ed] nothing more than conclusory statements that [the plaintiff] could travel without any discussion whatsoever." *Id.* at 706 (emphasis in original). Indeed, a review of the facts in that case indicates that the reviewers did not do *any* analysis about the patient's ability to travel. *Id.* at 699–705. Thus, *McMillan* concluded that when a claims administrator makes a health conclusion it must provide reasoning and citation to the record. *Id.*

Extrapolating from *McMillan*, Judge Parrish concluded that the denial letters in *Raymond M.* similarly failed to fulfill their obligation to conduct a fair review of the claims. *Raymond M.*, 463 F. Supp. 3d at 1282. For example, the most detailed of denial letters from *Raymond M.* states:

> You are a 17 year old female admitted to the mental health residential treatment service level of care on 12/21/2015. On admission, you were withdrawn and not fully cooperative with the treatment programming. You were treated with individual, group, family, horse, and milieu therapies. You successfully ventured away from the facility several times without incident and had not engaged in any

---

[1] This case is currently on appeal to the Tenth Circuit. *Raymond M. v. Beacon Health Options,* Appeal No. 21-4041(Mar. 30, 2021).

[2] Judge Parrish also relies on *Kerry W. v. Anthem Blue Cross & Blue Shield*, 444 F. Supp. 3d 1305, 1313 (D. Utah 2020). That case similarly draws its standard from *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697 (10th Cir. 2018). Thus, the court does not discuss *Kerry W* since the standard is what is at issue here.

self-harming behaviors. You were not psychotic or aggressive and you have a supportive family. As of 01/19/2016 it was not medically necessary for your symptoms to be treated with residential treatment service monitoring and they could have been safely addressed in a less restrictive level of care such as in outpatient treatment with individual treatment, family work and medication management.

*Id.* at 1264. It is this denial letter that prompted Judge Parrish to hold that the "denial letters contain[ed] neither citations to the medical record nor references to the reports . . . concerning the state of [the patient's] condition." *Id.* at 1282. Thus, Judge Parrish concluded the denial was arbitrary. *Id.*

Here, the denial letters similarly do not contain any specific citation to the medical record whatsoever. Instead, the denial letters simply contain general statements about A.K.'s condition on admission and minimal statements about her treatment while at Discovery. As noted, there is no specific reference to any of her medical history or professionals' opinions prior to her admission to Discovery. For example, the letters generally state: (1) that when A.K. was admitted she was diagnosed as having "Dysthymia, in partial remission, Major Depressive Disorder in remission but having an Anxiety Disorder and what is termed a rule out for Group B Traits (meaning personality issues)"; (2) A.K.'s diagnoses upon admission "did not change" during her first three months; (3) A.K.'s "medication changes were minimal"; (4) "[t]here was no evidence of self-injurious behavior"; (5) A.K.'s "goals of admission"—to consolidate her gains and control self-injurious behavior—appeared to have been met; (6) because her goals had been met care became custodial; and (7) the Plan's guidelines for Residential Treatment required "evidence of active treatment, including that the psychiatrist see the patient twice a week, whereas [A.K.] was seen once a month." (Rec. 2052–54.) Of these seven statements, only two make a general reference to A.K.'s condition: that her diagnoses "did not change" and there was no evidence of self-injurious behavior. Neither of these statements are supported by citations to

20

the record or explained in the context of A.K.'s prior, extensive mental health medical history.

Additionally, the letters do not explain or cite to any evidence to support its conclusion that

A.K.s goals of admission had been met and that she would not return to self-harming behavior

upon discharge. Without any support, the court finds that these conclusory statements result in an

arbitrary denial of A.K.'s treatment.

At the hearing, Defendants urged the court to look at the claims administrators' notes and

not just the denial letters sent to Plaintiffs. Defendants claim that these notes are more

substantive and explain in more detail A.K.'s medical history and the reason why coverage for

Discovery was no longer medically necessary. Plaintiffs' counsel argues that it would be

improper for the court to consider these documents as they were not provided to Plaintiffs. The

court agrees with Plaintiffs.

The court was unable to find any Tenth Circuit case law that speaks to this issue. The

First Circuit has, however, discussed "whether a plan administrator may defend a denial of

benefits on the basis of a different reason than that articulated to the claimant during the internal

review process." *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 115 (1st Cir. 2004). In

deciding this issue, the *Glista* court declined to adopt a "hard-and-fast rule" on this issue, instead

opting to take this on a case-by-case basis. *Id.* In finding that the administrator could not rely on

reasons that had not been articulated to the claimant, the *Glista* court considered the following:

(1) would "traditional insurance law place[] the burden on the insurer to prove that the

applicability" of a similar benefits exclusion rationale; (2) did the plan "expressly provide that

participants 'must receive a written explanation of the reasons for the denial'"; (3) did the

administrator give an "explanation for why it did not explain earlier" its unstated reason for

denying the claim; and (4) did the facts of the situation require that the controversy be resolved quickly? *Id.* at 131

The court finds *Glista* persuasive and will rely on its reasoning. Here, the court must hold Defendants to their denial rationales articulated in the denial letters because two of the *Glista* considerations are satisfied. First, the Plan requires "written notification from the applicable Claims Administrator" that would include: "(a) The specific reason or reasons for the denial; [and] (b) specific reference to any pertinent Plan provisions on which the denial was based[.]" (Rec. 129–30.) In fact, if a denial was "based on Medical Necessity," the notification must provide "an explanation of the scientific or clinical judgment of the determination, applying the terms of the Plan to the Participant's circumstances." (Rec. 129–30.) As explained above, that did not happen here. Second, Defendants have not given any reason why they did not include their full reasoning for the denial in the letters sent to Plaintiffs. Without any reason justifying their failure to explain their internal reasoning for denying A.K.'s claims, Defendants cannot now rely on those rationales.

Even were the court to consider those additional materials, the court is unpersuaded that the internal documents make any difference. The internal documents behind the third denial letter are, in fact, more detailed. (Rec. 1544–46.) This document details A.K.'s medical history quite thoroughly, noting her in-patient admissions, partial hospitalizations, residential treatment center stays, emergency room visits, out-patient treatment, and her history of regressing after discharge. (Rec. 1545.) The problem with these records—besides the fact that they were not communicated to Plaintiffs—is that they undermine the denial letters' conclusions and assertions. For example, the internal document states "[t]he chart [from Discovery] is absent of treatment plan updates that review her progress in attaining her objectives. Updated goals or

22

objectives are never stated. Of significance is *the absence of notes* relating to her progress in controlling suicidal threats, runaway behavior and self-injurious behavior." (Rec. 1545 (emphasis added).) In the third denial letter, however, Defendants assert that "[t]he treatment record indicates no evidence of ongoing self-injurious behavior." (Rec. 2004.) This is misleading because it suggests that A.K. had not had self-injurious or suicidal thoughts when the record actually indicates that there was simply an absence of notes on that subject. A lack of notes about self-injurious behavior does not mean A.K. was not struggling with such thoughts or behavior. As the aphorism goes, absence of evidence is not evidence of absence. Additionally, the third denial letter expressly states that "[t]hroughout the treatment, the attending psychiatrist did not change [A.K.'s] diagnoses." (Rec. 2004.) That statement is directly contrary to Defendants internal documents noting that "[t]he Master Treatment Plan changed the diagnosis to Major Depressive Disorder, recurrent and severe, Reactive Attachment Disorder and Anxiety Disorder NOS." (Rec. 1545.) Similar problems are present in the fourth denial letters' internal supporting notes. (*Compare* Rec. 2575–76 *with* Rec. 2052–53.) Thus, the internal documents that were not shared with Plaintiffs actually work to show that the denial letters' rationales were unsupported by the record, including Defendants own notes.

For the foregoing reasons, the court concludes that the denials were arbitrary because they lacked "any analysis, let alone a reasoned analysis," consisting of "nothing more than conclusory statements." *See McMillan*, 746 Fed. App'x at 706 (emphasis omitted).

### 4. Inconsistent Denial Letters

As noted above, one of the factors that a court must consider in ERISA benefits decision is the consistency of the denial reason between the administrators. *See Tracy O.*, 807 F. App'x at 853–54. Plaintiffs argue that the first two denial letters are wildly inconsistent with the last three

denials. Defendants attempt to distance themselves from the first two letters by: (1) claiming that

those letters did not constitute a medical necessity review; (2) asserting that the last three denials

were consistent; and (3) arguing that the first two denials were based upon different versions of

the Plan. The court will address each argument in turn.

First, the court is concerned at Defendants argument that the first two reviewers did not

conduct a medical necessity review. This argument is unsupported by the evidence. This is

manifest by looking at the first two denial letters and the supporting internal documents. The first

two denial letters clearly state that the reviewers looked at the medical records:

> Based upon current clinical [sic] member appears to require Mental Health
> Residential Treatment Center long term level of care.
>                                * * *
> Based upon current medical records, the member appears to require Mental Health
> Residential long term level of care.

(Rec. 442, 1904.). The plain language indicates that the claims administrator reviewed the

records and that A.K. appeared to require additional long-term care. Indeed, Defendants have not

pointed to any portion of the Plan or the record that demonstrates there was any meaningful

difference in the reviews' underlying the denial letters. The internal document supporting the

second denial letter states that A.K. "does meet [the criteria] for continued [mental health

Residential Treatment level of care]; but long term residential care as defined below is not a

covered service." (Rec 1872.) Therefore, the first and second denial letters stand in direct

opposition to the final three letters. These conflicting reasons alone are enough for the court to

find that the Defendants' denials were arbitrary.

Second, the final external denial letter's rationale is different from the third and fourth

denial letters, contrary to Defendants' assertions. While it is true that all three of the final

reviewers found that medical necessity was not met, their reasoning for why it was not met

differed. Specifically, the external review focused mainly on the Plan's requirement that treatment be the "most appropriate, safest, and most effective level of care." (Rec. 2606.) The external reviewer's opinion was, in short, that A.K.'s "remainder in a residential setting" was not "the safest and most effective level of care" because her conditions "could have been managed at a therapeutic school with intensive outpatient behavioral supports." (Rec. 2606.) This reasoning is different than the third and fourth reviewers' assertions that A.K.'s care had "become custodial." (Rec. 2004, 2053.) As noted above, A.K.'s care did not meet the Plan's definition of custodial care. This custodial care error is only further illustrated by the external reviewer not making that same misinterpretation.

Third, Defendants did not show that the outdated version of the Plan would require a different type of claims review process. In fact, it appears from the record that the only difference in the plan was that the exclusion for residential treatment care had been deleted. Thus, Defendants' assertion that it should not be held to account for an interpretation based on an old version of the Plan is not well taken because the Plan was—in all relevant and important ways—the same as the Plan upon which the final three reviews were based.

For the foregoing reasons, the court finds that the Defendants' shifting and inconsistent denial rationale is arbitrary and capricious.

## C. **Appropriate Relief**

"[W]hen a reviewing court concludes that a plan administrator has acted arbitrarily and capriciously in handling a claim for benefits, it can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006) (citations and internal quotation marks omitted). "The remedy when an ERISA administrator

fails to make adequate findings or to explain adequately the grounds of her decision is to remand the case to the administrator for further findings or explanation." *Id.* at 1288 (citation omitted). On the other hand, remand is unnecessary only when "the evidence clearly shows that the administrator's actions were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Id.* (citations and quotation marks omitted).

In this instance, the court finds that Defendants' denials were, in part, arbitrary and remand is not required. Although Defendants "fail[ed] to make adequate findings or to explain adequately the grounds of [their] decision"—which would require remand—that is not the basis for the court's decision to decline to remand this case. *Id.* Instead, the court basis its decision on the fact that Defendants' denials were arbitrary and capricious. The denials were arbitrary because Defendants gave inconsistent denial rationales and erroneously interpreted and applied the Plans' terms. These two types of denials fall into the category of denials for which remand is not necessary according to *Caldwell*. Accordingly, the court will not remand these claims to Defendants and instead orders Defendants to pay for A.K.'s treatment at Discovery.

<u>CONCLUSION</u>

For the foregoing reasons the court GRANTS IN PART AND DENIES IN PART Plaintiffs Motion for Summary Judgment. (ECF No. 77.) Plaintiffs' Motion is GRANTED as to their First Cause of Action for ERISA violations. The court DENIES Plaintiffs' Motion on their Second Cause of Action for Parity Act violations. (ECF No. 77.) This means that the court similarly GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment. (ECF No. 75.) Defendants' Motion is DENIED as to Plaintiffs' First Cause of Action for ERISA violations and GRANTED as to Plaintiffs' Second Cause of Action for violations of

the Parity Act. Since Defendants' denials were arbitrary and capricious, the court will not

remand the claims to Defendants and instead orders Defendants to pay for A.K.'s treatment at

Discovery.

DATED this 22nd day of June, 2021.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

ATTACHMENT B

DISTRICT COURT JUDGMENT FILED 06/22/21

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| D.K. and A.K.,<br><br>      Plaintiffs,<br><br>vs.<br><br>**UNITED BEHAVIORAL HEALTH and ALCATEL-LUCENT MEDICAL EXPENSE PLAN FOR ACTIVE MANAGEMENT EMPLOYEES,**<br><br>      Defendants. | **JUDGMENT**<br><br>Case No. 2:17-CV-01328-DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on the parties' Cross-Motions for Summary Judgment (ECF No. 75, 77.) In the court's Memorandum Decision and Order, dated June 23, 2021, the court awarded Plaintiffs summary judgment on their ERISA claim and denied their claim under the Mental Health Parity and Addiction Equity Act (29 U.S.C. §1132(a)(3)). Accordingly, Defendants are ordered to pay for A.K.'s treatment at Discovery and Plaintiffs' Mental Health Parity and Addiction Equity Act claim is denied and dismissed with prejudice. This action is closed.

DATED this 22nd day of June, 2021.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

ATTACHMENT C

MEMORANDUM DECISION AND ORDER ON FEES AND COSTS
FILED 09/07/21

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| D.K. and A.K.,<br><br>    **Plaintiffs,**<br><br>vs.<br><br>**UNITED BEHAVIORAL HEALTH and ALCATEL-LUCENT MEDICAL EXPENSE PLAN for ACTIVE MANAGEMENT EMPLOYEES,**<br><br>    **Defendants.** | **MEMORANDUM DECISION AND ORDER GRANTING IN PART BENEFIT AWARD, PREJUDGMENT INTEREST, ATTORNEY FEES, AND COSTS**<br><br>**Case No. 2:17-CV-01328-DAK**<br><br>**Judge Dale A. Kimball** |

This matter is before the court on Plaintiff's Motion for entering Judgment for Benefit Award and awarding Prejudgment Interest, Attorney Fees, and Costs, pursuant to the court's Memorandum Decision and Order in this case (ECF No. 96) and based on 29 U.S.C. §1132(g)(1), F.R.Civ.P. 54(d), DUCivR 54, and DUCivR 7-1. The court does not believe that a hearing will significantly aid in its determination of this motion. The court, therefore, renders the following Memorandum Decision and Order based on the materials submitted by the parties.

## DISCUSSION

In the court's Memorandum Decision and order dated June 22, 2021, the court granted the Plaintiffs' Motion for Summary Judgment as to their first cause of action brought under 29 U.S.C. §1132(a)(1)(B) alleging wrongful denial of ERISA benefits. In light of this decision, Plaintiffs seek the amount of the benefits at issue, an award of prejudgment interest on those benefits, an award of attorney fees under 29 U.S.C. §1132(g)(1), and reimbursement of their

allowable costs under 28 U.S.C. §§1920 and 1924 in the amount of $400 as the filing fee for this case.

The award of the benefits at issue in this case, sought by Plaintiffs, is not disputed by Defendants. The agreed upon amount of these benefits has been presented to the court by both Plaintiffs and Defendants as $88,505. In accordance with the court's Memorandum Decision (ECF No. 96), the $88,505 is recoverable by Plaintiffs.

Plaintiffs additionally seek prejudgment interest on the recoverable benefits at issue, as well as attorney fees and costs. Defendants object to both requests. The court addresses these disputes as follows.

## A. Prejudgment Interest on Benefits

It is well-established in the 10th Circuit that "[a]n award of prejudgment interest in an ERISA case is . . . within the district court's discretion." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 816 (10th Cir. 2010). Plaintiffs and Defendants agree on this point. In this case, the court chooses to use its discretion to grant prejudgment interest to Plaintiffs. The court does so in order to make Plaintiffs whole for the loss of income from monies that Plaintiffs were forced to expend that the Defendants should have paid in the first place.

Plaintiffs argue that the proper percentage per annum for prejudgment interest in ERISA cases is 10% under the Utah law on prejudgment interest rates for written contracts, U.C.A. § 15-1-1(2). Plaintiffs assert that the 10% per annum rate is appropriate compensation, as well as a small measure of equitable disgorgement from the benefit plan to reflect that Defendants wrongfully retained the benefit of funds that Defendants should not have retained. Defendants disagree. Defendants assert that, if prejudgment interest is awarded, the percentage per annum

should reflect what Plaintiffs would have made had they kept their funds in the financial markets during the time period at issue. However, Plaintiffs have demonstrated that there is a pattern in Utah district court ERISA cases where benefits were wrongfully denied to award, under U.C.A. § 15-1-1(2), 10% prejudgment interest per annum (ECF No. 100, fn. 9). The court finds this persuasive. The court awards to Plaintiffs prejudgment interest on the wrongfully denied benefits at the rate of 10% per annum, beginning on February 9, 2014 when coverage was first denied.

### B.  Attorney Fees and Costs

Under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(a), the court may "in its discretion" allow "a reasonable attorney's fee and costs of action to either party." In *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 254 (2010), the Supreme Court clarifies that there are limits to the court's discretion. The statute's language means that a litigant need not be the prevailing party to reasonably obtain an award of attorney fees, but merely must have achieved "some degree of success on the merits." *Id*. at 252, 255. A reversal of a denied claim is sufficient success to justify an award of fees. *Id*. at 255-256.

In *Hardt*, the Supreme Court also discusses the application of the well-accepted "five-factor" test from *DeBoard v. Sunshine Mining & Refining Co.*, 208 F.3d 1228, 1244 (10th Cir. 2000), that has been used to determine whether or not an award of fees in ERISA cases is appropriate. *Hardt* states: "Because these five factors bear no obvious relation to §1132(g)(1)'s text or to our fee-shifting jurisprudence, they are *not required* for channeling a court's discretion when awarding fees under this section. 560 U.S. at 254-255 (emphasis added). Therefore, the court does not need to use the "five-factor" test from *DeBoard* to determine whether attorney fees are appropriate in this case. The court instead relies on *Hardt* to decide that Plaintiffs'

3

success on the merits of the first action, which constituted a reversal of denied benefits, is

sufficient to qualify for an award of attorney fees and costs.

The court's decision would not be different if the "five-factor" test were applied in this

case. The five factors that *DeBoard* states a court should consider, when deciding whether to

exercise its discretion to award fees in ERISA cases, are as follows:

1. the degree of the offending party's culpability or bad faith;
2. the degree of the ability of the offending party to satisfy an award of attorney's fees;
3. whether or not an award of attorney's fees against the offending party would deter other persons acting under similar circumstances;
4. the amount of the benefit conferred on members of the plan as a whole; and
5. the relative merits of the parties' positions. 208 F.3d 1228, 1244 (10th Cir. 2000).

In this case, the first factor is satisfied by Defendants' culpability from their abuse of discretion

in denying D.K's claim. The second factor is satisfied by Defendants' substantial ability to pay –

a fact that is acknowledged by both Plaintiffs and Defendants. The third factor is satisfied

because the court believes that awarding attorney fees and costs will deter insurers and other

benefit plans from violating ERISA and the terms of employee benefit plans under similar

circumstances. While the fourth factor is not strong in this case, an award of attorney fees and

costs would still have a beneficial effect in this area of law. Therefore, the members of the plan

as a whole would be benefited, and the factor is satisfied. Finally, the fifth factor is satisfied

because D.K. prevailed in his goal of reversing the denial of his claim by the Defendants.

The court is awarding attorney fees and costs to Plaintiffs. Pursuant to the provisions of

28 U.S.C. §§1920 and 1924, the $400 filing fee is recoverable as costs in this case. The court

awards Plaintiffs this $400 filing fee.

To determine the amount of attorney fees to award, the court uses the "hybrid lodestar"

method – the method that the Supreme Court has decided is appropriate to determine attorney

fees in ERISA cases. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The hybrid lodestar

method requires that the court multiply the "number of hours reasonably expended on the litigation by a reasonable hourly rate." *Id*. The court then reviews the billing records and excludes any amounts it determines are "excessive, redundant, or otherwise unnecessary." *Id*. at 434. The court now applies the hybrid lodestar method for calculating attorney fees in this case as follows.

　　*1. Reasonable Hourly Rates*

　　The party seeking an award of attorney fees bears the burden of producing "satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. *Blum v. Stenson*, 465 U.S. 886, 896, n. 11 (1984). Plaintiffs' requested rate for Brian King is $600 per hour – an amount that Plaintiffs assert is his customary rate for his services in ERISA cases. Plaintiffs' requested rate for Sam Hall, the assisting associate attorney, is $250 per hour. Defendants have no issue with Sam Hall's requested rate, but object to Brian King's requested rate because they believe it is unreasonable and out-of-line with rates for similar services in Salt Lake City. Defendants request that Mr. King's rate be reduced to $450 per hour – a rate that is consistent with prevailing hourly rates for partners in the relevant community of Salt Lake City.

　　Plaintiffs assert that the court should look to national rates to establish a standard rate for specialties that draw on federal statutes or bodies of law, such as ERISA. Plaintiffs rely heavily on a number of cases from other circuits and district courts across the nation holding that a national rate is appropriate for ERISA cases (ECF No. 100, at 8). Defendants counter that courts in this district have rejected this national rate argument, and therefore the court should use the prevailing market rate for partners in Salt Lake City instead (ECF No. 106, at 10).

The court agrees with Defendants. This district generally uses a relevant market analysis when determining attorney fees in ERISA cases. See *James C. v. Aetna Health & Life Ins. Co*., No. 2:18-c-v-00717, 2021 U.S. Dist. LEXIS 4216, at *3 (D. Utah Jan. 8, 2021); *Carlile*, 2019 U.S. Dist. LEXIS 228481, at *1; *Foust*, 2019 U.S. Dist. LEXIS 202915, at *4. Earlier this year, a court in this district found that $450 was a reasonable hourly rate for Mr. King. *James C*., 2021 U.S. Dist. LEXIS 4216, at *3. This court agrees.

Given Mr. King's experience and the complexity of ERISA cases, $450 per hour is a reasonable rate for Mr. King.

2.  *Number of Hours Reasonably Expended on the Litigation*

Plaintiffs have submitted time sheets with the number of hours billed for Mr. King and Mr. Hall in the King Declaration and the Hall Declaration (ECF No. 100; Exs. C-D). Defendants have no qualm with Mr. Hall's time sheet, but argue that the hours billed by Mr. King for drafting are excessive because the documents are similar to those he creates in other cases. The court finds this unpersuasive. Upon reviewing the time sheet submitted by Mr. King, the court finds the that his time entries for this case are reasonable. Therefore, Mr. King's 80.4 billed hours and Mr. Hall's 35.1 billed hours are reasonable.

3.  *Appropriate Lodestar*

Based on the analysis above, the court uses the hybrid lodestar method to calculate the following lodestar amount for this matter. Brian King: 80.4 hours at $450 per hour = $36,180. Sam Hall: 35.1 hours at $250 per hour = $8,775. Therefore, the court finds a total lodestar amount for attorney fees of $44,955.

**<u>Conclusion</u>**

Based on the above reasoning, Plaintiff's Motion is GRANTED IN PART and DENIED

IN PART. The court reduces Plaintiffs' requested award for attorney fees and ORDERS

Defendants to pay Plaintiffs $88,505 in recoverable benefits, 10% per annum in prejudgment

interest, $44,955 in attorney fees, and $400 in costs.

DATED this 7th day of September, 2021.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge