No. 21-04088

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

D.K., K.K., AND A.K.

Plaintiffs-Appellees,

v.

UNITED BEHAVIORAL HEALTH AND ALCATEL-LUCENT MEDICAL
EXPENSE PLAN FOR ACTIVE MANAGEMENT EMPLOYEES

Defendants-Appellants.

_____

On appeal from the United States District Court for the
District of Utah, Case No. 2:17-cv-01328
The Honorable Dale A. Kimball

_____

**CORRECTED BRIEF OF APPELLEES**

***ORAL ARGUMENT REQUESTED***

_____

Brian S. King, Utah Bar No. 4610
*Counsel for Appellees*
D.K., K.K., and A.K.

BRIAN S. KING P.C.
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: 801-532-1739
Facsimile: 801-532-1936
brian@briansking.com

## TABLE OF CONTENTS

TABLE OF CONTENTS ……………………………………………….2

TABLE OF AUTHORITIES ………………………………………….3

STATEMENT OF PRIOR OR RELATED APPEALS …………………………...8

STATEMENT OF ISSUES PRESENTED FOR REVIEW ……………………8

STATEMENT OF FACTS …………………………………………………...9

SUMMARY OF THE ARGUMENT ……………………………………29

ARGUMENT …………………………………………………………..31

I.    THE COURT SHOULD DECLINE TO CONSIDER
      DEFENDANTS' APPEAL BECAUSE THEY DID NOT
      PREPARE AN APPENDIX SUFFICIENT FOR THIS COURT'S
      REVIEW ……………………………………………………31

II.   THE DISTRICT COURT CORRECTLY DETERMINED THAT
      DEFENDANTS ARBITRARILY AND CAPRICIOUSLY DENIED
      A.K. BENEFITS ……………………………………………36

      A.    The District Court Correctly Ruled that Defendants Erroneously
            Interpreted the Terms of the Plan ……………………………38

      B.    The District Court Correctly Ruled that Defendants' Denials
            Were Arbitrary and Capricious Because They Lacked Any
            Analysis, Let Alone a Reasoned Analysis …………………...46

      C.    The District Court Correctly Ruled that Defendants Did Not
            Engage with the Opinions of A.K.'s Treating Professionals…49

      D.    The District Court Correctly Ruled that Defendants Arbitrarily
            and Capriciously Denied Plaintiffs Benefits Because Their
            Denial Letters Were Inconsistent ……………………………55

III.   THE DISTRICT COURT WAS WELL WITHIN ITS DISCRETION
TO ORDER DEFENDANTS TO PAY FOR A.K.'S TREATMENT
AT DISCOVERY …………….…..………………………………59

CONCLUSION …………………………………………………………..62

STATEMENT REGARDING THE NEED FOR ORAL ARGUMENT..………..64

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ……………………….65

CERTIFICATE OF DIGITAL SUBMISSION …………………………………..66

CERTIFICATE OF SERVICE …………………………………………………...66

# TABLE OF AUTHORITIES

## Cases

*Abnathya v. Hoffman LaRoche, Inc.*, 2 F.3d 40 (3rd Cir. 1993) …………………37

*Aetna v. Haworth*, 300 U.S. 227 (1937)……………………………………………..62

*Ariana M. v. Humana Health Plan of Tex. Inc.*, 854 F.3d 753 (5th Cir. 2017)…...41

*Bird v. Regence N.M. State University of Univ.*, 619 Fed. App'x. 733
        (10th Cir. 2015) ………………………………………………………………57

*Black and Decker Disability Plan v. Nord*, 538 U.S. 822 (2003)……………52, 53

*Buffonge v. Prudential.*, 426 F.3d 20 (1st Cir. 2005)……………………………..60

*Burnett v. Southwestern Bell Tel., L.P.*, 555 F.3d 906 (10th Cir. 2009)………31, 32

*Caldwell v. Life Ins. Co. of N. Am.*, 287 F. 3d. 1276 (10th Cir. 2002)………...59-60

*Chasteen v. UNISIA JECS Corp.,* 216 F.3d 1212 (10th Cir. 2000) ………………33

*DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161 (10th Cir. 2006) ………60

*EEOC v C.R. England, Inc.*, 644 F.3d 1028 (10th Cir. 2011)…………………….48

*Egert v Conn. Gen. Life Ins. Co.*, 900 F.2d 1032 (7th Cir. 1990)………………...41

*Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180
        (10th Cir. 2007)……………………………………………………….37-38, 60

*Florence Nightingale Nursing Sev. v Blue Cross of Blue Shield of Ala.*, 41 F.3d
        1476 (11th Cir. 1995)………………………………………………………42

*Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792 (10th Cir. 2004)...……………...50-52

*Kimber v. Thiokol Corp.*, 196 F.3d 1092 (10th Cir. 1999)………………………..37

*LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789 (10th Cir. 2010)…………………37

*Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580 (10th Cir. 2019)………………………………………………………………53-54

*McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253 (10th Cir. 1998)…………42

*McMillan v. AT&T Umbrella Ben. Plan No. 1*, 746 Fed. App'x. 697 (10th Cir. 2008)…………………………………………………………………37

*Mead v. Reliastar Life Ins. Co.*, 768 F.3d 102 (2nd Cir. 2014)...……..…………..62

*Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)…………………………..37, 52

*Metzger v. Unum Life Ins. Co. of Am.*, 476 F.3d 1161 (10th Cir. 2007)……....39, 40

*Milligan-Hitt v. Bd. of Trs. of Sheridan County Sch. Dist. No. 2*, 523 F.3d 1219 (10th Cir. 2008)…………………………………………………………………31

*Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221 (10th Cir. 1999)…………………………………………………………………35

*Murrell v. Shalala*, 43 F.3d 1388 (10th Cir. 1994)……………………..…...39-40

*Nixon v. City and Cty. of Denver*, 784 F.3d 1364 (10th Cir. 2015)………………47

*Owings v. United of Omaha Life Ins. Co.*, 873 F.3d 1206 (10th Cir. 2017)…..38, 58

*Questar Pipeline Company v. Grinberg*, 201 F.3d 1277 (10th Cir. 2000)….…….32

*Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311 (10th Cir. 2009)…………..51-52, 53

*Reedy v. Werholtz*, 660 F.3d 1270 (10th Cir. 2011)…………………………..47, 51

*Rekstad v. U.S. Bank Corp.*, 451 F.3d 1114 (10th Cir. 2006)……………………59

*S.B. v. Oxford Health Insurance, Inc.*, 419 F. Supp. 3d 344 (D. Conn. 2019)…………………………………………………………………43

*Saffle v Sierra Pacific Power Company Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455 (9th Cir. 1996)…………………………………42

*Sanchez v. Beaver Cnty. Sherriff*, 856 F. App'x 770 (10th Cir. 2021)……48, 51, 57

*Sandoval v. Aetna Life and Casualty Ins. Co.*, 967 F.2d 377 (10th Cir. 1992)………………………………………………………48, 51, 53

*Sage v. Automation Inc. Pension Plan & Trust*, 845 F.2d 885 (10th Cir. 1998)…………………………………………………...48, 51

*Sanpete Water Conservancy District v. Carbon Water Conservancy District*, 226 F.3d 1170,1175 (10th Cir. 2000)………………………………………34

*Starkey Ex Rel. A. B. v Boulder Cnty. Soc. Servs.*, 569 F. 3d 1244 (10th Cir. 2009)……………………………………………………………40

*Tam v. UNUM Ins. Co.*, 2020 U.S. Dist. LEXIS 186477 (C.D. Cal. 2020)…………………………………………………………62

*Tracy O. v Anthem Blue Cross Life and Health Ins.*, 807 Fed. App'x. 845 (10th Cir. 2020)………………………………………………38, 56, 58

*Travelers Indem. Co. v. Accurate Autobody, Inc.*, 340 F.3d 1118 (10th Cir. 2003)……………………………………………………31, 32, 35

*United States v Arellano-Sandoval*, 506 Fed. App'x. 827 (10th Cir. 2013)………39

*United States v. Kunzman*, 54 F.3d 1522 (10th Cir. 1995)………………………..48

*Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002 (10th Cir. 2008)………...60-61

*Weiss v. Banner Health*, 416 F. Supp.3d 1178 (D. Colo. 2019)………………41-42

*Wit v. United Behavioral Health*, 2019 U.S. Dist. LEXIS 35205 (N.D. Cal. 2019)……………………………………………………………43

## Statutes

29 U.S.C. § 1133(2)………………………………………………………………….51

## Other Authorities

29 C. F. R. § 2560.503-1…………………………………………………...49, 54

29 C. F. R. § 2590.715-2719………………………………………………….49, 55

10th Cir. R. App. P. 10.4…………………………………………………..31-32, 35

10th Cir. R. App. P. 28.1………………………………………………………...9

10th Cir. R. App. P. 30.1………………………………………………………...31, 35

10th Cir. R. App. 32.1…………………………………………………………54

81 Fed. Reg. 92,316 (Dec. 19, 2016)…………………………………………...55

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals to this claim.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

**Issue 1**: Defendants did not prepare an appendix containing the pleadings or the evidence that the district court relied upon to make its decision.

*As a threshold matter, should this Court decline to consider Defendants' appeal when the appendix is insufficient to determine if the district court erred?*

**Issue 2**: The district court ruled that Defendants arbitrarily and capriciously denied A.K. mental health benefits for four separate reasons.

*Did the district court correctly rule?*

**Issue 3**: When a district court concludes that a plan administrator has arbitrarily and capriciously denied benefits, it may either remand the case to the administrator for a renewed evaluation of the case, or it can award the claimant benefits.

*Did the district court abuse its discretion in awarding benefits to A.K. rather than remanding to the claim administrator when the evidence clearly shows that A.K. was entitled to benefits?*

## STATEMENT OF FACTS[1]

A.K. was adopted by her parents, D.K. and K.K., when she was five weeks old. Supp. App. Vol. 6 at 10, 78, 252; Supp. App. Vol. 7 at 131-132. A.K. was the beneficiary of her father D.K.'s self-funded employee welfare benefit plan, named the Alcatel-Lucent Medical Expense Plan For Active Management Employees (the "Plan"). App. Vol. 2 at 19. The Plan was administered by United Behavioral Health. *Id*. at 2, 20.

### General Terms of the Plan

The Plan provided coverage for both mental health and medical/surgical treatments as long as those treatments were found to be "Medically Necessary." App. Vol. 2 at 2. The Plan indicated that treatment was "Medically Necessary" if:

> (i) It is accepted by the health care profession in the U.S. as the most appropriate level of care (the frequency of services, the duration of services, and the site of services, depending on the seriousness of the conditions being treated such as in the Hospital or in the Physician's office).

---

[1] Appellees have contemporaneously filed a supplemental appendix under rule 30.2, Tenth Circuit Rules of Appellate Procedure. *See* 10th Cir. R. 30.2(A)(1) (providing that if the appellee "believes that the appellant's appendix omits items that should be included" in the appendix, it "may file a supplemental appendix with the answer brief"). Appellees' supplemental appendix contains eleven volumes. Appellees also contemporaneously filed a motion to seal volumes two through eleven of their supplemental index, which contain much of the pre-litigation record reviewed by the district court.

In their brief, Appellees cite to both Appellants' appendix and the Appellees' supplemental appendix by volume and page number, for example, App. Vol. 1 at 27, or Supp. App. Vol. 8 at 249. *See* 10th Cir. R. App. P. 28.1(A)(1).

(ii) It is the safest and most effective level of care for the condition being treated.

(iii) It is appropriate and required for the diagnosis or treatment of the accidental injury, Illness or Pregnancy.

(iv) There is not a less intensive or more appropriate place of service, diagnostic, or treatment alternative that could have been used in lieu of the place of service or supply given.

(v) The treatment is provided in a clinically controlled research setting using a specific research protocol that meets standards equivalent to that as defined by the National Institute of Health for a life-threatening or seriously debilitating condition. The treatment must be considered safe with promising efficacy as demonstrated by accepted clinical evidence reported by generally recognized medical professionals or publications.

(vi) It is not an Experimental or Investigative Treatment, Drug, or Device.

App. Vol. 2 at 7.

The Plan further provided definitions for various facilities, including

Residential Treatment Centers, which was defined to mean:

an extension of or an alternative to acute Hospital care. The Residential Treatment Center must meet appropriate state licensing requirements and be accredited by the JCAHO. The Residential Treatment Center provides services which are less intensive than acute In-Patient care, but satisfies the requirement for a protected and structured environment in cases where Outpatient treatment is not appropriate. The patient program is oriented toward discharge of the patient to Outpatient care. Residential Treatment Centers are day treatment centers, and Halfway Houses which provide treatment for Mental Illness.

App. Vol. 2 at 9-10.

In addition, the Plan defined "Custodial Care" to mean:
treatment or service prescribed by a medical professional, that
could be rendered safely and reasonably by a person not
medically skilled, or that is designed mainly to help the patient
with daily living activities. These activities are the following:
>(a) Personal care such as help in: walking, getting in and
>out of bed, bathing, eating by spoon, tube or gastrotomy,
>exercising, and dress;
>(b) Homemaking, such as preparing meals or special
>diets;
>(c) Moving the patient;
>(d) Acting as a companion or sitter;
>(e) Supervising medication that can usually be self-
>administered; or
>(f) Treatment or services that any person may be able to
>perform with minimal instruction including, but not
>limited to, recording temperature, pulse, and respirations,
>or administration and monitoring of feeding systems.

App. Vol. 2 at 6.

For the time period relevant to this case, UBH based their Medical Necessity

Determinations on the "Optum 2014 Level of Care Guidelines[,]" (the Optum

Guidelines), which provided Guidelines for when "Admission," "Continued

Service," and "Discharge" from a "Residential Treatment Center" was appropriate.

Supp. App. Vol. 7 at 159. In their pre-amble, the Optum Guidelines provided that:

[t]he course of treatment in a Residential Treatment Center is
focused on addressing the 'why now' factors that precipitated
admission (e.g., changes in the member's signs and symptoms,
psychosocial and environmental factors, or level of functioning)
to the point that the member's condition can be safely,
efficiently and effectively treated in a less intensive level of
care.

*Id.*

The Optum Guidelines provided that admission into a Residential Treatment

Center was appropriate if it met "Common Criteria for all Levels of Care" and:

> • The member is not in imminent or current risk of harm
> to self or others and/or property.
> <u>AND</u>
> • Co-occurring behavioral health and physical conditions
> can be safely managed.
> <u>AND</u>
>   • The "why now" factors leading to admission cannot
> be safely, efficiently, or effectively addressed and/or
> treated in a less intensive setting due to acute changes in
> the member's signs and symptoms and/or psychosocial
> and environmental factors. Examples include:
> ° Acute impairment of behavior or cognition that
> interferes with activities of daily living to the extent that
> the welfare of the member or others is endangered.
> ° Psychosocial and environmental problems that are
> likely to threaten the member's safety or undermine
> engagement in a less intensive level of care without the
> intensity of services offered in this level of care.

App. Vol. 2 at 26-28.

The Optum Guidelines provided that continued service in a Residential

Treatment Center was appropriate if it met the "Common Criteria for all Levels of

Care" and:

> • Treatment is not primarily for the purpose of providing
> custodial care.
> • Custodial care involves services that don't seek to cure,
> are provided when the member's condition is
> unchanging, are not required to maintain stabilization, or
> don't have to be delivered by trained clinical personnel.

App. Vol. 2 at 26-27.

Finally, the Optum Guidelines provided that discharge from a Residential

Treatment Center was appropriate when "Common Criteria for all Levels of Care"

were met and:

- Care is custodial. Indications include:
  - The member's signs and symptoms have been stabilized, resolved, or a baseline level of functioning has been achieved;
  - The member's condition is not improving; or
  - The intensity of active treatment in Inpatient is no longer required.

*Id.*

## A.K.'s Struggles with Mental Health Disorders

As a child, A.K. was shy, anxious, and "emotionally charged," and when

A.K. was seven years old, her parents took her to see a licensed professional

counselor to help her with her emotional outbursts. Supp. App. Vol. 6 at 78, 252;

Supp. App. Vol. 7 at 131-132.

Once A.K. reached her sixth-grade school year, her struggles became more

profound. She became depressed and struggled to stay on top of her homework.

Supp. App. Vol. 6 at 74; Supp. App. Vol. 7 at 132. Her anxiety increased. Supp.

App. Vol. 6 at 75. And unbeknownst to her parents, A.K. began cutting herself

with razor blades. Supp. App. Vol. 6 at 75; Supp. App. Vol. 7 at 132, 173. A.K.'s

parents took her to see a counselor, but by the middle of her seventh-grade year,

A.K. discontinued therapy after it became apparent that she was not "opening up" to her therapist. Supp. App. Vol. 6 at 75; Supp. App. Vol. 7 at 173. A.K. continued to secretly cut herself during this time, and shortly after she stopped seeing her therapist, she cut herself so severely that she had to be treated at the emergency room. Supp. App. Vol. 6 at 75. Afterwards, A.K. began seeing a new therapist, but despite her renewed attendance in therapy, A.K. attempted suicide by cutting herself just three weeks after her emergency room visit. *Id*. A.K.'s injuries required stitches. *Id*.

The same day as her suicide attempt, A.K. was admitted to the Seay Behavioral Center ("Seay") in-patient unit, where she began receiving inpatient treatment for her mental health disorders. *Id*. After slightly more than a week, A.K. transitioned to Seay's day patient program. *Id*. A.K. was discharged from Seay ten days later. *Id*. But just a week after she was discharged, A.K. ran away from home. *Id*. When police located her, she said that she wanted to kill herself. Supp. App. Vol. 2 at 63; Supp. App. Vol. 6 at 75. She was readmitted to Seay's in-patient unit. *Id*.

After a two-week stay at Seay, A.K. was admitted to the Cedar Crest Residential Treatment Center ("Cedar Crest"), a sub-acute inpatient mental health care provider. Supp. App. Vol. 6 at 75. At this time, A.K. was diagnosed with

"major depressive disorder, severe and recurrent." *Id*. A.K. received treatment at Cedar Crest for five weeks. *Id*.

Following her discharge from Cedar Crest, A.K. began attending a day program at Children's Medical Center ("Children's Medical") and resumed treatment with her regular therapist. *Id*. In addition, A.K. began seeing a psychiatrist to manage her psychiatric medications. *Id*.

A.K. returned to public school for the beginning of her eighth-grade year. *Id*. But during the month of September, A.K. cut herself on several occasions, some of which required visits to the emergency room. *Id*. One day after she was discharged from Children's Medical's day program, A.K. became upset with something her parents served for dinner and she ran away from home. Supp. App. Vol. 6 at 75, 78; Supp. App. Vol. 7 at 179. That evening she tried to strangle herself with some clothing and she was readmitted to Children's Medical, this time in their inpatient program. Supp. App. Vol. 2 at 229, 252; Supp. App. Vol. 6 at 75.

UBH determined however, that the following day, she did not "require this level of care" because, according to UBH, she was "denying suicidal thoughts or plan and is not at risk of harm to self or others at this point." Supp. App. Vol. 2 at 255. A.K., they concluded, "could be treated by providers in a partial hospitalization program setting." *Id*. She was discharged that day and readmitted to

Children's Medical partial hospitalization program. Supp. App. Vol. 2 at 259-26;
Supp. App. Vol. 6 at 75.

But just three days later, A.K. again attempted to strangle herself when she
went home for the evening. Supp. App. Vol. 2 at 269, 275. She was readmitted to
Children's Medical's inpatient unit. Supp. App. Vol. 6 at 75. From October 18,
2012 to December 13, 2012 A.K. received treatment at the Meridell Achievement
Center ("Meridell"), a residential treatment center. Supp. App. Vol. 6 at 75; Supp.
App. Vol. 7 at 132-133. UBH denied continued care during this time, but after
Plaintiffs appealed, the denial was overturned and one more week was approved.
Supp. App. Vol. 3 at 82, 88.

Following her discharge from Meridell, A.K. attended a day patient program
at The Excel Center ("Excel") from December 16, 2012 to January 28, 2013. Supp.
App. Vol. 6 at 75. She also began seeing a therapist trained in dialectical
behavioral therapy ("DBT"). *Id*. She continued to cut herself during this period and
had multiple outbursts at home. Supp. App. Vol. 3 at 118, 124. After her discharge
from Excel, A.K. began reattending eighth grade at public school as well as a teen
DBT skills group. Supp. App. Vol. 6 at 75.

For a month, A.K. appeared to be doing better. However, in March, A.K. cut
her wrist again and was admitted to University Behavioral Center ("University")
for major depressive disorder and suicidal ideation. Supp. App. Vol. 3 at 217;

Supp. App. Vol. 6 at 76. She received a month of treatment, but the day after she was discharged, A.K. was readmitted for suicidal ideation and spent one more week at University. Supp. App. Vol. 6 at 76. Believing that A.K.'s recent struggles may have been due to the stress of returning to her school, A.K.'s parents withdrew her from public school and enrolled her in a small private school. *Id*. A.K. also re-enrolled in her group and individual DBT therapies. *Id*.

But just two weeks after her discharge from University, A.K. cut "all up and down" one of her arms during a shower. *Id*. Four days later, A.K. cut herself repeatedly and she was again readmitted to University. *Id*. After another week of treatment at University, A.K. was discharged to Meridell for further residential treatment with the treatment team from whom she had previously received care. Supp. App. Vol. 3 at 262, 276-277; Supp. App. Vol. 6 at 76.

During May of 2013, staff at Meridell told A.K.'s parents that A.K. would need long-term residential treatment between eight and eighteen months to effectively treat her underlying mental health disorders and finally put a stop to her recurrent suicidal and self-harming behaviors. Supp. App. Vol. 7 at 133, 182. But UBH informed A.K.'s parents that, despite the fact that their Plan covers residential treatment, it assumes patients do not require 24 hour treatment and will approve treatment only until a patient is stabilized. App. Vol. 2 at 54.

**UBH Continues to Require A.K. to Be Discharged After
Short Treatment Stays Despite Her Escalating Self-Harm, Suicidal Ideation,
and Inability to Maintain at Lower Treatment Levels**

UBH decided not to cover any treatment for A.K. at Meridell from July 30, 2013 onward. Supp. App. Vol. 7 at 133; Supp. App. Vol. 8 at 9. A.K.'s parents immediately requested an expedited appeal of UBH's decision to deny coverage for further residential treatment for A.K. *Id*. However, UBH upheld its denial, and A.K. was discharged from Meridell on July 31, 2013, after receiving 79 days of residential treatment. Supp. App. Vol. 5 at 47; Supp. App. Vol. 8 at 9. Three days after she was discharged from Meridell and began another day program at Excel, A.K. pried a small mirror from a jewelry box and cut herself on her left arm and groin, nearly severing her femoral artery. Supp. App. Vol. 4 at 172, 188, 197; Supp. App. Vol. 6 at 76; Supp. App. Vol. 7 at 182. Another cut required 12 stitches to close. *Id.* Following this incident of self-harm, A.K. was admitted into the inpatient program at Children's Medical on August 3, 2013. *Id.* UBH authorized three days of inpatient treatment. Supp. App. Vol. 4 at 177.

While A.K. was at Children's Medical, her parents reached out to McLean 3East, a residential treatment program that offered an intensive six- to eight-week DBT skills training program for adolescents and young adults, considered one of the most effective therapies for treating self-harming behaviors. Supp. App. Vol. 7 at 133, 174. However, while A.K. was still at Children's Medical, Dr. Judith

Mintz, a clinician at McLean 3East, indicated that she would only allow A.K. to be admitted into the program if A.K.'s parents could guarantee that, following discharge from McLean 3East, A.K. would be placed in a residential treatment program for 12 months so she could practice and internalize the skills taught to her at McLean 3East. Supp. App. Vol. 7 at 133, 174, 182. Dr. Mintz explained that the most important factor for creating lasting recovery in patients like A.K. was that she spend a significant period of time in residential treatment so that she could practice using skills she learned in therapy until she could apply them. *Id.*

A.K. was discharged from Children's Medical back to Meridell on August 14, 2013. Her treatment team at Children's Medical reiterated the recommendations that had already been given by A.K.'s treatment team at Meridell and by Dr. Mintz at McLean 3East: they strongly recommended that A.K. be placed for "10 to 18 months" in a structured residential treatment program. [Supp. App. Vol. 7 at 133-134, 174. Without this amount of time to receive therapy to regulate her emotions, practice positive coping skills, and develop relationship skills, she could not return home safely, they advised. Supp. App. Vol. 7 at 134.

A.K.'s parents discussed with Mr. William Johnson, a "Care Advocate Lead" at Optum Healthcare, a subsidiary of UnitedHealth Group, that UBH repeatedly required A.K. to be discharged to a lower level of care despite her escalating self-harming behaviors and her regression without 24-hour supervised

care. Supp. App. Vol. 7 at 133, 175. Mr. Johnson counseled A.K.'s parents to research and identify long-term residential facilities that can treat A.K.'s mental health issues and request a "case exception" for her long-term treatment there. Supp. App. Vol. 7 at 133, 174.

A.K.'s parents hired an Educational Consultant to identify appropriate long term residential treatment options for A.K. Supp. App. Vol. 4 at 262, 290; Supp. App. Vol. 6 at 76; Supp. App. Vol. 7 at 175. The Educational Consultant conducted a nationwide search for licensed treatment facilities that would be qualified to treat A.K.'s diagnoses of mood disorder, ADD, depression, social skills deficits, and personality disorder traits. *Id.* After the Educational Consultant had narrowed his search down to three recommendations, A.K.'s parents researched the facilities, interviewed Admission Directors, and talked to references. *Id.* K.K. toured two of the facilities, both licensed residential treatment centers. *Id.*

A.K.'s parents determined that both of the facilities K.K. had toured would be acceptable treatment facilities for A.K., and informed Mr. Johnson, the "Care Advocate Lead" for Optum Healthcare. *Id.* Mr. Johnson counseled A.K.'s parents to submit a request to UBH for A.K. to be treated "for up to 12 months" at either Discovery (where A.K. was eventually treated) or the second residential treatment center K.K. had toured. *Id.*

UBH informed Plaintiffs that they would have the request reviewed by a third-party reviewer, IPRO. *Id.* As part of its review, IPRO reviewed letters and recommendations sent by A.K.'s prior treatment providers. Supp. App. Vol. 7 at 282, 292. In a letter dated September 8, 2013, Ms. Kimberly Weaster, M.Ed., an LPC (licensed professional counselor), ACS (approved clinical supervisor), and NCC (national certified counselor), who was a Program Therapist at Meridell opined that A.K. would need "ongoing specialized residential treatment ... upon discharge from Meridell in order to keep her safe and give her the best possible chance for full recovery from her complex clinical issues." Supp. App. Vol. 7 at 291. Ms. Weaster further noted that:

> [a]lthough historically [A.K.] improves while in the residential treatment milieu, she continues to exhibit emotional reactivity that places her at ongoing risk of relapse when discharged to home. She is precariously balanced and quickly regresses to self-injury and suicidal thoughts and/or behaviors when not in a monitored 24-hour a day therapeutic setting.

*Id.*

In a separate letter sent to IPRO during its medical necessity review, Dr. Andrew Diederich, an attending physician at Children's Medical who had been part of A.K.'s treatment team, wrote:

> I am writing to you to speak to the need for [A.K.] to receive assistance for long term residential treatment. Over the course of working with her through multiple inpatient admissions with her as well as seeing the results of the more typical intermediate-duration residential placements, she has struggled to make the needed progress to be successful in the home. There is a chronic

pressure in the medical system over time to reduce the duration of treatments, and this drive for efficiency leaves out a small subset of children that cannot make the needed changes unless they are in a single consistent program that will keep them until they can develop the needed skills to be safe.

[A.K.]'s particular clinical picture fits this group. Processing does occur with her, and therefore she is able to make progress, but her speed of this processing is much slower than her peer group, causing her to lose many of the important elements of the treatment process. This will make many of the processes seem slower and ineffective, when really she needs a greater length of time to allow these skills to be developed.

Based on my experience with her, it is my clinical recommendation that she needs a long term residential placement.

Supp. App. Vol. 7 at 292.

In another letter, dated September 10, 2013, Dr. K.K. Riedel, M.D., the

Medical Director at Meridell, wrote to IPRO that "[A.K.] is currently under my

medical care at [Meridell]. She is well-known to me from two previous

admissions." Supp. App. Vol. 7 at 290.  Dr. Riedel went on to opine that while

A.K. responded "well to the external structure provided by the residential treatment

center setting[,]" she tended to "decompensate[ ] upon discharges due to her not

having been able to internalize and consolidate gains." *Id.* Accordingly, Dr. Riedel

recommended that "[A.K.] needs a long-term residential treatment center

placement to accomplish the goals necessary for her to succeed and have a chance

at sustaining a healthy life." *Id.*

After conducting its review, IPRO notified A.K.'s parents that it had

approved A.K.'s treatment at Discovery for an initial 90 days, with a clinical

review to be conducted at the end of that time. Supp. App. Vol. 5 at 79; Supp. App.

Vol. 7 at 134. In explaining its reasoning, IPRO noted that A.K.'s near suicide

within a few days of being discharged from her prior residential treatment program

demonstrated that "another two month stay in the same residential treatment is not

enough treatment as it is too risky to discharge her out of a 24-hour residential

treatment." Supp. App. Vol. 7 at 145. IPRO further noted that A.K. "needed more

specialized treatment to better insure that she would be able to improve and sustain

the improved coping skills and emotional regulation needed to exist outside of a

24-hour setting without being a high risk to harm herself again." *Id.*

While A.K. was awaiting discharge from Meridell to Discovery, Meridell

informed Plaintiffs that it had received an "Adverse Benefit Decision" from UBH

attempting to deny coverage for any further days of treatment at Meridell. Rec.

2035. Upon being reminded that IPRO had already approved for A.K. to receive

long-term residential treatment at Discovery, and upon IPRO weighing in that it

believed A.K. should discharge from Meridell directly to Discovery, UBH

appeared to withdraw its attempt to deny further residential treatment for A.K. *Id.*

//

//

23

### UBH Denies A.K.'s Treatment at Discovery

Following IPRO's decision, A.K. enrolled at Discovery on November 4, 2013. *Id.* Ninety-three days later, on February 6, 2014, UBH sent a letter to Plaintiffs informing them that they would be denying coverage for A.K.'s treatment from February 9, 2014 onwards. App. Vol. 2 at 62. UBH's reviewer, a licensed professional counselor, stated that A.K. "*appears to require Mental Health Residential Treatment Center long term Level of Care,*" but indicated that claims for A.K.'s treatment would be denied going forward "due to excluded service." Supp. App. Vol. 6 at 5. (emphasis added).

On June 25, 2014, K.K. appealed UBH's denial of coverage for A.K.'s treatment. *See generally* Supp. App. Vol. 6 at 3, 256. Among other things, K.K. pointed out in her appeal that the provision of the Plan that UBH relied on to exclude A.K.'s care had been deleted by subsequent amendments. Supp. App. Vol. 6 at 6, 8. On August 1, 2014, UBH responded and again affirmed their denial of coverage for A.K. from February 9, 2014 onward. *Id*.

The second reviewer, Dr. Robert C. Kho, M.D., issued a denial that was identical in every respect to the language used in the first denial. Like the licensed professional counselor who had issued the first denial, Dr. Kho found that "[b]ased upon current medical records, *the member appears to require Mental Health*

24

*Residential long term level of care* but due to excluded service, a denial will be submitted." Supp. App. Vol. 7 at 11(emphasis added).

K.K. appealed the second denial and again reminded UBH that the exclusion for "Alternative Treatment Facilities accessed or provided Out-of-Network" had been deleted from the Plan by amendment. Supp. App. Vol. 7 at 3, 7.

Internal documents from UBH indicate that, sometime after K.K.'s second appeal, UBH realized that she was correct that the Plan did not exclude residential treatment that was obtained out-of-network and noted that "the initial first level appeal was completed based on excluded service in error." Supp. App. Vol. 2 at 5.

Accordingly, UBH sent a denial letter which they styled as "the Final Adverse Determination of your internal appeal." Supp. App. Vol. 7 at 110-112. UBH provided several reasons for its denial which they would abandon in a subsequent denial letter. *Id*. In addition to these reasons, UBH indicated for the first time that coverage for A.K.'s care was denied from February 9, 2014 onwards because "medical necessity was not met." Supp. App. Vol. 7 at 111.

On February 5, 2015, K.K. appealed UBH's third denial decision and argued that she deserved an additional appeal because UBH's third rationale for denying coverage for A.K.'s treatment from February 9, 2014 onwards was "vastly different" from its first and second denial rationales. Supp. App. Vol. 7 at 169. In her February 5 appeal, K.K. provided UBH with an extensive description of A.K.'s

medical history, and with A.K.'s medical records for the period of time that she received treatment at Discovery. Supp. App. Vol. 7 at 168-195. K.K. also argued vigorously that A.K. met the Plan's criteria for her treatment to be considered medically necessary. Supp. App. Vol. 7 at 184-195. In the appeal, K.K. requested that in the event UBH persisted in asserting that A.K.'s care was not medically necessary, UBH tell her "what weight [was] given" to the professional recommendations of A.K.'s treatment teams at Meridell and Children's Medical (including Dr. Diederich, Dr. Riedell, and Ms. Wiester), Dr. Mintz, and the reviewers at IPRO, all of whom had agreed with UBH's first two reviewers that long-term treatment at a residential treatment center was warranted for A.K. Supp. App. Vol. 7 at 188. K.K. also requested that, in the event UBH continued to base their denials on a lack of medical necessity, UBH explain to her "exactly how [A.K.'s] clinical record" supported their determination, including detailing "how you are able to justify a medical necessity denial, based on the clinical record provided." Supp. App. Vol. 7 at 195. In addition, K.K. requested that UBH provide her "with all the evidence in the form of clinical references upon which you relied to support your adverse determination." Supp. App. Vol. 7 at 198.

On March 6, 2015, UBH provided Plaintiff with a fourth and final denial rationale. Supp. App. Vol. 7 at 159-160. UBH's final denial stated that:

Benefit coverage is not available for the following reason(s):

26

As of the last covered day, 01/31/2014, medical necessity was not met. . . . On admission, [A.K.] was described as having had Dysthymia, in partial remission, Major Depressive Disorder in remission but having an Anxiety Disorder and what is termed a rule out for Group B Traits (meaning personality issues). These diagnoses did not change and medication changes were minimal. There was no evidence of self-injurious behavior. This would appear to address the goals of admission which were to consolidate your daughter's gains so that she could control herself injurious [sic] behavior. When this was achieved, care became custodial, which is not a covered service.

*Id.*

Having exhausted their internal appeal obligations, Plaintiffs filed a lawsuit.

### The District Court's Decision

Both parties moved for summary judgment and the district court granted summary judgment to Plaintiffs.

The district court summarized A.K.'s significant mental health treatment that had been ineffective in preventing A.K. from regressing to self-harm: In the twenty months between A.K.'s first suicide attempt on March 4, 2012 and her admission into the Discovery Ranch for Girls, A.K. had 11 psychiatric emergency room visits; five in-patient hospitalizations for a total of 58 days; four stints of treatment in residential treatment centers for stays lasting 38 days, 57 days, 63 days, and 79 days; six enrollments into partial hospitalization programs for a total of 69 days; weekly individual therapy; family therapy; medication management; and DBT therapy. App. Vol. 1 at 47. Yet, the district court noted, "[n]one of this was

27

sufficient to prevent A.K. from regressing to self-injury and suicidal behavior anytime she was not involved in some form of 24/7 inpatient treatment." *Id.* "Discovery and long-term residential treatment," the district court concluded, "were the professionals' recommended—and obvious—next steps." *Id.*

The district court consequently ruled that UBH's decision to deny A.K. benefits for her care at Discovery was arbitrary and capricious for four reasons. First, the court concluded, "Defendants abused their discretion in finding that A.K's care had become 'Custodial' under the terms of the Plan." *Id.* at 57. Second, the court found that UBH did not fairly engage with A.K.'s treating physicians' opinions, as it was required to do by ERISA. *Id.* at 57-59. Third, the district court determined that UBH abused its discretion because the denial letters did not contain specific citations to the medical record as required by the Plan, the denial letters lacked any reasoned analysis, and the letters contained only conclusory statements without evidentiary support. *Id.* at 59-64. And fourth, the district court concluded that "the Defendants' shifting and inconsistent rationale" for denying benefits was "arbitrary and capricious." *Id.* at 66.

The district court concluded that the "appropriate relief" was to order Defendants to pay for A.K.'s treatment at Discovery. App. Vol. 1 at 66-67 (capitalization and emphasis removed). The district court further ordered UBH to pay for A.K.'s attorneys' fees and costs. *Id.*

UBH now appeals.

## SUMMARY OF THE ARGUMENT

As a threshold matter, this Court should decline to consider the merits of Defendants' appeal. The Tenth Circuit Rules of Appellate Procedure require appellants to prepare an appendix that is sufficient for this Court's review. Defendants failed to do so. They did not include in their appendix the pertinent pleadings below or the vast majority of the evidence that the district court relied upon to make its decision.

Should this Court decide to consider Defendants' appeal, however, the district court correctly ruled that Defendants arbitrarily and capriciously denied A.K. mental health benefits. First, Defendants incorrectly interpreted and applied the Plans' terms. Defendants incorrectly determined that A.K.'s care at Discovery was custodial and they misapplied the 'why now' factors in contradiction of the Plan's medical necessity definition.

Second, the district court correctly ruled that Defendants' denials were arbitrary and capricious because their denials lacked any reasoned analysis. Defendants complain that the district court did not consider the reasoning in their internal records, but the district court ruled that even considering those documents, the Defendants' denials were inconsistent and lacked a reasoned analysis. And even if the district court had not considered Defendants' internal records, it would

have been right to do so because Defendants cannot rely on evidence that is not communicated to Plaintiffs.

Third, the district court correctly ruled that Defendants did not engage with the opinions of A.K.'s treating medical professionals. Defendants arbitrarily refused to credit A.K.'s reliable evidence, including the opinions of several of her treating physicians, all of whom insisted that without long-term residential care, A.K. would regress into self-harm, as well as A.K.'s extensive medical records that supported her treating professionals' opinions.

Fourth, the district court correctly ruled that Defendants arbitrarily and capriciously denied A.K. benefits because Defendants' denial letters were inconsistent. Defendants' internal records show that the second reviewer, Dr. Kho, determined that A.K.'s care was medically necessary. Yet the third and fourth reviewers inconsistently denied her care on the basis that it was not medically necessary.

Finally, the district court acted well within its discretion to order Defendants to pay for A.K.'s treatment, rather than remand the case back to them to reconsider her claim. When the evidence shows, like here, that a claimant is entitled to benefits, but the administrator arbitrarily and capriciously denies those benefits, an order awarding benefits is appropriate.

The Court should affirm.

## ARGUMENT

### I.    THE COURT SHOULD DECLINE TO CONSIDER DEFENDANTS' APPEAL BECAUSE THEY DID NOT PREPARE AN APPENDIX SUFFICIENT FOR THIS COURT'S REVIEW

As a threshold matter, this Court should decline to consider the merits of Defendants' appeal. The Tenth Circuit Rules of Appellate Procedure require appellants to prepare an appendix that is sufficient for this Court's review. *See* 10th Cir. R. App. P. 30.1(B) (1) ("An appellant represented by retained counsel must electronically file an appendix sufficient for considering and deciding the issues on appeal."); *Milligan-Hitt v. Bd. of Trs. of Sheridan County Sch. Dist. No. 2*, 523 F.3d 1219, 1231 (10th Cir. 2008) ("The appellant's appendix must be 'sufficient for considering and deciding the issues on appeal.'") (citations and footnotes omitted). These rules are not "'empty gestures'" and the Court has "'repeatedly enforced them.'" *Burnett v. Southwestern Bell Tel., L.P.*, 555 F.3d 906, 910 (10th Cir. 2009) (quoting *Travelers Indem. Co. v. Accurate Autobody, Inc.*, 340 F.3d 1118, 1121 (10th Cir. 2003)).

Materials appellants are required to include in the appendix are the relevant pleadings below, any exhibits attached to those pleadings, and other materials the district court considered when making its decision. *See* 10th Cir. R. 10.4(D)(2) ("When the appeal is from an order disposing of a motion or other pleading, the motion, relevant portions of affidavits, depositions and other supporting documents

… and any responses and replies filed in connection with that motion or pleading must be included in the record or appendix."). These materials are necessary because, without them, the appellate court cannot determine whether the district court erred or even whether the appellant preserved its arguments below. *See*, *e.g.*, *Burnett*, 555 F.3d at 909 ("Without the parties' summary judgment exhibits, appropriate review of the district court's orders is not possible because we do not have important evidence that the district court considered…."); *Questar Pipeline Co. v. Grynbe*rg, 201 F.3d 1277, 1292 (10th Cir. 2000) ("[W]e are reluctant to overturn a district court's ruling without being able to examine the evidence or arguments it heard in making its ruling.").

When an appellant fails to include these required materials in its appendix, this Court routinely declines to review the appeal. *See* 10th Cir. R. 10.4(B); *Travelers Indem. Co*., 340 F.3d at 1121 (holding that appellants' failure "to include in the appendix the document that controls the resolution of the issues on appeal … deprives them of the right to challenge the judgment of the district court.").

Here, Defendants did not provide an appendix sufficient for this Court's review. First, they "inexplicably" did not include their answer to Plaintiffs' third amended complaint, the parties' cross motions for summary judgment, the parties' oppositions to motions for summary judgment, or the parties' replies. This alone forecloses this Court's review. *See Burnett*, 555 F.3d at 908 (declining to review

case whose appendix "inexplicably" did not include summary judgment

pleadings); *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1221-1222 (10th Cir.

2000) (declining to review district court's decision where appellant "has not

included in the appellate record any of the motions filed by the parties").

But even more telling, Defendants did not include the vast majority of the

evidence that the district court relied upon. After reviewing the parties' pleadings

and the 2,886-page pre-litigation appeal record, the district court ruled that

Defendants arbitrarily and capriciously denied A.K. benefits. But Defendants

included only 151 of those pre-litigation pages in their appendix. Of those 151

pages, Defendants included *none* of the exhibits Plaintiffs presented in their pre-

litigation appeals. For example, Plaintiffs submitted thirteen exhibits with their

second-level appeal, including over three hundred pages of A.K.'s medical records,

A.K.'s psychological and psychiatric assessments, and several letters from A.K.'s

therapists and medical providers. *See* Supp. App. Vol. 7 at 168-302, Supp. App.

Vol.8 at 3-292, and Supp. App. Vol.9 at 3-65. But Defendants included none of

these materials in their appendix.

In fact, the only evidence that Defendants included in their appendix that

Plaintiffs submitted below are (1) Plaintiffs' appeal letters (without any of their

supporting exhibits), *see* App. Vol. 2 at 64-71, 91-121; (2) *one* of the three letters

Plaintiffs submitted with their initial request for benefits—even though the district

court quoted from all three letters Plaintiffs submitted with their initial request for benefits in its Memorandum Decision and Order—*see* App. Vol. 1 at 46; App. Vol. 2 at 43; and (3) two pages of A.K.'s medical records that merely summarized her medications, *see* App. Vol. 2 at 48-49. This is even though the crux of Defendants' claims on appeal are whether, as Defendants put it, the district court "improperly substitut[ed] its judgment" for that of Defendants' reviewers, Br.Aplt.25, and they urge this Court, under *de novo* review, to "conclude there was 'sufficient evidence in the record to support' the denial of benefits.'" Br.Aplt.34 (citation removed). Defendants, however, do not provide this Court with the evidence that the district court—or the reviewers—relied upon. *Sanpete Water Conservancy Dist. V. Carbon Water Conservancy Dist.*, 226 F.3d 1170, 1175 (10th Cir. 2000) ("To conduct our de novo review, we must necessarily review the materials before the district court.").

Defendants also challenge the district court's conclusion that Defendants did not engage with A.K.'s treating professional's opinions, and fault it for, in their opinion, not considering all the evidence in the pre-litigation appeal record. *See* Br.Aplt.39-41. Yet Defendants did not provide this Court with all the evidence in the pre-litigation record, instead cherry-picking evidence that they believe supports their position while leaving out what supports Plaintiffs'.

Such one-sided review is not permissible, or even possible. The Court should consequently decline to consider Defendants' appeal. *Travelers Indem. Co*., 340 F.3d at 1121.

Should this Court, however, decide to reach the merits of Defendants' appeal, Appellees have concurrently filed a supplemental appendix that contains the materials Defendants should have included in their appendix. *See* 10th Cir. R. 30.2(A)(1) ("An appellee who believes that the appellant's appendix omits items that should be included may file a supplemental appendix with the answer brief."). Appellees, however, do not file this supplemental index to remedy Defendants' failure to provide the materials. Unlike the appellant, an appellee has no duty to prepare an appendix. *See*, *e.g.*, *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1239 n.18 (10th Cir. 1999) (explaining that an "appellee has no parallel duty to produce an appendix"). Plaintiffs here have not cross-appealed and do not bear any burden on the issues presented in this appeal. *See* 10th Cir. R. 10.4(B) ("When the party asserting an issue fails to provide a record or appendix sufficient for considering that issue, the court may decline to consider it.")*; see also* 10th Cir. R. 30.1(B)(3) (same). Rather, Appellees urge this Court to dismiss Defendants' appeal, and they provide a supplemental appendix only to the extent that the Court declines to do so.

35

## II.   THE DISTRICT COURT CORRECTLY DETERMINED THAT DEFENDANTS ARBITRARILY AND CAPRICIOUSLY DENIED A.K. BENEFITS[2]

Defendants contend that the district court erroneously ruled that Defendants arbitrarily and capriciously denied A.K. benefits. They raise four complaints to the district court's ruling. First, they argue that the district court wrongly rejected their reviewers' conclusion that A.K.'s continued residential treatment was not medically necessary. Br.Aplt.30-38. They further contend that the district court erroneously concluded that their denial of benefits was arbitrary and capricious because, according to them, their custodial care determination was an independent basis for denying benefits, separate from their medical necessity determination. *Id.* at 43-46. Second, they assert that the district court erroneously determined that their denial letters did not comply with ERISA's requirements. *Id.* at 38-43. Third, Defendants assert that the district court erroneously ruled that they did not engage with the opinions of A.K.'s treating medical professionals. Finally, Defendants argue that the district court incorrectly determined that their denial letters were inconsistent. *Id.* at 47-50.

---

[2] Plaintiffs argued below that the district court should review Defendants' denial of benefits *de novo*. The district court, however, applied the arbitrary and capricious standard of review. Although Plaintiffs maintain that the *de novo* standard of review is the correct standard, they do not contest the district court's application of the arbitrary and capricious standard on appeal because even under that standard, Defendants' denial of benefits does not withstand scrutiny.

Should this Court decide to consider Defendants' appeal, it reviews the district court's decision *de novo*, using the same standard that applied in district court. *See LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 795-96 (10th Cir. 2010). The district court applied the arbitrary and capricious standard. Under this standard, the Defendants' denial "will be upheld unless it is not grounded on any reasonable basis," *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999), or it lacks "good faith," *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193-1194 (10th Cir. 2007); *see also Abnathya v. Hoffman LaRoche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (explaining that district court may overturn denial that is "'without reason, unsupported by the evidence or erroneous as a matter of law'") (citation omitted). While deferential, this standard "is not without meaning." *McMillan v. AT&T Umbrella Ben. Plan No. 1*, 746 Fed. Appx. 697, 705 (10th Cir. 2018) (unpublished). "This is because ERISA imposes 'a special standard of care upon a plan administrator, namely, that the administrator 'discharge [its] duties … solely in the interests of the participants and beneficiaries' of the plan.'" *Id.* (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008)).

In conducting arbitrary and capricious review, courts "consider whether: (1) the decision was the result of a 'reasoned and principled process,' (2) is 'consistent with any prior interpretations by the plan administrator,' (3) is 'reasonable in light

of any external standards,' and (4) is 'consistent with the purposes of the plan.'"
*Flinders*, 491 F.3d at 1180 (citation omitted); *see also Tracy O. v. Anthem Blue Cross Life & Health Ins.*, 807 Fed. Appx. 845, 853-854 (10th Cir. 2020) (same). A plan administrator's "failure to consistently apply the terms of an ERISA plan is arbitrary and capricious," as is "an interpretation inconsistent with the plan's unambiguous language." *Tracy O.*, 807 Fed. Appx. 845 at 854 (citing *Owings v. United of Omaha Life Ins. Co.*, 873 F.3d 1206, 1213 (10th Cir. 2017) (holding that shifting interpretations of "disability" was arbitrary and capricious).

As shown below, under this standard, the district court correctly determined that Defendants arbitrarily and capriciously denied A.K. benefits. None of Defendants' arguments have merit.

### A.    The District Court Correctly Ruled that Defendants Erroneously Interpreted the Terms of the Plan.[3]

Defendants first argue that the district court erred because, according to them, the "district court admitted that UBH's medical necessity determination was supported by substantial evidence and sound reasoning," and consequently, they assert, the district court should have affirmed Defendants' denial of A.K.'s benefits. Br.Aplt.29 (emphasis added). Defendants further argue that its conclusion that A.K.'s care was not custodial did not undermine its reviewers' medical

---

[3] This Section responds to Defendants' Arguments I.A and I.C in their opening brief.

necessity decision. *Id.* at 43-46. This Court should not address this point because Defendants do not challenge the district court's determination that they incorrectly determined that A.K.'s care at Discovery was custodial under the terms of the Plan. Defendants are mistaken in any case. The district court's discussion of medical necessity was limited to the bubble created by UBH when it failed to properly analyze A.K.'s claim. The district court correctly concluded that Defendants incorrectly interpreted and applied the Plans' terms.

Defendants have waived their right to challenge to the district court's medical necessity ruling. They do not contest the district court's determination that they erroneously determined that A.K.'s care was not custodial under the Plan's terms. *See* Br.Aplt.43-46. They argue only that their medical necessity determination was sufficient to uphold their decision below. *Id.* Because an independent, unchallenged ground supports the district court's ruling, Defendants waive their challenge on this point. *See Metzger v. Unum Life Ins. Co. of Am.*, 476 F.3d 1161, 1168 (10th Cir. 2007) (holding that appellant "waived her challenge" to because she neglected to challenge a second, independent ground for district court's decision). And because this Court "may affirm on the basis of this unchallenged finding alone, as it is sufficient to support" the district court's decision, it need not consider Defendants' arguments further. *United States v. Arellano-Sandoval*, 506 Fed. Appx. 827, 832 (10th Cir. 2013); *see also Murrell v.*

*Shalala*, 43 F.3d 1388, 1390 (10th Cir. 1994) (holding that because there was an "unchallenged … sufficient basis" for affirming the district court's decision, the appellant's "success on appeal is foreclosed—regardless of the merit of his [other] arguments"); *Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1252 (10th Cir. 2009) ("When an appellant does not challenge a district court's alternate ground for its ruling, we may affirm the ruling."); *Metzger*, 476 F.3d 1161 at 1168 (affirming the district court's grant of summary judgment because the appellant failed to challenge an "independent ground" for affirmance).

Defendants are wrong in any event. In the district court, Defendants argued that A.K.'s continued care at Discovery was not medically necessary. To assess this claim, the district court "divide[d]" its analysis into two parts: first, it considered Defendants' denial of benefits based on their application of the "why now factors"; and second, it addressed Defendants' application of the Plan's term of custodial care. App. Vol. 1 at 55-57. The district court applied this two-pronged approach because this is how Defendants evaluated Plaintiffs' appeals. In their denial letters, Defendants stated that they denied benefits as not medically necessary because the "'why now' reason for the admission had been addressed," and "[w]hen the 'why now' reason for admission has been addressed, the care is considered custodial." App. Vol. 1 at 49 (stating that when "goals of admission" were "achieved, care became custodial, which is not a covered service.").

While the district court found that it could not "properly say" that the reviewers arbitrarily and capriciously concluded that A.K.'s three months of treatment at Discovery did not meet the "*why now*" factors, it ruled that "the care A.K. received at Discovery was not Custodial Care as defined by the Plan." App. Vol. 1 at 56 (emphasis added). It concluded that Defendants' "interpretations" of custodial care were "erroneous" and "a denial based thereon is arbitrary." App. Vol. 1 at 57. The district court consequently ruled that the "Defendants abused their discretion in finding that A.K's care had become 'Custodial' under the Plan." *Id*.

This conclusion is lent even more weight because the 'why now' factors do not control the determination of medical necessity. The Plan's terms control. And unlike the term "medical necessity," the 'why now' factors are not terms of the Plan. Instead, they are guidelines, meant to provide guidance to those interpreting the Plan.

While an insurer is permitted to rely on guidelines to make coverage decisions, it can do so only if the guidelines are not inconsistent with the plan's terms. *See Ariana M. v. Humana Health Plan of Tex., Inc.*, 854 F.3d 753, 761 (5th Cir. 2017); *Egert v. Conn. Gen. Life Ins. Co.*, 900 F.2d 1032, 1036 (7th Cir. 1990) ("[A]n administrator may establish and rely on procedures or guidelines so long as they reasonably interpret the plan."). The guidelines cannot "change the definition

of a term within a plan or effectively add requirements to that definition." *Weiss v. Banner Health*, 416 F. Supp. 3d 1178, 1186, 2019 U.S. Dist. LEXIS 159796, *15 (quotation marks and citation omitted)*; see also Saffle v. Sierra Pacific Power Co. Bargaining unit Long Term Disability Income Plan*, 85 F.3d 455, 459-60 (9th Cir. 1996) (explaining that guidelines cannot "effectively impose[] a new requirement for coverage" because that would amount to impermissibly rewriting the plan's terms *post hoc*); *Florence Nightingale Nursing Serv. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1483-84 (11th Cir. 1995) (finding it arbitrary and capricious when an analyst used a guideline definition not mentioned in the Plan to add additional requirements for coverage); *McGraw v. Prudential Ins. Co. of Am.,* 137 F.3d 1253, 1259 (10th Cir. 1998) (holding that ERISA plan fiduciary's failure to utilize the proper plan language or criteria in evaluating whether a plan beneficiary is entitled to benefits is an abuse of discretion).

Here, Defendants applied the 'why now' factors, not the Plan's terms for medical necessity. The 'why now' factors do not control because they are inconsistent with the Plan's definition of medical necessity. Medical necessity under the Plan explicitly includes services that are provided for the cure or relief of health *conditions*, not just especially pressing symptoms of those conditions. *See*

App. Vol. 1 at 7.[4] Discovery's services were provided to cure or provide relief for A.K.'s health conditions. As Plaintiffs' treatment teams, Dr. Mintz at McLean3East, and the IPRO external reviewers all noted, the goal to A.K.'s admission into Discovery was to provide "long-term residential treatment" until A.K. developed the tools she needed to break her years-long cycle of relapsing upon leaving an inpatient treatment setting. Supp. App. Vol. 7 at 133-134, 290, 292. Defendants' own reviewers, Ms. Dunning and Dr. Kho, tacitly agreed on this point when they both noted that A.K. required long-term treatment at a residential treatment center. App. Vol. 2 at 62; Supp. App. Vol. 7 at 11.

In any event, even if the 'why now' factors controlled the medical necessity determination, Defendants' argument would still fail. Despite Defendants' contention that A.K.'s residential treatment at Discovery was no longer medically necessary because "she had improved and developed coping skills to repress urges to harm herself," the pre-litigation appeal record shows precisely the opposite. Br.Aplt.38. For example, A.K.'s treating professionals *at Discovery*, Drs. Tim Lowe and Ryan Williams, stated that A.K. "struggles implementing the coping

---

[4] Courts in other jurisdictions have explicitly condemned 'why now' factors that direct claim administrators to extend coverage for care intended to address only the symptoms that precipitated a claimant's admission into residential treatment. *See, e.g., Wit v. United Behavioral Health*, 2019 U.S. Dist. LEXIS 35205, at \*84 (*S.B. v. Oxford Health Insurance, Inc.*, 419 F. Supp. 3d 344, 361-363 (D. Conn. 2019). And Defendants concede that they no longer use the 'why now' factors to make medical necessity determinations. Br.Aplt.7 n.1.

skills she is being taught" and that she "has not acquire[d] relaxation/coping skills to effectively manage stress/anxiety." Supp. App. Vol. 8 at 21. They warned that because A.K. "has not learned to regulate her mood outside a structured therapeutic facility," she "would return to old patterns of self-harm" if she were discharged early. Supp. App. Vol. 8 at 22. They consequently advised that A.K. "will need more time to learn and apply these skills" before she could be safely discharged to a less restrictive setting.  Supp. App. Vol. 8 at 21-23.

Likewise, Dr. Quinten J. Harvey, a Ph.D. who performed a comprehensive psychological assessment of A.K. while she was at Discovery, advised that because of the "connection between [A.K.'s] anxiety and maladaptive behaviors, *continued* monitoring of her abilities to implement adaptive coping skills during times of stress is critical." Supp. App. Vol. 7 at 280; 250, 281 (emphasis added). He further concluded that "it was critical that [A.K.] *continue* to benefit from a predictable, structured lifestyle." Supp. App. Vol. 7 at 281(emphasis added).

Indeed, before A.K. was admitted to Discovery, her treating professionals consistently and uniformly advised that she needed long-term residential care to properly learn and apply coping skills. For example, Kimberly Weaster cautioned that "[a]lthough historically [A.K.] improves while in the residential treatment milieu," she is "precariously balanced and quickly regresses to self-injury and suicidal thoughts and/or behaviors when not in a monitored 24-hour a day

therapeutic setting." Supp. App. Vol. 7 at 291. Dr. David Riedel likewise warned that A.K. will "decompensate upon discharge due to her not having been able to internalize and consolidate gains." Supp. App. Vol. 7 at 290. And Dr. Andrew Diederich advised that A.K. "cannot make the needed changes unless [she is] in a single consistent program that will keep [her] until [she] can develop the needed skills to be safe." Supp. App. Vol. 7 at 292.

Defendants' own internal records further demonstrate that their denials based on medical necessity were unsupported. For example, Dr. Baker noted that he based his denial in part on his observation that A.K.'s "chart is absent of treatment plan updates that review her progress in attaining her objectives." He found that "[u]pdated goals or objectives are never stated" and "[o]f significance is the absence of notes relating to her progress in controlling suicidal threats, runway behavior and self-injurious behavior." But as the district court noted, the "absence of evidence is not evidence of absence." App. Vol. 1 at 59-64.

The actual reason for A.K.'s admission, as IPRO determined, was so that she could receive "specialized treatment to better insure that she would be able to improve and sustain the improved coping skills and emotional regulation needed to exist outside of a 24-hour setting without being a high risk of harm to herself again." Supp. App. Vol. 7 at 145. Defendants' third and fourth denial rationales do not indicate that these goals had been met simply because she had not injured

herself while she was receiving 24-hour care. In short, the district court correctly ruled that Defendants incorrectly interpreted and applied the terms of the Plan.

**B.    The District Court Correctly Ruled that Defendants' Denials Were Arbitrary and Capricious Because They Lacked Any Analysis, Let Alone a Reasoned Analysis.[5]**

Defendants argue next that the district court erroneously determined that their denial letters did not comply with ERISA's requirements. Br.Aplt. 38-39. They assert that they did comply with ERISA's requirements because "each reviewing psychiatrist found that continued residential treatment was medically unnecessary; referenced specific medical necessity requirements from the Plan and Guidelines; and explained why those requirements were unmet, pointing to record facts such as A.K.'s treatment notes and plan." *Id.* at 38-39. But because Defendants failed to address the district court's decision or otherwise explain why the district court's decision was wrong on this point, this Court should not address Defendants' argument, and should affirm.

The district court determined that Defendants abused their discretion because their denial letters did not contain specific citations to the medical record, lacked a reasoned analysis, and contained mere conclusory statements. App. Vol. 1 at 59. Even though the district court determined that it "would be improper" to flesh out Defendants' denials by relying on the "full reasoning" located in the

---

[5] This Section addresses Argument I.B. in Defendants' opening brief.

claim administrator's internal notes that were not communicated to Plaintiffs, the

district court nevertheless concluded that "[e]ven were the court to consider those

additional materials, the court is unpersuaded that the internal documents make any

difference" because the internal notes' reasoning "undermine[s] the denial letters'

conclusions and assertions." App. Vol. 1 at 59-60. The district court then gave

several examples of statements in the internal notes that were either "misleading"

or "directly contrary" to the denial letters. *Id.*

Defendants, however, do not engage with the district court's consideration

of their internal documents. Indeed, Defendants do not even acknowledge that the

district court evaluated whether the reasoning in their internal case notes could

save their conclusory and unsupported denial letters. Instead, Defendants argue

that the district court erred because it "refused to consider the reviewers' Case

Notes…." Br.Aplt.41-42. But as shown, this is factually incorrect.

Because Defendants did not address the district court's reasoning, this Court

should not address Defendants' challenge on this point. "The first task of an

appellant is to explain to us why the district court's decision was wrong." *Nixon v.

City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015). When an appellant

fails to do so, the reviewing court will not review the claim. *See Reedy v. Werholtz*,

660 F.3d 1270, 1275 (10th Cir. 2011) ("The argument section of Plaintiffs'

opening brief does not challenge the court's reasoning on this point. We therefore

do not address the matter."); *see also United States v. Kunzman*, 54 F.3d 1522, 1534 (10th Cir. 1995) ("It is insufficient merely to state in one's brief that one is appealing an adverse ruling below without advancing reasoned argument as to the grounds for the appeal."); *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1050 n.18 (10th Cir. 2011) (holding that because appellant "failed to present any argument or authority in support of this particular … claim, we decline to further consider it on appeal"); *Sanchez v. Beaver Cty. Sheriff*, 856 Fed. Appx. 777, 779 (10th Cir. 2021) (declining to consider appellant's argument because he failed "to explain what was wrong with the reasoning that the district court relied on in reaching its decision").

The district court was correct in any case. Defendants may not rely on evidence not communicated to Plaintiffs. "Receiving a 'full and fair review' requires 'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.'" *Sandoval v. Aetna Life & Casualty Ins. Co*., 967 F.2d 377, 382 (10th Cir. 1992) (quoting *Sage v. Automation, Inc. Pension Plan & Trust,* 845 F.2d 885, 893-94 (10th Cir. 1988)). This means that the claims administrator "must provide the claimant … with any new or additional evidence considered, relied upon, or generated by the plan or issuer (or at the direction of the plan or issuer) in connection with the claim," and it "must be provided as soon as possible

and sufficiently in advance of the date on which the notice of final internal adverse benefit determination is required to be provided … to give the claimant a reasonable opportunity to respond prior to that date." 29 C.F.R. § 2590.715-2719(b)(2)(ii)(C)(2). Defendants did not provide Plaintiffs with the additional reasoning in their internal records. Even if the district court had not considered Defendants' internal records, it would have been right to hold Defendants to the reasoning articulated in their denials.

### C.    The District Court Correctly Ruled that Defendants Did Not Engage with the Opinions of A.K.'s Treating Professionals.[6]

Defendants also argue that the district court erroneously determined that their denials were arbitrary and capricious because they did not engage with A.K.'s medical professionals' opinions. Br.Aplt. 39-43. According to them, they were not required to "'affirmatively respond to' the claimant's submissions and arguments," but "need only take them 'into account.'" Br.Aplt.39 (quoting 29 C.F.R. § 2560.503-1(g)(1)(vi)). Again, Defendants failed to address the district court's decision or otherwise explain why the district court's decision was wrong on this point. This Court should consequently not address Defendants' argument, and affirm.

---

[6] This Section addresses Argument I.B. in Defendants' opening brief.

The district court determined that Defendants abused their discretion because they did not "fairly engage" with A.K.'s treating physician's opinions. App. Vol. 1 at 59. Relying on the Tenth Circuit's "'narrow principle that fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggest that the information might confirm the beneficiary's theory of entitlement,'" the district court concluded that Defendants failed to credit A.K.'s "extensive" 20-month medical history and her providers' letters that demonstrated her prior treatment had been "insufficient to keep A.K. from reverting to self-harming behavior." *Id*. (quoting *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004)). While the court recognized that Defendants' denial letters stated that they reviewed A.K.'s treating physicians' letters, "[w]hether Defendants engaged with those opinions is an entirely different matter." *Id*. Because "the only reference to all of A.K.'s treatment and professionals' opinions is a passing reference stating that the purpose of the treatment was to 'consolidate' A.K.'s 'gains,'" "this strikes the court as an instance where Defendants 'shut their eyes to readily available information when the evidence in the record suggest that the information might confirm the [Plaintiffs'] theory of entitlement.'" *Id*. (quoting *Gaither*, 394 F.3d 792, 807 (10th Cir. 2004) (alteration in original)).

Defendants fail to address the district court's reasoning. For example, they do not argue that they did *not* "shut their eyes to readily available information," *Gaither*, 394 F.3d at 807, try to distinguish *Gaither*, or otherwise argue that *Gaither* does not apply to this case. Defendants do not even cite to *Gaither* once in their brief. Because Defendants did not address this controlling precedent or the district court's reasoning, this Court should not address Defendants' challenge on this point. *See Sanchez*, 856 Fed. App'x. at 779 (declining to consider appellant's argument because he failed "to explain what was wrong with the reasoning that the district court relied on in reaching its decision"); *Reedy*, 660 F.3d at 1275.

In any event, the district court was correct. ERISA underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2). Receiving a "'full and fair review' requires 'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by *both* parties prior to reaching and rendering his decision.'" *Sandoval v. Aetna Life & Casualty Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (quoting *Sage v. Automation, Inc. Pension Plan & Trust,* 845 F.2d 885, 893-94 (10th Cir. 1988)) (emphasis added). The "plan administrator has a fiduciary

duty to the insured to conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim." *Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1324 (10th Cir. 2009); *see also Gaither*, 394 F.3d at 807-08 ("While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them.").

ERISA thus "sets forth a special standard of care upon a plan administrator" to "discharge [its] duties … *solely in the interests of the participants and beneficiaries* of the plan…." *Metro. Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2350, 171 L. Ed. 2d 299 (2008) (emphasis added) (quoting § 1104(a)(1)). Plan administrators consequently "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834.

Here, Defendants "arbitrarily refuse[d] to credit" Plaintiffs' "reliable evidence, including the opinions of [A.K.'s] treating physician." *Id.* As the district court rightly noted, Defendants could not have "fairly engage[d]" with A.K.'s submitted evidence when Defendants' only reference to all of A.K.'s treatment and professionals' opinions is one "passing reference stating that the purpose of the treatment was to 'consolidate' A.K.'s 'gains.'" [Dec.15]. Defendants failed to address anything else in the hundreds of pages of A.K.'s medical records, her treating practitioners' numerous letters and recommendations, and A.K.'s

psychological and psychiatric evaluations, even though they all uniformly stated that without lengthy residential treatment at Discovery, A.K. would regress and self-harm. App. Vol. 1 at 57-59. Indeed, although Defendants argue on appeal that they did take Plaintiffs' evidence into consideration, they also inconsistently argue that they were *not* required to take into account A.K.'s medical "symptoms" "leading up to her admission to Discovery" because those materials "logically do not dictate whether continued residential treatment is needed after" A.K.'s admission. Br.Aplt.39-40. In other words, Defendants insist that they need *not* "credit" Plaintiff's reliable evidence, even when her "symptoms" at admission to Discovery dictated what her goals for discharge would be. *Black & Decker Disability Plan*, 538 U.S. at 834. They are wrong. The district court correctly concluded that Defendants failed to engage with Plaintiffs' evidence. *Sandoval,* 967 F.2d at 382. *See also Rasenack*, 585 F.3d at 1326 ("AIG cherry-picked the information helpful to its decision to deny Mr. Rasenack's claim and disregarded the contrary opinions of the medical professionals who examined, treated, and interviewed Mr. Rasenack.").

Defendants also attempt to distance their obligation to not dismiss Plaintiffs' evidence out of hand by arguing that ERISA's medical benefits regulations are less onerous than ERISA's disability benefits regulations. *See* Br.Aplt. 39, 41-42 (citing *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 589 n.7

(10th Cir. 2019) (unpublished)). The only authority they cite for that proposition, however, is found in a footnote of an unpublished decision. *Id*. As such, it is not binding authority on this Court. *See* Tenth Cir. R. App. P. 32.1(A) ("Unpublished decisions are not precedential.").

But in any event, the footnote in *Mary D.* is wrong. *Mary D*. supposed that because the federal regulations governing adverse benefits determinations for disability benefits and health benefits slightly differ, that they are "inapposite." 778 F. App'x at 589 n.7. It noted that the federal regulations require adverse benefits determinations for disability benefits to state the basis for disagreeing with or not following the views of claimants' treating professionals while the federal regulations provide that adverse benefit determinations for health benefits must include an explanation of the scientific or clinical judgment for the determination, "applying the terms of the plan to the claimant's medical circumstances…." *Id*. (comparing 29 C.F.R. § 2560.503-1(g)(1)(v) with 29 C.F.R. § 2560.503-1(g)(1)(vii)). But this is a distinction without a difference. The federal regulations require adverse health benefit determinations to "apply[] the terms of the plan to the claimant's *medical circumstances*…." § 2560.503-1(g)(1)(v) (emphasis added). This necessarily requires claim administrators to engage with the claimants' treating professionals' opinions.

Indeed, there is no distinction between disability and group health plans with respect to a full and fair review. The need for ERISA plans to strictly comply with ERISA's claims procedure regulations and engage in a more substantive dialogue with both health and disability claimants has been made clearer in the past decade. *See* 29 C.F.R. § 2590.715-2719(b)(2)(ii)(C) – (F). In fact, the Department of Labor issued guidance in 2016 explaining that it was *strengthening* its disability benefit plan rules to align more closely with the group health plans. It stated that its rule "revises and strengthens the current rules primarily by adopting certain procedural protections and safeguards for disability claims that are currently applicable to claims for group health benefits pursuant to the Affordable Care Act." Claims Procedure for Plans Providing Disability Benefits, 81 Fed. Reg. 92,316 (Dec. 19, 2016).

The district court consequently correctly ruled that Defendants arbitrarily and capriciously denied A.K. benefits because they did not engage with her treating professionals' opinions.

**D.    The District Court Correctly Ruled that Defendants Arbitrarily and Capriciously Denied Plaintiffs Benefits Because Their Denial Letters Were Inconsistent.**

Defendants argue that the district court incorrectly determined that their denial letters were inconsistent. *Id.* at 47-50. Defendants again failed to address the district court's decision on this ground or otherwise explain why the district court's

decision was wrong. This Court should consequently not address this argument as well, and affirm.

The district court concluded that Defendants' denials were arbitrary because the denials' "shifting and inconsistent rationale is arbitrary and capricious." App. Vol. 1 at 66, 64 (relying on *Tracy O.*, 807 F. App'x at 853-854, for the proposition that "one of the factors that a court must consider in [an] ERISA benefits decision is the consistency of the denial reason between the administrators"). The court gave three reasons why the denials were inconsistent. First, the district court concluded that the first two reviewers did conduct a medical necessity review and their denial letters "stand in direct opposition to the final three letters." App. Vol. 1 at 65. Second, the district court also determined that the "final external denial letter's rationale is different from the third and fourth denial letters" because the external reviewer found that "A.K's 'remainder in a residential setting' was not 'the safest and most effective level of care' [when] her conditions 'could have been managed at a therapeutic school with intensive outpatient behavioral supports,'" while the third and fourth reviewers denied A.K.'s benefits on the ground that "A.K.'s care had 'become custodial.'" *Id*. (quoting Supp. App. Vol. 7 at 111, 160). And third, the district court found that the denial letters were inconsistent because the defunct exclusion for residential treatment was the only difference between the versions of the Plan. App. Vol. 1 at 66.

Defendants do not acknowledge all three reasons that the district court determined made the denials inconsistent, let alone challenge the district court's decision on all three points. This Court should consequently decline to consider Defendants' argument. *See Sanchez*, 856 Fed. Appx. at 779 (declining to consider appellant's argument because he failed "to explain what was wrong with the reasoning that the district court relied on in reaching its decision"); *Bird v. Regents of N.M. State Univ.*, 619 Fed. App'x 733, 766 (10th Cir. 2015) (affirming decision below where appellants "generally have not addressed or challenged the court's extensive reasoning").

Instead, Defendants contest only the first reason that the district court gave, arguing that their "initial denial of coverage based on an obsolete Plan exclusion was not inconsistent with [their] subsequent medical necessity determination." Br. Aplt. 29. This is so, Defendants assert, because the first two reviewers did *not* analyze whether A.K.'s treatment at Discovery was medically necessary. Br.Aplt.48. According to Defendants, the reviewers' statement that A.K.'s long-term treatment "appears" necessary means "that the first two reviewers did *not* analyze whether A.K.'s treatment at Discovery was 'medically necessary.'" *Id*. (emphasis in original). But even if the word "appears" could be so construed, Defendants' internal records refute this assertion. For example, UBH internal records for Plaintiffs' first appeal provide that Dr. Kho concluded that "[b]ased

57

upon the current medical records, the patient *requires* mental health residential long-term level of care but due to excluded service, a denial will be submitted." [R.480] (emphasis added). Another note likewise provided that Dr. Kho determined that A.K. "DOES MEET criteria for medical necessity/CDG but is denied due to an excluded service." Supp. App. Vol. 5 at 209 (capitalization in original). Defendants' internal records clearly show that Dr. Kho determined that A.K.'s care was medically necessary. And as the district court ruled, that determination was inconsistent with Defendants' later denials stating that A.K.'s care was *not* medically necessary.

A denial of benefits is arbitrary and capricious when the plan administrator fails "to consistently apply the terms of an ERISA plan," or its interpretations of the Plan's terms are "inconsistent with the plan's unambiguous language." *Tracy O.*, 807 Fed. Appx. at 854 (citing *Owings*, 873 F.3d at 1213 (10th Cir. 2017) (holding that shifting interpretations of "disability" was arbitrary and capricious). Defendants' shifting denial rationales were inconsistent here and the district court consequently correctly ruled that Defendants' denials were arbitrary and capricious.

### III.   THE DISTRICT COURT WAS WELL WITHIN ITS DISCRETION TO ORDER DEFENDANTS TO PAY FOR A.K.'S TREATMENT AT DISCOVERY

Defendants finally argue that the district court abused its discretion in awarding Plaintiffs benefits because it should have instead remanded the case to the claim administrator to reevaluate Plaintiffs' claim for benefits. *See* Br.Aplt. 50-57. They assert that remand is "the proper remedy unless it 'is so clear-cut that it was unreasonable' to deny benefits," and that here, they had a "colorable" claim that required remand. Br.Aplt. 51, 54 (quoting *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1121 (10th Cir. 2006)).

The district court disagreed. It concluded that the "appropriate relief" in this case was to order Defendants to pay for A.K.'s treatment. App. Vol. 1 at 66-67 (capitalization and emphasis removed). This was because, the district court reasoned, a remand to the claims administrator was "not necessary" when the "basis for the court's decision" were that Defendants' "denials were arbitrary and capricious," and that they gave "inconsistent denial rationales and erroneously interpreted and applied the Plans' [sic] terms." *Id.* Under these circumstances, the district court ruled, remand was not necessary. *Id.* (citing *Caldwell*).

When a plan administrator's decision is overturned as arbitrary and capricious, reviewing courts may either remand the case to the plan administrator "for a renewed evaluation of the claimant's case" or they may order an award of

benefits. *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006). "Which of these two remedies is proper in a given case, however, depends upon the specific flaws in the plan administrator's decision." *Id.* If the plan administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision, for example, then the "proper remedy is to remand the case for further findings or additional explanation." *Caldwell*, 287 F.3d at 1288. But "if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1194 (10th Cir. 2007); *see also Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005); *Caldwell*, 287 F.3d at 1289.

Here, as the district court correctly noted, the "specific flaws" in Defendants' decision were not that Defendants failed to make adequate factual findings. *Caldwell*, 287 F.3d at 1288. Rather, the flaws were that Defendants' "denials were arbitrary and capricious," and that they gave "inconsistent denial rationales and erroneously interpreted and applied the Plans' [sic] terms." App. Vol. 1 at 66-67. Under these circumstances, "the evidence in the record clearly shows that the claimant is entitled to benefits" and an order awarding such benefits is appropriate." *Flinders*, 491 F.3d at 1194. *See also Weber v. GE Group Life Assur. Co.,* 541 F.3d 1002, 1015-1016 (10th Cir. 2008) (holding that "district court

correctly decided to award Mr. Weber the death benefits" because "GE's interpretation of the eligibility and actively at work requirements was unreasonable"). Defendants' interpretation and application of the Plan were "unreasonable," and they should not be afforded a fifth bite at the apple. *Weber,* 541 F.3d at 1015-1016.

Plaintiffs have already exhausted their obligations to appeal Defendants' denial letters and that Defendants have already either met or failed to meet their obligations to provide Plaintiffs with the "specific *reasons*" for their denials. For the Court to allow Defendants to come up with different reasons to deny Plaintiffs' claims after Plaintiffs have already exhausted their administrative obligations violates both the spirit and the letter of ERISA's claims procedure regulations. Further, it perversely incentivizes similarly situated defendants to continually deny claims for spurious reasons – secure in the knowledge that they will receive additional "bites" at the proverbial apple even if plaintiffs' administrative obligations are long-extinguished and Plaintiffs' right to vindication in Court has been triggered.

While ERISA treats plan administrators as somewhat analogous to administrative agencies during a claimant's prelitigation appeals, the text of ERISA itself "does not contain any provisions governing remands to plan administrators once those actions have been initiated, nor does it explain how

judicial review of determinations made on remand is to occur." *Mead v. Reliastar Life Ins. Co.*, 768 F.3d 102, 112 (2nd Cir. 2014). This strongly contrasts with the regulatory frameworks governing *actual* administrative agencies, and as courts in other districts have noted, runs a significant and problematic risk of creating an unfair "heads we win; tails, let's play again" system of benefits adjudication in favor of defendant insurance companies. *Tam v. First Unum Life Ins. Co.*, 2020 U.S. Dist. LEXIS 186477 (C.D. Cal. 2020) (citation and internal quotation marks omitted). Further, remanding this case to Defendants would likely run afoul of the Article III of the United States Constitution's language prohibiting federal courts from issuing advisory judicial opinions as opposed to final judgments of conclusive character on meritorious civil actions. *See* U.S. Const. Art. III. As the Supreme Court noted in *Aetna Life Insurance Co. v. Haworth*, "[w]here there is [ ] a concrete case admitting of an immediate and definitive determination of the legal rights of the parties" in the context of a civil dispute over insurance benefits, the case may be appropriately resolved by an declaratory judgment addressing the dispute. 300 U.S. 227, 241-44 (1937).

The district court did not abuse its discretion. The Court should affirm.

## CONCLUSION

For the foregoing reasons, the Court should affirm.

/s/ Brian S. King
BRIAN S. KING P.C.
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: 801-532-1739
Facsimile: 801-532-1936
brian@briansking.com

*Counsel for Appellees*

**STATEMENT REGARDING THE NEED FOR ORAL ARGUMENT**

Pursuant to 10th Cir. R. 28.2(C)(2), the Appellants provide the following statement regarding their request for oral argument in the above captioned appeal.

Plaintiffs request the opportunity to present oral argument in support of their claim. This case involves the interpretation of ERISA, a complex statute, and among other things, the issues of what remedy is available when a Plan or insurer utilized incorrect criteria to determine eligibility for benefits. The matter is of significant importance in the Tenth Circuit in light of the fact that several million individuals in the Circuit receive employee welfare benefits. This Court's interpretation of ERISA and its regulations is important to these individuals.

DATED this 16th day of February 2022.

/s/ *Brian S. King*
Brian S. King

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   [x] this brief contains 12,860 words, including the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

   [ ] this brief uses a monospaced typeface and contains ___ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [x] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point New Times Roman, or

   [ ] this brief has been prepared in a monospaced typeface using [word processing program] with [characters per inch and type style].

Dated this 16th day of February, 2022.


 */s/ Brian S. King*
Brian S. King

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

1. all required privacy redactions have been made per 10th Cir. R. 25.5;

2. if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

3. the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, AVG which is updated on a daily basis, and according to the program are free of viruses.

  /s/ *Brian S. King*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served to all parties registered to receive court notices via the Court's CM/ECF system.

At such time as the Court accepts the Appellees' filing, bound copies of the brief and appendices will be ordered and delivered to the Court and counsel for the Appellants.

Date: 2/16/22

  /s/ *Brian S. King*
Brian S. King
**BRIAN S. KING, PC**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com